**RUBINSTEIN & COROZZO, LLP**
COUNSELORS AT LAW

RONALD RUBINSTEIN
JOSEPH R. COROZZO

CARLA SANDERSON*
ALSO ADMITTED IN NEW JERSEY

260 MADISON AVENUE
22ND FLOOR
NEW YORK, N.Y. 10016

TELEPHONE (212) 545-8777
FAX (212) 679-1844
INFO@RUBCORLAW.COM

November 16, 2015

The Honorable Jack B. Weinstein
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Kamel Lambus*, 15-cr-382

Dear Judge Weinstein,

      I represent the defendant, Kamel Lambus, in the above captioned case. I write in response to the Government's letter dated November 12, 2015 to request a hearing on the issue of the legality of the separation orders in the above captioned case. While the BOP certainly controls conditions of confinement and decides whether to separate defendants, the separations in the instant case were instituted at the behest of the Government, pursuant to 28 CFR 524.72(f), solely for punitive purposes.[1] Such arbitrary and coercive action by the Government continues to interfere with Mr. Lambus's constitutional rights. Specifically, the ill-effects of the separations- in addition to- the everyday challenges of pretrial custody at the MDC include, excessive delays and restrictions for visits, sick call, stigmatization as an assumed Government informant, and court appearances. The most serious impact of the separations pertain to the defendants' ability to mount a defense as they are prevented from visiting the law library or discussing their case other than in a pre-planned co-counsel / co-defendant meeting. While the government asserts that these sporadic meetings obviate the need to lift the separations, such meetings cannot be held with the frequency necessary to review the evidence and discuss case strategy and therefore, the defendants are stifled with regard to the preparation of a joint defense.[2] The separations therefore constitute an additional barrier to the defendants presenting a defense of their choice should they chose to pose a joint-defense.

---

[1] Should the Government claim that it is the BOP and not the Government that decided to institute the separation at hand, the defense requests a hearing during which the defense can question the BOP officials to determine whether the separation was instituted for constitutionally valid reasons.

[2] The Government's request to move Shakeem Powell and Andre Mitchell out of the MDC and to the separate GEO facility further hinders the defendants' ability to meet during codefendant meetings.

<u>This Court should not defer to a decision by the BOP and/or the Government that lacks any other purpose other than to punish, coerce and hinder the defendants from preparation of a defense</u>

The Government's claim that the separations are in place to address security concerns or to avoid collusion in the instant matter is misplaced. The Government claims that the separations are required to prevent "separated defendants from being able to speak to each other outside the presence of counsel so as to ensure that they are not able to collude or otherwise conspire to direct others to commit further narcotics-related offenses, acts of violence, intimidate witnesses, or obstruct justice by destroying evidence." Government letter filed 11/12/15 at page 3. While the Government claims that these concerns are merited because the defendants are members of a drug dealing street gang- which is of questionable veracity in and of itself- there is no policy that all alleged members of narcotics conspiracies, racketeering enterprises, or gang be separated during pretrial detention. Thus, the Government's claims are likely applicable to a majority of inmates at the MDC and do not explain how Mr. Lambus who is charged with no violent crimes requires the separation while most other MDC inmates do not.

Indeed, the cases cited by the Government to support the claim that that Courts "routinely show deference to BOP determinations that separating co-defendants is an appropriate way to address security concerns" are strikingly distinguishable. Unlike the instant case where the defendants are charged solely with a narcotics conspiracy offense, the Government cited cases where Courts refused to disturb separations for defendants charged with seriously violent offenses- namely, murder, assaults and extortions relating to racketeering offenses. For instance, <u>United States v. Ashburn</u>, is of no relevance as the Court denied a motion to lift separations for defendants charged with multiple counts of: Hobbs Act Robbery, use of a firearm, murder in aid of racketeering, and assault with a dangerous weapon in aid of racketeering. 2014 WL 1800409, at *14 (EDNY May 6, 2014). Similarly, in the multi-defendant racketeering case, United States v. Marino, defendants were charged with numerous counts of extortions involving threats of violence, assaults in aid of racketeering, and interference with commerce by threats of violence the Government agreed to lift separations on all defendants- despite being charged with these violent crimes- save defendant Marino. 09-CR-1243 (LAK)(Dkt. #150)(SDNY). Defendant Marino, who was charged with murder, was "a Mafia Boss who has a history of participating in violent crimes (including murder and obstruction of justice) from prison." Lastly, the Government claims that the Court's deference to the BOP's separation of defendants charged with multiple counts of 1) violent crime/machine gun use, 2) intentional murder using firearms, 3) murder in furtherance of a narcotics conspiracy, violent crime/machine gun use where death occurs. United States v. Williams, 2004 WL 1192086 at 1* (SDNY 2004). The Government's inability to supply analogous case law upholding separations where defendants are not charged with violent crimes reveals the frailty of its position.

<u>The claim that the separation is required for "security concerns" is baseless</u>

The Government's claim that the defendants are all "members or affiliates" of a drug-trafficking organization and street gang that refers to itself as the "Paper Chasing Goons"[3] or "Pov

---

[3] While the Government claims Paper Chasing Goons is a violent gang there is no evidence of this. On the contrary, the defendants used the PCG name for their music production. See Government submission page 4 citing PCG Entertainment.

City" is speculative and inaccurate. The Government merely cited inflammatory lyrics from a gangster rap song, a staged music video, and photographs of the defendants posing in a certain way, as proof of gang membership. At the outset, the Government failed to note that the subsection of the Jamaica Queens neighborhood that defendant Kamel Lambus is from has been nicknamed "Pov City" for over a decade. "Pov" is short for "poverty" as the neighborhood is historically marginalized and plagued with the problems of a poor, inner city neighborhood. Thus, many people from the area relate with the struggles of being from "pov city" and identify strongly with both the term and the ways of life one learns growing up there. Thus, at age 17 or 18, as a teenager, Kamel Lambus got his "Pov City" tattoo (the same tattoo that the government claims proves his gang membership in 2015). The Government similarly failed to inform the Court that rapper Cadillac Tah wrote a popular song called the "Pov City Anthem" in 2001 inspired by the Pov City neighborhood. Thus, merely because certain individuals may refer to a "Pov City Gang" does not mean that it is a "drug-trafficking organization" or "criminal enterprise" as defined by the United States Attorney's Office.

The Government argues that defendants are members of the purported "Pov City" or "Paper Chasing Goons" gang because of music videos posted on social media. The Government claims that these gangster raps about drug dealing, gun ownership, gangs and snitches prove the defendants' involvement. Apparently, the Government is unfamiliar with the genre of gangster rap music – artists such as Rick Ross, Jay Z, and numerous others- whose rhymes not only reference but glorify street life and the guns, drugs and violence associated with it. The Government failed to explain why the lyrics it cited from the "ManDown" song should be taken at face value while the majority of lyrics in this multimillion dollar gangster rap industry reference murder, violence, drugs, snitches and money.[4] The gratuitous and inflammatory lyrics cited by the Government cannot be considered for their truth or to justify the punitive separations in place. Likewise, the "PCG Gang" music video, featuring a rapper named "Chief All Over" in which Mr. Lambus appears at a table counting money appears staged to promote the gangster rap lifestyle. The Government further attached a series of photos posted by Scott Williams wherein Mr. Lambus is present and someone inserted the initials "P.C.G." on the photo. Mr. Lambus appears in the photographs posing or showing his middle finger. Neither the photographs nor the music videos prove Mr. Lambus' membership in a gang and they do not constitute evidence that he would collude to obstruct justice.[5]

Finally, the Government's reference to Mr. Lambus' 2003 conviction has nothing to do with his reputation in 2015 nor does it show an ability to "reach outside the prison and direct third parties to destroy evidence and intimidate witnesses."[6] Mr. Lambus never reached outside the prison to direct anyone to remove belongings from his apartment.[7] Instead, a friend of Mr. Lambus had learned on the day of his arrest that he was arrested and independently decided to remove his valuables that day from his home for safekeeping.

---

[4] The Government also cited a quote from another music video in which Mr. Lambus appears with lyrics "We PCG, we're the number one dope boys in NYC" as further grounds for why the separation is required.

[5] In fact, codefendant Shavona Trappier, was present at codefendant meetings and has since apparently taken a plea notwithstanding the fact that she was present with codefendants who are on planning to exercise their right to a trial.

[6] Those confined at the MDC awaiting trial are presumed dangerous or flight risks. The Government's claim that a separation is necessary because Kamel Lambus has a prior weapons possession conviction is difficult to believe considering the violent crimes charged against many detainees at MDC and their serious criminal histories.

[7] In fact, the Government has phone records that would reveal Mr. Lambus did not make calls the day of his arrest.

RUBINSTEIN & COROZZO, LLP

There are no grounds to support the Government's claims that there is a greater risk that Mr. Lambus would collude or obstruct justice than any other inmate. The jail house calls cited by the Government on September 13 and 14 do not contain any facts to support an inference that Mr. Lambus was attempting to intimidate a witness. Had the Government provided a full transcript of the conversations it would be clear that, rather than intimidate a witness, Mr. Lambus believed the witness had made false statements to the police about someone he knew and had lied about seeing drugs and guns at the person's apartment.[8] Mr. Lambus stated: "tell him..say yo remember the day that that kid [unintelligible] to bring weed and right after he pulled off, right after he pulled off, the police locked him and this girl up?" ..."say that to him and say son that kid lied to the police and told the police that he sees drugs and guns in Tiff's crib all the time." September 14, 2015 MDC call made by Kamel Lambus. This is a legitimate, and if true, extremely troubling concern, and Mr. Lambus- who was aware that his MDC calls are monitored- explained this concern without any insinuation that the person should be intimidated. Rather, Mr. Lambus wished the message to be conveyed to his friend to warn him about someone who had supplied the police with lies. Thus, the Government is incorrect with regard to its claims both that Mr. Lambus destroyed evidence or intimidated witnesses.[9]

For the above reasons, the separations must be lifted as they are arbitrary, unnecessary and punitive, and no grounds exist to justify the continuing infringement of Mr. Lambus' rights.

Very truly yours,

Ronald Rubinstein

---

[8] Both the September 13 and 14 calls were over 15 minutes long and Mr. Lambus expressed his concerns at around the ten minute mark of both calls and briefly discussed the matter in passing.

[9] The Government's raising Mr. Lambus's MDC administrative violation of obtaining additional phone minutes from other inmates to call his loved ones does not show Mr. Lambus will utilize co-defendants "to communicate and direct activities of his confederates outside the prison."

4