UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————————x

UNITED STATES OF AMERICA,


           -v-                                    Case No. 15-CR-382 (JBW)


KAMEL LAMBUS, *et. al.*

                    Defendants.
————————————————————————x


**DEFENDANT'S SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE FROM GPS
TRACKING DEVICE, WIRETAP INTERCEPTIONS,
AND ALL OTHER EVIDENCE DERIVED THEREFROM**


RUBINSTEIN & COROZZO LLP
260 Madison Avenue
New York, NY 10016

*Attorneys for Defendant,*
*          Kamel LAMBUS*

i

## TABLE OF CONTENTS

I.   THE GPS LOCATION DATA ACQUIRED FROM LAMBUS, AND ANY OTHER EVIDENCE DERIVED THEREFROM, MUST BE SUPPRESSED AS HAVING BEEN OBTAINED IN BLATANT VIOLATION OF HIS FOURTH, FIFTH, AND FOURTEENTH AMENDMENT RIGHTS, THROUGH THE UNLAWFUL ACTIONS OF STATE PAROLE OFFICERS AND FEDERAL AGENTS ....................................... 3

  A.   Background ................................................................................................ 3

    1.   *Lambus Required To Start Wearing A GPS-Equipped Ankle Monitor As A "Special Condition" Of His State-Imposed Term Of Post-Release Supervision* ............................................................................................ 4

    2.   *Wiretap Applications Reveal Ankle Monitor On Lambus Was In Fact Used Primarily By Federal Agents For The Purpose Of Conducting Warrantless GPS Tracking Surveillance On Lambus For A Period In Excess Of Two Years As Part Of Their Investigation For This Case* ............................................ 5

    3.   *Further Discovery Confirms That The GPS Monitoring Condition Was Administratively Imposed By DOCCS Without Any Apparent Justification Or Authorization And Without Any Form Of Process, Possibly at The Behest Of Federal Agents* ...................................................................................... 6

  B.   The GPS Evidence Must Be Suppressed As Tainted By The Unlawful Actions of The State (DOCCS), Which Violated Defendant's Right to Due Process And His Right Against Unreasonable Search and Seizure .............................................. 11

  C.   The GPS Evidence Must Also Be Suppressed Because Federal Agents Independently Violated Defendant's Fourth Amendment Rights Through Their Own Use Of The Device To Conduct Continuous GPS Tracking Surveillance Without Judicial Authorization ........................................................... 16

II.  THE WIRETAP AFFIDAVITS CANNOT SUPPORT A FINDING OF PROBABLE CAUSE BASED ON THE CONCLUSORY STATEMENTS THAT ARE LEFT AFTER ALL OF THE UNLAWFULLY OBTAINED EVIDENCE, MATERIALLY FALSE STATEMENTS, AND MISLEADING INFORMATION IS REMOVED FROM WITHIN THEIR FOUR CORNERS ....................................................................... 20

  A.   Materially False or Misleading Statements and Omissions ...................................... 21

    1.   *106th Road Incidents on May 2, 2014* ................................................... 21

    2.   *Search Warrant and Arrests at 107-53 Watson Place on July 1, 2014* .................. 21

    3.   *Misleading Omissions and Mirepresentations Regarding the Targets Themselves and The Nature of "Associations"* ................................................ 22

      4. *Materially False Statements Regarding The Origins and Timeline of the Investigation* .................................................................................................... 24

   B.   Vague and Conclusory Allegations ............................................................. 24

      1.  *Alleged Heroin Sale by Scott Williams on November 10, 2014 Based on Information from Unspecified Source* ................................................ 25

      2.  *Alleged Heroin Sale by Tiheem Crocker in February 2014 Based on Information from Unspecified Source* ................................................ 25

      3.  *Targets With No Apparent Connection to Any of The Factual Allegations in the Wiretap Affidavits* ..................................................................... 26

   C.   Unlawfully Obtained Evidence .................................................................... 27

      1. *The Cell Phone Analysis* .......................................................................... 27

      2. *The GPS Evidence* .................................................................................... 28

**CONCLUSION** ................................................................................................... **29**

# Cases

_Archer v. Comm'r of Correction of State of N. Y._, 646 F.2d 44 (2d Cir. 1981) ........................ 18

_Belleau v. Wall_, 811 F.3d 929 (7th Cir. 2016) ............................................................12, 17

_Doe v. Mass. Parole Bd._, 82 Mass. App. Ct. 851 (2012) ...........................................13

_Elkins v. United States_, 364 U.S. 206 (1960) ........................................................... 16

_Franks v. Delaware_, 438 U.S. 154 (1978) ................................................................20

_Gagnon v. Scarpelli_, 411 U.S. 778 (1973) .............................................................13

_Grady v. North Carolina_, 135 S. Ct. 1368 (2015) ......................................................... 11

_Horton v. California_, 496 U.S. 128 (1990) ............................................................17

_Illinois v. Gates_, 462 U.S. at 239 (1983) ..............................................................24

_Morrissey v. Brewer_, 408 U.S. 471 (1972) .............................................................13

_Riley v. California_, 134 S. Ct. 2473 (2014) ...........................................................28

_Rochin v. California_, 342 U.S. 165 (1952) .............................................................. 19

_Samson v. California_, 547 U.S. 843 (2006) ...........................................................13

_United States v. Bout_, 731 F.3d 233 (2d Cir. 2013) ...................................................... 19

_United States v. Broward_, 594 F.2d 345 (2d Cir. 1979) ............................................. 19, 20

_United States v. Brown_, 402 F.3d 133 (2d Cir.2005) ..................................................... 14

_United States v. Clark_, 638 F.3d 89 (2d Cir. 2011).......................................................24

_United States v. Cushnie_, 14-CR-119 (S.D.N.Y. Dec. 31, 2014) ..................................... 17, 18

_United States v. Gagnon_, 373 F.3d 230 (2d Cir. 2004) ...............................................25

_United States v. Hogan_, 712 F.2d 757 (2d Cir. 1983) .................................................. 19

_United States v. Jones_, 132 S. Ct. 945 (2012) ..................................................... 11, 16, 29

_United States v. Lambis_, 15-CR-734 (S.D.N.Y. July 12, 2016) .........................................28

_United States v. Leon_, 468 U.S. 897 (1984) ..............................................................20

_United States v. Marin–Buitrago_, 734 F.2d 889 (2d Cir. 1984).............................................20

_United States v. Myers_, 426 F.3d 117 (2d Cir. 2005) ............................................... 13, 14

_United States v. Porter_, 555 F. Supp. 2d 341 (E.D.N.Y. 2008) ....................................... 14, 15

_United States v. Restrepo_, 890 F. Supp. 180 (E.D.N.Y. 1995) ...................................................29

_United States v. Russell_, 411 U.S. 423 (1973) ............................................................... 18

_United States v. Salazar_, 945 F.2d 47 (2d Cir.1991). ................................................ 25

_United States v. Wagner_, 989 F.2d 69 (2d Cir. 1993) ............................................. 25

_Washington v. Glucksberg_, 521 U.S. 702 (1997) ........................................................13

_Wong Sun v. United States_, 371 U.S. 471 (1963) .................................................... 30

## Statutes

18 U.S.C. § 3117 .............................................................................................................. 16

21 U.S.C. § 841 ................................................................................................................. 2

9 NYCRR  § 8003.2 ........................................................................................................... 3

N.Y. Mental Hygiene Law, art. 10 .................................................................................. 3

NYS DOCCS Dir. No. 9000 ............................................................................................. 6

NYS DOCCS Dir. No. 9219 ............................................................................................. 3

U.S. Const. amend. IV, V, XIV ............................................................................... _passim_

## PRELIMINARY STATEMENT

On January 9, 2015, the Government sought and obtained the first of several Title III wiretap authorizations in its investigation of this case. Through this wiretap and subsequent intercept authorizations, which allowed law enforcement to conduct generalized surveillance on dozens of individuals for a period of about six months, the Government built a federal narcotics trafficking case by combining a handful of low level street deals into a single conspiracy indictment.

Most of the Targets and other individuals identified in the wiretap applications had only a tenuous, if any, relationship to one another; indeed, the single most important connection that many of them had in common was their physical proximity in a densely populated neighborhood of Queens, New York. If the Government were permitted to conduct the same generalized surveillance that was undertaken in this case on a university campus, it could very well indict every college dormitory in the nation on federal narcotics charges. This is not the purpose Congress had in mind when it enacted legislation authorizing wiretaps under Title III, nor is it an appropriate application of federal conspiracy statute.

Towards the end of its investigation, the Government sought several search warrants, all of which led to the seizure of relatively insignificant drug quantities from several Defendants, who were then lumped together in a conspiracy indictment for no other reason than to aggregate the weight of their low level street dealings into something more than just a few grams, and to trigger the federal statutory minimums at

21 U.S.C. § 841. Putting aside the unbelievable waste of resources directed towards this lengthy federal investigation into street-level drug dealers and addicts, the entire case was founded upon tainted evidence from the outset—stemming from the unauthorized GPS tracking surveillance conducted on Defendant Kamel Lambus, for a period in excess of two years (26 months).

Accordingly, this motion seeks to suppress the evidence obtained from: (a) the unauthorized GPS tracking surveillance on Lambus; (b) the wiretap authorizations, which were premised upon an impermissible combination of unlawfully obtained evidence, along with various misrepresentations, material omissions, and irrelevant distractions in the wiretap affidavits, that should not have been factored into the probable cause analysis; and (c) any and all other evidence that was subsequently derived from the GPS and/or wiretap evidence, which must be suppressed as fruit of the poisonous tree.

I. **THE GPS LOCATION DATA ACQUIRED FROM LAMBUS, AND ANY OTHER EVIDENCE DERIVED THEREFROM, MUST BE SUPPRESSED AS HAVING BEEN OBTAINED IN BLATANT VIOLATION OF HIS FOURTH, FIFTH, AND FOURTEENTH AMENDMENT RIGHTS, THROUGH THE UNLAWFUL ACTIONS OF STATE PAROLE OFFICERS AND FEDERAL AGENTS**

A. **Background**

In March 2012, Defendant Kamel Lambus ("Lambus") began serving a term of post-release supervision ("PRS") with the New York State Department of Corrections and Community Supervision ("DOCCS"), following his release from prison on a prior state controlled substance offense. During his first visit to the local community supervision office in Queens, New York, Lambus met with his assigned parole officer Trudy Kovics ("PO Kovics"), and agreed to observe certain standard conditions of release,[1] such as mandatory participation in routine drug screenings and nighttime curfew hours, with certain exceptions to accommodate his work schedule. *See Chronological Record of Post-Release Supervision* [*hereinafter "PRS Rep't," attached hereto as* **EXHIBIT A**], at 1. According to DOCCS records, Lambus reported on a bi-weekly basis as required and did

---

[1] *See* "Release Conditions," 9 NYCRR § 8003.2 (setting forth the standard conditions of release under New York's post-release supervision program). Although some offenders may be subject to more intensive forms of supervision and "special conditions" of release, the unexceptional nature of Lambus's prior state offense did not warrant the application of any such provisions or anything beyond the standard conditions of release at the time of his sentencing or release.

There is no particular regulatory or statutory provision that addresses whether or when DOCCS may administratively impose electronic monitoring absent some kind of judicial intervention or authorization; in fact, the only publicly available policy statement regarding the imposition of GPS monitoring in relation to DOCCS supervision program deals with the administration of Strict and Intensive Supervision and Treatment (SIST), in cases where the condition has been specifically imposed by a Court pursuant to state statutory provisions governing the release of recidivist sex offenders. *See* NYS DOCCS Dir. No. 9219 (Mar 17, 2014), at 1, 2 ("In order to enhance public safety . . . [and] in accord with the Court's instruction . . . the PO shall administer GPS monitoring in accord with SIST policy") (*citing* the "Sex Offender Management and Treatment Act," at N.Y. Mental Hygiene Law, art. 10), *available at* http://www.doccs.ny.gov/Directives/9219.pdf.

3

not appear to have any problems abiding by the conditions of his release. *See generally PRS Rep't*, at 1-2 (consistently noting "no problems," and "no drug use," etc. ).[2]

1. ***Lambus Required To Start Wearing A GPS-Equipped Ankle Monitor As A "Special Condition" Of His State-Imposed Term Of Post-Release Supervision***

On or about May 8, 2013, after having already served approximately 14 months of his PRS term, Lambus was placed on electronic monitoring as a newly imposed "special condition" of his release. The precise reasons and process which resulted in Lambus being placed on electronic monitoring cannot be discerned from any part of the documents or records that have been obtained from DOCCS, *see infra,* at pp. 6-11, though it is clear that the modification to his conditions of release was imposed without any kind of judicial intervention or administrative adjudication.[3] The parole officers who placed the GPS ankle monitor on Lambus at his local community supervision office told him that the device would be removed after 3-6 months, *see infra,* fn. 11. In the end, however, Lambus was subjected to 24/7 location monitoring for over two years (26 months), without any explanation as to why the condition could not be lifted, despite asking to have the ankle bracelet removed on multiple occasions (*see infra,* fn. 12)—up to and until July 8, 2015,

---

[2] According to DOCCS records, Lambus was only reported to have violated his conditions of his release on one occasion throughout the term of his post-release supervision, arising from an incident that occurred more than a year later, when he was arrested for playing dice with his friends outside of a deli on the Fourth of July in 2014. The DOCCS records relating to that incident state that he pleaded guilty to disorderly conduct and was ordered to pay a $350 fine. More importantly, the documents confirm that Lambus had not incurred any other previous violations up to and until that point in his PRS term. *See* <u>Violation of Release Report</u> (July 21, 2014) (indicating "no previous violations" throughout the course of his PRS term) [*attached hereto as* **EXHIBIT C**, at 2].

[3] Contrary to the Government's representations at the hearing held before this Court on May 6, 2016, it is now indisputably clear that the GPS condition was imposed without any kind of process or adjudication. *See* <u>Transcript of May 6, 2016 Hearing Before J. Weinstein</u>, at 8-9 [*attached hereto as* **EXHIBIT D**] (suggesting that there was an administrative "order," resulting from some kind of adjudication or other process).

when Lambus was arrested by federal agents in connection with the alleged narcotics conspiracy at issue in this case.

**2. *Wiretap Applications Reveal Ankle Monitor On Lambus Was In Fact Used Primarily By Federal Agents For The Purpose Of Conducting Warrantless GPS Tracking Surveillance On Lambus For A Period In Excess Of Two Years As Part Of Their Investigation For This Case***

Following the arrests in this case, the Government produced discovery materials relating to several wiretap and search warrant applications.[4] The affidavits in support of the wiretap applications were prepared by Special Agent Christopher Popolow ("Agent Popolow"),[5] and set forth the details of an investigation into a group of individuals' alleged dealings in firearms and narcotics trafficking.[6]

More importantly, these materials also revealed that the GPS device on Lambus was used by federal agents to track his whereabouts throughout the course of their investigation, and to support the probable cause analysis in their wiretap applications. *Wiretap 1 Aff.* at ¶ 71 ("[the] ankle bracelet [on Lambus]. . . provides location data for [his] whereabouts on a periodic basis . . .").

In light of the foregoing, the defense has been engaged in an ongoing effort to obtain additional information—from both the Government and from DOCCS—about the precise reason why Lambus was placed on electronic monitoring, and the nature of any federal involvement in that decision.

---

[4] *See generally* Govt' Letter Re Rule 16 Discovery (Aug. 20, 2015) (Dkt. 90).

[5] Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) Narcotics/Violent Gang Unit.

[6] *See Complete List of Wiretap Authorizations* [attached hereto as **EXHIBIT E**]; *see also Affidavit in Support of an Application for an Order Authorizing the Interception of Wire Communications* (Jan. 9, 2015) [*hereinafter "Wiretap 1 Aff"* attached hereto as **EXHIBIT F**].

3. ***Further Discovery Confirms That The GPS Monitoring Condition Was Administratively Imposed By DOCCS Without Any Apparent Justification Or Authorization And Without Any Form Of Process, Possibly at The Behest Of Federal Agents***

While the Government concedes that its agents engaged in warrantless GPS tracking surveillance throughout this investigation, neither DOCCS nor the Government has produced any official record or other definitive statement documenting the reasons why the electronic monitoring condition was imposed on Lambus in the first place. Indeed, the circumstances surrounding DOCCS' decision to impose the GPS condition remain entirely unclear, as does the process by which that decision was made. What *is* clear, however, is that the GPS device allowed federal agents to conduct 24/7 location monitoring on Lambus for over two years, without any kind of judicial authorization or oversight.

Meanwhile, the DOCCS records from his PRS term provide strong circumstantial evidence of possible federal involvement with the state parole authorities in charge of his supervision, starting in late 2012—just a few months before Lambus was placed on electronic monitoring. According to those records, Sr. Parole Officer and Investigator Thomas W. Scanlon ("SPO/Inv. Scanlon") in the DOCCS Bureau of Special Services ("BSS")[7] received information from an outside law enforcement agency about a pending investigation into Lambus, at some point around the first week of October 2012. *See PRS*

---

[7] The Bureau of Special Services (BSS) is a special investigative unit within DOCCS that "provides supportive services to Community Supervision . . . [and] assists with other law enforcement [agencies'] investigations." *See* NYS DOCCS Dir. No. 9000 (Oct. 16, 2015) *available at* http://www.doccs.ny.gov /Directives/9000.pdf.

*Rep't*, at 3 (noting that "Lambus is being investigated by [some] other [unspecified] law enforcement . . . they are searching his facebook profile, etc.").[8]

On or about April 5, 2013, SPO/Inv. Scanlon was again contacted by an unspecified law enforcement agency about a "confidential investigation" into Lambus and his suspected involvement in "illegal activities." *PRS Rep't*, at 5. As a result and at the direction of BSS, the local parole office ramped up its supervision efforts by conducting more frequent curfew and employment visits, drug screenings, and additional surveillance, both at his current residence and at another address, where Lambus had been planning to move in with his cousin, pending approval from his parole officer; SPO/Inv. Scanlon also requested that a search of his residence be conducted "for contraband and to determine if the residence of record resembles the location [in the above referenced facebook photos]." *PRS Rep't*, at 5-6.[9]

---

[8]  Despite the Government's previous representations that this investigation only began in 2013, it is now clear that the federal investigation into Lambus was well under way at that point, and was actually an off-shoot from an earlier investigation with warrant and wiretap applications dating back from November 2010 through July 2012. *See Gov't Letter Re Rule 16 Discovery* (May 11, 2016) (Dkt. 197, at Page ID 1856-59) (listing applications from prior investigation involving some of the same targets, from 2010 through late 2012); *see also, e.g., Information Sheet* (Dkt. 61-1, at Page ID 271, ¶ 8); *Gov't Letter Re Motion to Quash* (Aug. 10, 2016) (Dkt. 255, at Page ID 2193) (claiming DOCCS records dating back to 2012 as work product of this investigation); *but see Wiretap 1 Aff.* at ¶ 25 (initially claiming that the investigation of this case began "at some point in 2013 . . .").

[9]  *PRS Rep't*, at 5 ("4/5/2013 10:00 AM . . . residence to be searched"); *PRS Rep't*, at 6 (describing conferences held between BSS and the local supervision office to discuss case actions in light of information from confidential source that Lambus is involved in drug activities, "[5/2/2013 3:08 PM] continue periodic searches of residence . . . [5/3/2013 12:19 PM] not allowing subject to move to [new] residence on 75th Road, which [SPO/Inv. Scanlon] . . . suspects may be involved in drug activity . . . [instructing parole officer to conduct additional surveillance], curfew visits . . . urine will be consistently checked . . . subject will be confronted with verification of employment . . . [and] PO will conduct employment visits").

The Government has also produced a copy of an email exchange between SPO/Inv. Scanlon and several other parole officials from around the same time, but the subject line and contents of the email have been redacted in their entirety. *See Redacted Email from BSS, SPO/Inv. Scanlon* (Apr. 5, 2013) [*attached hereto as* **EXHIBIT G**].

None of these efforts proved to be especially fruitful—they actually did more to disprove than confirm any suspicions as to his involvement in illicit activities. A search of his residence conducted on April 9, 2013, did not yield any particularly incriminating evidence—save for a few marijuana roaches in a living room ashtray which did not belong to Lambus, as corroborated by the negative results of his subsequent urinalysis screening. *See* *PRS Rep't*, at 5.  As indicated in the record of his parole officers' "negative" surveillance visits at the new proposed residence on both May 3, 2013 and May 6, 2013, there were no noticeable signs of unlawful activity there either. *PRS Rep't*, at 5-6.[10] Nevertheless, the decision to place Lambus on electronic monitoring appears to have been made around that very same time.  *See* *PRS Rep't*, at 6 ("[5/6/2013 9:45 AM] case conference . . . [Lambus] to be placed on electronic monitor when he reports on 5/8/13").

At various points in the proceedings of this case, the Government has claimed that Lambus was placed on electronic monitoring after incurring a curfew violation on the evening of May 5, 2013. *See e.g.,* *Govt's Motion to Quash Subpoena* (Dkt. 208, at 2) (citing a record entry from the DOCCS case management system, wherein his parole officer notes that Lambus was not home when she conducted a curfew visit at 9:40 p.m. on the evening of May 5, 2013); *see also* *Transcript of May 6, 2016 Hearing Before  J. Weinstein*, at 8 [*attached hereto as* **EXHIBIT D**] (claiming that the GPS condition was imposed because Lambus violated his curfew). In another record entry from a few days later, however—an entry that was conveniently omitted in previous disclosures to the defense—his parole officer notes that Lambus was actually working that night and that his employer had even

---

[10] *See also* *PRS Rep't*, at 7 (showing that Lambus was eventually given permission to move into the new residence a few weeks later on May 23, 2013).

offered to report with him at the parole office in order to provide any necessary confirmation. *See PRS Rep't*, at 6 (May 8, 2016 2:30 PM).

The explanation that DOCCS gave Lambus is substantially different. According to Lambus, the GPS condition was imposed on him at the direction of his parole officer's supervisor—Bureau Chief and Area Supervisor Mark Parker ("SPO/AS-BC Parker")—who interrogated him about an internet photo from a social media website—and threatened to "violate" him (meaning that he would be sent back to prison) unless Lambus agreed to provide his "consent" for a 3-6 month period of electronic monitoring. *See Def's Aff*, at ¶ 16 [*attached hereto as* **EXHIBIT H**].[11] The version of events set forth by Lambus appears to be consistent with his parole officer's own record entries in the DOCCS case management system on that day.  *See PRS Rep't*, at 6 (May 8, 2013 4:15 PM) (noting that SPO/AS-BC Parker questioned him about a Facebook photo, which Lambus claimed was from 2009). A copy of that very photograph was subsequently produced by DOCCS along with the other previously undisclosed documents and records that had been kept in the files from his PRS term, *see Photograph of Kamel Lambus* [*attached hereto as* **EXHIBIT J**] (reflecting the exact contents of the photo described by Lambus in his earlier affidavit, at ¶ 12 as himself "holding a young girl who is holding what appears to be showing off a large sum of money") (produced to the defense on June 22, 2015, at Dkt. 212). Lambus was outfitted

---

[11]  In an affidavit filed with his initial suppression motion, Lambus claimed that the officers at his local supervision office told him that the GPS condition would be lifted after 3-6 months, *see Def's Aff, at ¶* 16 (originally filed as an attachment to his first motion to suppress on April 14, 2016, at Dkt. 173-2, Page ID 813-816, and attached hereto as Exh. H). The defense has since received additional records from his DOCCS file, including a report from Veritracks (the private vendor that provides GPS services to DOCCS) which essentially confirms that the GPS monitoring period was originally set to expire after six months. *See Veritracks Report* (August 7, 2013) [*attached hereto as* **EXHIBIT I**] (displaying the scheduled end date as November 8, 2013, exactly six months from the day that the device was initially placed on Lambus at his local supervision office).

with a GPS-equipped ankle bracelet that very same day and never received any other explanation as to why his parole office had introduced this new "special condition" to his supervision. Lambus was never reported to the Parole Board for any alleged violations of his conditions of release around that time, nor does it appear that he received any sort of hearing, or documentation regarding the decisional process that led to his sudden placement on electronic monitoring.

After about six months, Lambus asked to have the ankle monitor removed, but was told, without further explanation, that DOCCS was not ready to have the GPS condition lifted. _PRS Rep't_, at 9 (Oct. 23, 2013) (noting that Lambus "wanted to know when EM will come off," but that AS Parker told him "not yet."). Lambus inquired as to when the condition would be lifted on multiple other occasions over the next two years, but never received a definitive answer.[12] Lambus also claims that on one of those occasions, his parole officer said she "did not know what was going on," because the GPS decision was "above her," _Def's Aff_, at ¶ 22-24—which is more or less consistent with a record entry in DOCCS' case management system on April 16, 2014, _see PRS Rep't_, at 11 (noting that Lambus was "still upset . . . again asked when it will be removed, [but] PO does not know.").

This lack of clarity and apparent unwillingness to provide Lambus any straight answers in response to his repeated inquiries is especially troubling in light of other

---

[12]  _See, e.g._, _PRS Rep't_, at 10 (Dec. 18, 2013) ("again asked when EM would be removed . . . discussed [with] AS Parker," noting possibility of having device removed after holidays); _PRS Rep't_, at 10 (Jan. 8, 2014) ("again asked about GPS, PO will again [conference with] AS Parker"); _PRS Rep't_, at 10-11 (Feb. 5, 2014) ("again discussed EM/GPS; as per AS Parker, monitor cannot yet be removed"); _PRS Rep't_, at 11 (Mar. 5, 2014) ("again asked about EM, has been almost 11 months"); _PRS Rep't_, at 12 (June 25, 2014) (noting that Lambus again inquired about when the ankle monitor would be removed).

record entries which show that senior DOCCS officials at the highest levels of the agency had been apprised and consulted about the GPS situation. *See* <u>*PRS Rep't*</u>, at 9 (Sept. 23, 2013) (noting that a case conference was held with Assistant Commissioner Andrea Evans and Regional Director Michael Burdi); *see also* <u>*PRS Rep't*</u>, at 10 (Dec. 2, 2013) ("<u>***discussed GPS justification due to ongoing sensitive investigation***</u> . . .") (emphasis added).

On or about June 11, 2014, Lambus even wrote a letter to the Inspector General in DOCCS' Central Office, in which he explained that the ankle monitor had been placed on him more than a year ago and asked to have it removed. Although he never received a response, a copy of his letter was also among the documents that DOCCS recently produced pursuant to the defense subpoena. *See* <u>*Letter from Lambus to Inspector General, DOCCS Central Office*</u> [*attached hereto as* <u>**EXHIBIT K**</u>].[13]

**B. The GPS Evidence Must Be Suppressed As Tainted By The Unlawful Actions of The State (DOCCS), Which Violated Defendant's Right to Due Process And His Right Against Unreasonable Search and Seizure**

The Supreme Court's recent decisions clearly provide that the use of location monitoring and surveillance conducted with the assistance of GPS tracking technology is a Fourth Amendment search; this remains true regardless of whether the GPS device is used by law enforcement to track a suspect's vehicle during an investigation, as in <u>*United States v. Jones*</u>, 132 S. Ct. 945 (2012), or if it is imposed as a condition of release on a state parolee by requiring him to wear a GPS-equipped ankle bracelet as in <u>*Grady v. North Carolina*</u>, 135 S. Ct. 1368 (2015). In <u>*Grady,*</u> the Supreme Court unequivocally held that a

---

[13] *See also* <u>*PRS Rep't*</u>, at 12 (June 11, 2014) (noting that Lambus "[had] called Albany re ankle monitor, spoke to various people, [and] was told to send a letter to Inspector General's office . . . ").

State's imposition of GPS monitoring as a condition of parole for certain offenders is a

Fourth Amendment search:

> [The] State . . .  conducts a search when it attaches a [GPS]
> device to a person's body, without consent, for the purpose of
> tracking that individual's movements. . . . The State's program
> is plainly designed to obtain information. And since it does so
> by physically intruding on a subject's body, it effects a Fourth
> Amendment search.

<u>Grady</u>, 135 S. Ct. at 1370-71 (holding that GPS monitoring requirement imposed by state on

certain types of offenders after release from prison was a Fourth Amendment search;

remanding case back to the state courts for an initial determination on whether the GPS

condition amounted to a "reasonable" search, as applied to a recidivist sex offender in

accordance with state statute.) [14]

    Here, as in <u>Grady</u>, the GPS surveillance conducted on Lambus for over two years

was clearly a search under the Fourth Amendment; thus, the admissibility inquiry turns

on questions of reasonableness, such as (1) whether the DOCCS acted reasonably when it

modified his conditions of release to require that he start wearing a GPS ankle monitor in

May 2013, and (2) whether it was reasonable to extend the GPS condition from the initial

monitoring period of 3-6 months to 26 months. The defense respectfully submits that the

answer to both of these questions is a resounding NO. It was not reasonable—not at all.

---

[14] *See also* <u>Belleau v. Wall</u>, 811 F.3d 929, 935 (7th Cir. 2016) (finding that GPS monitoring of recidivist sex offender was reasonable in part because "the main objective was not to generate evidence *for law enforcement purpose*.") (emphasis in original); *id.* at 935-6 (making a clear distinction between the reasonableness of imposing the GPS condition for public safety reasons, and the separate question of whether law enforcement may use the "fruits of such surveillance techniques" for investigative purposes).

Although a warrantless search is per se unreasonable, the Fourth Amendment analysis in this case must also concededly account for any diminished expectation of privacy resulting from Defendant's post-release supervision status.[15] To that end, the framework for evaluating special conditions of release that implicate constitutionally protected interests under the Fourth and Fifth Amendments must reflect heightened constitutional concerns whenever such conditions touch upon fundamental liberty interests. _United States v. Myers_, 426 F.3d 117, 126 (2d Cir. 2005) ("If the liberty interest at stake is fundamental, a deprivation of that liberty is 'reasonably necessary' only if the deprivation is narrowly tailored to serve a compelling government interest.") (citing _Washington v. Glucksberg_, 521 U.S. 702 (1997)); _see also_ _Doe v. Mass. Parole Bd._, 82 Mass. App. Ct. 851, 858 (2012) (finding due process violation arising from modification of parolees' conditions of release where "there was no evidence . . . [of] any change in circumstances upon which to base the modification . . . [or] impose additional punishment in the form of GPS [monitoring] conditions.") (citing _Morrissey v. Brewer_, 408 U.S. 471, 482 n. 8 (1972) and _Gagnon v. Scarpelli_, 411 U.S. 778, 782 & n. 3 (1973) for the proposition that parolees have a substantial liberty interest and due process right in continued release absent restrictive and punitive conditions of GPS monitoring). Therefore, any such condition must be "reasonably related" to the reasons for its

---

[15] It bears noting that Defendant's status as a post-release supervisee is more akin to that of a probationer than to that of a parolee. _See_ _Samson v. California_, 547 U.S. 843, 850 (2006) (recognizing that probationers and persons subject to supervised release have a greater expectation of privacy than parolees since "parole is more akin to imprisonment than probation."). Therefore, the reasonableness of the GPS location monitoring in this case must also be weighed against the fact that Defendant was merely subject to a term of post-release supervision, as opposed to the potentially more onerous burdens and conditions of parole.

imposition.  *See* *United States v. Brown*, 402 F.3d 133, 136 (2d Cir.2005) (explaining that special conditions of federal supervised release must be reasonably related to, inter alia, "the nature and circumstances of the offense").

In the context of conditions involving such intrusive forms of supervision as GPS monitoring, the bar is set quite high, and any "reasonable" justification is almost always contingent upon legitimate public safety concerns. *See e.g.,* *United States v. Porter*, 555 F. Supp. 2d 341, 344 (E.D.N.Y. 2008) (upholding a condition of supervised release which required the defendant to wear a GPS-equipped ankle monitor in order to ensure compliance with other restrictions imposed on him regarding unsupervised contact with minors;  finding that the GPS condition was reasonably related to his underlying child pornography offense, and no greater a deprivation of liberty than was reasonably necessary, given the defendant's history of disobeying court-imposed restrictions and the fact that his supervised release had been revoked in the past after failing to account for his whereabouts, despite multiple, repeated, warnings and reminders). In the instant case, the GPS monitoring condition imposed on Lambus—which cannot be said to have been related to any legitimate public safety rationale—represents a significantly "greater deprivation of . . . liberty than [was] . . . reasonably necessary" to address any of the proffered explanations for its having been imposed.  *Myers*, 426 F.3d at 128.

In the end, it barely matters whether the GPS condition was imposed due to a curfew violation as the Government claims, or because of a photograph as DOCCS led Lambus to believe—or even at the behest of federal agents, as the record seems to suggest. Each of these theories has its own problems and implications, but not one is

capable of withstanding constitutional scrutiny. Even if Lambus had actually incurred a curfew violation, the Government's proffered explanation that the GPS condition was imposed for that reason is entirely implausible. It is hardly standard procedure for DOCCS to place an individual on GPS monitoring for a mere curfew violation. The defense is unaware of any other instance in which electronic monitoring has been imposed under similar circumstances, or any source of authority that supports such draconian measures. The alternative explanation that was given to Lambus at his local parole office was clearly pretextual, and is based on the contents of a photograph that was not exactly incriminating in and of itself. Any form of consent that Lambus may have provided arising out of that confrontation was quite obviously coerced and therefore invalid. Moreover, even if he had provided proper consent for the GPS device, it certainly did not extend to federal agents or contemplate an unlimited period of time. And while the record certainly tends to suggest that federal agents were somehow involved, the State's actions were equally unconstitutional under whichever one of these theories the Court chooses to adopt. None of the proffered reasons are "reasonably related" to public safety or any other legitimate concern that would justify 24/7 location monitoring and surveillance through the use of a GPS device, cf. _United States v. Porter_, 555 F. Supp. 2d 341, 344 (E.D.N.Y. 2008); and none of the proffered explanations provide ample justification for subjecting Lambus to continuous GPS location surveillance for over two years—certainly not without any form of process throughout that entire period, and without any other means through which Lambus could have contested the condition. There is simply no plausible explanation that could reconcile the constitutional defects in

the State's course of action with the basic due process rights afforded to parolees and probationers, or the reasonableness standards that govern the imposition of such intrusive special conditions of release.

It is long standing principle that federal law enforcement may not benefit from evidence that has been unlawfully obtained by the State in violation of a defendant's constitutional rights. *See* <u>*Elkins v. United States*</u>, 364 U.S. 206 (1960) (disposing of the "silver platter" doctrine as an exception to the Fourth Amendment's exclusionary rule). As such, the GPS evidence must initially be suppressed without regard to any other aspect of the analysis herein, as tainted evidence resulting from the State's unconstitutional course of action when it imposed the GPS condition on Lambus without justification, authorization, or any form of process.

**C. The GPS Evidence Must Also Be Suppressed Because Federal Agents Independently Violated Defendant's Fourth Amendment Rights Through Their Own Use Of The Device To Conduct Continuous GPS Tracking Surveillance Without Judicial Authorization**

The GPS evidence must also be suppressed because of the independent violation of Defendant's right against warrantless GPS tracking that was perpetrated by federal agents who used and accessed the device to further their investigation for the purpose of the criminal prosecution at bar. As the Court noted in <u>*Jones*</u>, the requirement that federal law enforcement obtain a tracking warrant for the use of a GPS device was already set forth by statute, long before the Court's seminal Fourth Amendment ruling. *See* <u>*Jones*</u>, 132 S. Ct. at 964 (explaining that the installation of a GPS device must authorized, "as required by the terms of the warrant and by 18 U.S.C. § 3117(a) and Rule 41(b)(4).")." As such, any use of a

GPS tracking device without a search warrant violates both federal statute and the Fourth Amendment, absent a few narrow exceptions which are not present in the instant case. *See* Horton v. California, 496 U.S. 128 (1990).(explaining that warrantless searches are presumptively unreasonable, subject to certain specifically established and well-delineated exceptions).

The Government surely cannot argue that the state-imposed conditions of release on Lambus provided federal agents with the same authority bestowed upon his parole officer to search his residence. To the extent that individuals subject to various forms of state or federal supervision have a reduced expectation of privacy, Government has never been permitted to abuse these conditions as a broad exception to the warrant requirement on searches that are conducted for general investigative purposes. As such, there is no logical explanation for its agents' apparent belief that they could use a GPS device placed on Lambus pursuant to his state imposed supervision for the purpose of collecting evidence to use against him in a separate federal criminal prosecution. In other words, the GPS evidence would have to be suppressed as having been improperly used by federal agents, even if the device had been lawfully imposed on Lambus by DOCCS pursuant to his PRS term. *See* Belleau v. Wall, 811 F.3d 929, 935 (7th Cir. 2016) (explaining that law enforcement may not use a GPS device imposed on a defendant as a condition of his release for general investigative purposes or to "generate evidence" for future prosecutions).

In stark contrast to the federal agent's inexplicable course of action here, the case of United States v. Cushnie, 14-CR-119, 2014 WL 7447149 (S.D.N.Y. Dec. 31, 2014)

demonstrates the ordinary prudence that should be undertaken when seeking a tracking warrant to authorize the use of a GPS device, even where the target of such surveillance may also be subject to a reduced expectation of privacy resulting from other legitimate forms of court imposed supervision. Although the defendant in <u>Cushnie</u> was on federal supervised release, and even had an arrest warrant stemming from the alleged violation of his conditions of release, the U.S. Marshalls still applied for a tracking warrant before using a GPS device to monitor his whereabouts and coordinate an arrest. *Id.*  By contrast, Lambus had not even been referred to Parole Board for any violations to his conditions of release, nor was he subject to an arrest warrant; and yet, federal agents surreptitiously tracked his whereabouts for over two years, without ever applying for a warrant. If a warrant had been sought, it is doubtful that any court would have authorized anything beyond a period of 45 days, and certainly not the *17 consecutive 45-day periods* during which Lambus was subject to GPS surveillance in this investigation.

The separate question as to whether federal agents were involved in having the GPS monitor placed on Lambus is an important one, as it tends to suggest a deliberate intent to circumvent the courts, and would warrant more drastic measures than mere suppression of the evidence. *See* <u>United States v. Russell</u>, 411 U.S. 423, 431-32 (1973) (stating that a court may dismiss an indictment when "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction"); <u>Archer v. Comm'r of Correction of State of N. Y.</u>, 646 F.2d 44, 47 (2d Cir. 1981) ("some law enforcement practices may be 'so outrageous that due process principles would absolutely bar the government from

invoking judicial processes to obtain a conviction.'")(citing _Rochin v. California_, 342 U.S. 165 (1952); _see also United States v. Broward_, 594 F.2d 345, 351 (2d Cir. 1979) (explaining that dismissal may be warranted where it is necessary "either to eliminate prejudice to a defendant in a criminal prosecution . . . [and it] is impossible to do so by imposition of lesser sanctions, or [where there is a need] to deter a pattern of demonstrated and longstanding widespread or continuous official misconduct."); _accord United States v. Hogan_, 712 F.2d 757, 761 (2d Cir. 1983) (dismissing indictment due to egregious prosecutorial misconduct before the grand jury); _United States v. Bout_, 731 F.3d 233, 238 (2d Cir. 2013) (citing cases involving the "violation of the defendant's person" as an example of circumstances which might warrant dismissal). Putting aside this more egregious aggravating factor, however, the suppression issue alone boils down to a more simple analysis. The bottom line here is that federal agents engaged in continuous GPS tracking surveillance for over two years, without judicial authorization, and without any legitimate exception to the otherwise applicable warrant requirement. As a result, the GPS evidence must be suppressed as having been obtained in violation of Defendant's Fourth Amendment rights, plain and simple.

II. **THE WIRETAP AFFIDAVITS CANNOT SUPPORT A FINDING OF PROBABLE CAUSE BASED ON THE CONCLUSORY STATEMENTS THAT ARE LEFT AFTER ALL OF THE UNLAWFULLY OBTAINED EVIDENCE, MATERIALLY FALSE STATEMENTS, AND MISLEADING INFORMATION IS REMOVED FROM WITHIN THEIR FOUR CORNERS**

It is well settled that recklessly or intentionally false or misleading information in an affidavit offered in support of a wiretap application violates the Fourth Amendment, and entitles the subject of the search to suppress evidence derived from it. *See, e.g., United States v. Leon*, 468 U.S. 897, 923 (1984); *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). In the instant case, and as outlined below, the amount of misleading information that was put forth in the wiretap affidavits is absolutely staggering. While some of the defects can surely be attributed to mere oversights and innocent mistakes, it is also appears as though many of the most egregious misrepresentations were deliberate. The fact that the probable cause analysis was also peppered with unlawfully obtained evidence only adds insult to injury, and further mandates the suppression of all evidence stemming from the wiretap authorizations. In any event, the affidavits cannot support a finding of probable cause after the materially false statements and misleading omissions are taken into account, in combination with the unlawfully obtained GPS evidence, and evidence from so-called cell phone records which the Government cannot produce. *See United States v. Broward*, 594 F.2d 345, 350 (2d Cir. 1979); *United States v. Marin–Buitrago*, 734 F.2d 889, 895 (2nd Cir. 1984)

## A. Materially False or Misleading Statements and Omissions

### 1. 106th Road Incidents on May 2, 2014

As explained in the previously filed suppression motion, the wiretap affidavits fundamentally misconstrued the events that occurred in the vicinity of 106th Road on May 2, 2014. (Dkt. 173 at 14-18, Page ID 762-766). Specifically, the affidavits attempt to establish a fictitious link between narcotics activities at a suspected "stash house" located at 177-34 106th Road in Queens, New York—which was raided by the NYPD Gang Squad on May 2, 2014—and Defendants Lambus, Williams, and Mitchell, on account of their having been questioned by police in the same vicinity on that day. In reality, and as evidenced by Scott Williams' successful civil rights action arising from the events of that day, Lambus and his co-defendants had nothing to do with the narcotics raid that took place at the 106th Road address, except for the fact that they were unlawfully detained and questioned without cause in the same vicinity on that day. *See* <u>*Scott Williams v. NYPD*</u> (E.D.N.Y. Case No 14-cv-05126) (civil complaint) [*attached hereto as* **EXHIBIT L**]. <u>Accordingly, the misleading statements used to establish a connection exists between the above named Defendants and the individuals involved in the 106th Road incident on May 2, 2014, at ¶¶ 15, 18, 34, must be stricken from the affidavit.</u>

### 2. Search Warrant and Arrests at 107-53 Watson Place on July 1, 2014

The wiretap affidavits also misrepresent the execution of a search warrant at 107-53 Watson Place, which resulted in the arrests of Henry Curry, Dakym Trappier, and Shavona Trappier on July 1, 2014, at ¶¶ 17, 19, fn. 2, 20, 22, 33. It is alleged that approximately "90 glassines (or 3 grams)" of heroin were recovered, and that such a

quantity is "consistent with distribution, [and] not personal use." ¶ 19 and fn. 2. That information is materially false; in fact, only 30 glassines were ever recovered during the search of that location, and were scattered across various places among six individuals who were at the residence at that time—which is actually quite consistent with personal use, and *not* distribution. *See* <u>Queens Cty District Attorney Intake Form and Criminal Information</u>, <u>People v. Dakym Trappier</u> (Index No. 2014QN038377) [attached hereto as **EXHIBIT M**]. <u>Accordingly, the false and misleading information at ¶¶ 17, 19, fn. 2, 20, 22, 33, must be stricken from the affidavit.</u>

### 3. Misleading Omissions and Mirepresentations Regarding the Targets Themselves and The Nature of "Associations"

The affidavits also conveniently omit critical information about the Targets themselves, perhaps as a matter of convenience, which would have undercut the probable cause finding upon which the wiretap applications were granted if it had been included. For instance, the wiretap affidavits failed to disclose the fact that many of the "associations" it describes among the Targets are of a familial nature, first and foremost, which tends to undercut the affidavit's apparent implication that each of these individuals is "an associate of . . . [the other]," as a result of their involvement in a criminal enterprise. Specifically, the affidavits consistently failed to mention that the Trappier siblings (Shavonna and Dakym) are "associate[s]" of Lambus, in part because they are related through Samir Tripp, who is the Trappiers' aunt by blood, and who Lambus also considers to be his aunt, through her relationship to his uncle (they have a child together, who is Lambus's nephew). Lambus has known the Trappier siblings as

cousins since birth, having been raised as part of the same family in the same neighborhood for their entire lives. In fact, Lambus was actually residing at the home of their aunt Samir Tripp from 2012-2013. Additionally, Dakym Trappier and Shakeem Powell are half-brothers (born to the same mother), and Kasheem Spencer is also Powell's half-brother on his father's side. While Kasheem and Dakym have no direct blood relation, they have always viewed each other as step-siblings of sorts, through their mutual half-brother—and are very close to one another, owing in part to their proximity in age. Relatedly, the affidavits also failed to mention that Kasheem Spencer—who is portrayed as a hardened criminal and member of the alleged "drug trafficking organization"—was actually just a high school student at the time of his arrest in November 2014.

While the existence of these family ties would not have precluded the simultaneous possibility of a criminal enterprise between some of the Targets, their omission in the affidavits is certainly material because the disclosure of these relationships would have provided the authorizing court with reason for pause to stop and consider whether the certain implicitly criminal associations portrayed in the affidavits were in fact more innocent associations, born out of actual kinship or blood relations. For instance, the fact that law enforcement observed an incoming call from Dakym Trappier to Kasheem Spencer, at ¶ 33 and fn. 13, becomes wholly inconsequential and insignificant when viewed in light of the fact that they are practically siblings, whose personal bond precedes and outweighs any inference of criminality that can be drawn from their being "associated" with one another, as the affidavits seek to imply.

Accordingly, the calls between described at ¶¶ 33  and fn. 13 should be stricken from the affidavit as misleading in light of the omitted information. In evaluating the totality of the circumstances and information within the four corners of the wiretap affidavits, the Court should also consider that the "associations," described in ¶¶ 19, 22, 23 are based at least in part, if not primarily, on familial relationships between these individuals.

### 4. Materially False Statements Regarding The Origins and Timeline of the Investigation

The wiretap affidavits also made blatantly false statements about the timing and origin of the investigation, *see Wiretap 1 Aff*, at ¶ 24-25. As discussed in our co-defendant's motion, the representation that no prior applications had previously been sought on the targets in this case was materially false, in light of the numerous previous applications sought pursuant to a prior investigation—as were the representations that this investigation only began in 2013, *see supra* fn 8.

### B.  Vague and Conclusory Allegations

Although there is no "specific test" that determines whether a particular source may be relied upon as support for a probable cause determination, the Supreme Court has instructed that the "totality of circumstances" must present the magistrate with "[s]ufficient information . . . .  to make the necessary determinations [meaning that] . . . [such] action cannot be a mere ratification of the bare conclusions of others." United States v. Clark, 638 F.3d 89, 97 (2d Cir. 2011) (citing *Illinois v. Gates,* 462 U.S. at 239 (1983) . In accordance with approach set forth by *Illinois v. Gates,* 462 U.S. at 239, the central

question is whether probable cause exists, given all the totality of the circumstances set forth in the affidavit, which must also take into account the 'veracity' and 'basis of knowledge' of persons supplying hearsay information. _United States v. Wagner_, 989 F.2d 69, 71–72 (2d Cir. 1993).

### 1. Alleged Heroin Sale by Scott Williams on November 10, 2014 Based on Information from Unspecified Source

It is alleged that Scott Williams sold heroin to an unspecified "source" or "informant" on November 10, 2014, at ¶¶ 13, 30, 32 and fn. 8. There is no other information about this purported buyer or source and no information about where this alleged transaction occurred.[16] The affidavit also fails to specify whether any such transaction was actually observed by law enforcement personnel, as opposed to merely having been reported that Williams had sold heroin to someone on that date.[17] Accordingly, the vague and conclusory allegations regarding Williams, at ¶¶ 13, 30, fn. 8, must be stricken from the affidavit.

### 2. Alleged Heroin Sale by Tiheem Crocker in February 2014 Based on Information from an Unspecified Source

It is also alleged that another informant purchased heroin from Tiheem Crocker in February 2014, at ¶ 15. Upon information and belief, the charges against Crocker were dismissed immediately after his arrest, after the Government learned that law

---

[16]   The only "source" whose veracity is established in the wiretap affidavits is the confidential informant described at ¶ 26, in relation to the December 2014 controlled buy from Earl Davis, and is clearly not the same purported buyer as the unspecified source referenced at ¶¶ 13, 30, fn. 8.

[17]   _See United States v. Gagnon_, 373 F.3d 230, 236 (2d Cir. 2004)("Whether . . . [an] informant speaks to an officer in person or through the mediation of an anonymous means of communication . . . bear[s] upon the reliability of the information . . . a "face-to-face informant . . . [is] more reliable than an anonymous . . . tipster.") (citing _United States v. Salazar_, 945 F.2d 47, 50–51 (2d Cir.1991).

enforcement had actually mistaken him for someone else. More importantly, the allegations regarding Crocker's purported involvement in a drug transaction ultimately suffer from the same fatal problem as the allegations against Williams in that there is absolutely indication of the purported informant's background or reliability. <u>Accordingly, ¶ 15 must be stricken from the affidavit.</u>

### 3. Targets With No Apparent Connection to Any of The Factual Allegations in the Wiretap Affidavits

The affidavit names Antonio Williams and Stanley Fuller among 13 other "Targets" of the wiretap application. Aside from listing them as targets at ¶¶ 14 and 16, the individuals are not mentioned at any other point in the affidavit; their connection to the alleged targets narcotics of other targets is not explained or even implicated again. It also worth noting that law enforcement did not establish probable cause as to these individuals until well after the wiretaps started to produce information, which allowed them to start collecting information and gathering evidence against these defendants without ever having had to make a specific showing of probable cause as to their involvement in the alleged conspiracy. <u>Accordingly, paragraphs ¶¶ 14, 16 should be stricken from the affidavit as conclusory allegations, since there is no information to support these individuals' status as "Targets" in the wiretaps.</u>

## C.  Unlawfully Obtained Evidence

### 1. The Cell Phone Analysis

The previously filed suppression motion also raised concerns about the source of information in the cell phone analysis, at ¶¶ 32-37, which claims to have been derived from toll records and pen/trap data obtained pursuant to subpoenas served on the cell phone providers. In light of the concerns expressed about an unauthorized search of the 4421 cell phone that was seized by the NYPD, and also due to the prevalence of unlawful mobile forensics surveillance operations that have recently been uncovered in litigation brought by the New York Civil Liberties Union (NYCLU), the defense has asked the Government to produce the subpoenas and pen/trap orders that were used to obtain that information.[18] After sending some portion, but not all of the materials needed to account for the cell phone analysis, the Government has indicated that it will not (or presumably cannot) produce further materials to substantiate the claim that the information referenced in the cell phone analysis at ¶¶ 32-37, was lawfully obtained. The Government has most recently expressed the view that Rule 16 does not require the production of the underlying subpoenas and pen/trap orders.  When defense counsel sought to inspect the 4421 cell phone as an alternative to obtaining these mysterious toll records, the

---

[18] See List of Investigations in Which NYPD Used Stringray Technology (documents obtained by the NYCLU through FOIL litigation) [*attached hereto as* **EXHIBIT N**], documenting the NYPD's broad and indiscriminate use of stingray technology in practically cases every case, including thousands of narcotics investigations. *See also "NYCLU Sues NYPD After it Refuses to Disclose Critical Information About Stingrays,"* (May 19, 2016) (revealing information that the NYPD has used Stingrays more than 1,000 times since 2008 in investigations ranging from robbery and drug cases to criminal contempt of court, without a written policy."), *available at* http://www.nyclu.org/news/nyclu-sues-nypd-after-it-refuses-disclose-critical-information-about-stingrays.

Government replied that the 4421 cell phone is not in their custody and not available for inspection.

The cell phone analysis should not be credited unless the government can produce lawfully obtained and contemporaneous documentation of its requests for toll records and pen register data to substantiate its claim that the 4421 cell phone was "not searched" after having been seized by the NYPD and that no other undisclosed cell phone surveillance and interception technologies were used instead of obtaining the records through a legitimate lawful source. a warrant is generally required before such a search, even when a cell phone is seized incident to arrest. *See* <u>*Riley v. California*</u>, 134 S. Ct. 2473, 2493 (2014) (holding that law enforcement must obtain a warrant to search a cell phone, "even when a cell phone is seized incident to arrest."); <u>*United States v. Lambis*</u>, Case No. 15-CR-734, 2016 WL 3870940, at *2 (S.D.N.Y. July 12, 2016) (suppressing evidence obtained through the warrantless use of a cell-site simulator, *i.e.,* stingray device). <u>Unless and until the Government can substantiate its claim that the information used for the cell phone analysis was legitimately obtained, the allegations at ¶¶ 32-37 should be stricken from the affidavit and not factored into the probable cause analysis.</u>

### 2. The GPS Evidence

As explained in Part I of the instant motion, and in the previous suppression motion, the unlawfully obtained GPS evidence tainted this investigation from the outset. *See* <u>*Wiretap Aff*</u>. 1, at ¶ 71. In addition to the concerns already expressed on that point, the Court should further consider the incredibly intrusive nature of GPS tracking in and of itself, which provided investigators with an omnipresent view of the Defendant's every

move for over two years, resulting in an unconscionable invasion of his right to privacy. *See Jones*, 132 S. Ct. 945, 955–56 (2012) (recognizing that "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of [private] detail[s]" about an individual's personal life and choices.). In the context of the wiretap affidavits and other applications, the GPS evidence is also especially problematic because it is impossible to identify and separate the information that was gained from legitimate conventional investigation techniques as opposed to having been derived from the GPS surveillance. This problem is not even limited to the instances where Lambus is said to have been in proximity to this or that place, but also undermines the existence of particular associations and a number of other inferences which could also very well have been derived from the GPS evidence. <u>Accordingly, the wiretap evidence must also be suppressed insofar as it was obtained in reliance on evidence stemming from unauthorized warrantless GPS surveillance.</u>

## **CONCLUSION**

For these reasons, Defendant respectfully moves to suppress all evidence stemming from the unauthorized GPS tracking surveillance on Lambus, or the wiretap authorizations. Additionally, Defendant further moves to suppress any and all derivative evidence that could not have been obtained but-for the evidence any and all other evidence that was subsequently derived from the GPS and/or wiretap evidence, which must be suppressed as fruit of the poisonous tree. *See United States v. Restrepo*, 890 F. Supp. 180, 198 (E.D.N.Y. 1995) ("Evidence derivative of a constitutional violation must be

suppressed as the "fruit of a poisonous tree," unless the taint of the constitutional violation has dissipated.) (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407 (1963).

Dated:     New York, NY
           September 20, 2016

                                   Respectfully Submitted,

                                   _____/s/_____

                                   Agatha M. Cole

                                   Ronald Rubinstein

                                        *Attorneys for Defendant,*
                                            *Kamel LAMBUS*

                                   **RUBINSTEIN & COROZZO LLP**
                                   260 Madison Avenue, 22nd Floor
                                   New York, NY 10016


CC:    Assistant United States Attorneys Lauren Elbert and Michael Robotti and Marcia
       Henry