UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>– against –<br><br>KAMEL LAMBUS, STANLEY FULLER, *ET AL.*,<br><br>Defendants. | **MEMORANDUM AND ORDER ON MOTIONS TO SUPPRESS**<br><br>15-CR-382 |

**JACK B. WEINSTEIN, Senior United States District Judge:**

**APPEARANCES**

| | |
|---|---|
| **United States:** | **Robert L. Capers**<br>United States Attorney, E.D.N.Y.<br>By: **Michael P. Robotti**<br>**Lauren Howard Elbert**<br>**Marcia Maria Henry**<br>271 Cadman Plaza East<br>Brooklyn, NY 11201 |
| **Kamel Lambus:** | **Ronald Rubinstein**<br>**Joseph R. Corozzo**<br>**Agatha M. Cole**<br>Rubinstein & Corozzo, LLP<br>260 Madison Avenue<br>22nd Floor<br>New York, NY 10016 |
| **Stanley Fuller:** | **James Kousouros**<br>Law Office of James Kousouros<br>260 Madison Avenue<br>22nd Floor<br>New York, NY 10016 |

**Table of Contents**

I.    Introduction ........................................................................................................ 1

II.   Facts .................................................................................................................... 2

   a.   Charges Against Lambus and Fuller ......................................................... 2

   b.   State Supervision of Lambus and Coordination between State and Federal Law
        Enforcement Agencies .............................................................................. 2

   c.   The Instant Investigation and the Attachment of the Tracking Device........................ 3

   d.   Initial Wiretap Application ....................................................................... 8

   e.   Subsequent Wiretaps ............................................................................... 12

III.  Law ................................................................................................................... 14

   a.   Standard of Review on Motion to Suppress Location Data ............................. 14

   b.   Standard of Review on Motion to Suppress Evidence Gathered from January 9, 2015
        Wiretap .................................................................................................. 14

   c.   Fourth Amendment Prohibition of Unreasonable Searches and Seizures ................. 17

   d.   Reasonableness of Warrantless Searches of Parolees Conducted Pursuant to "Special
        Needs" ................................................................................................... 18

   e.   Reasonableness of Warrantless Searches of Parolees under a "Totality of the
        Circumstances" Test ................................................................................ 21

IV.   Monitoring: Application of Law to Facts ....................................................... 23

   a.   Constitutionality of the Electronic Monitoring Search ............................ 23

      i.    Nature and Purpose of the Search ...................................................... 23

      ii.   Lambus's Reasonable Privacy Expectations ..................................... 27

      iii.  Totality of the Circumstances ........................................................... 31

      iv.   Lack of Counsel ................................................................................. 31

   b.   Good Faith Exception to the Exclusionary Rule ....................................... 32

V.    Motion to Suppress Recordings from Wiretap Authorized on January 9, 2015 ......... 37

VI.   Conclusion ....................................................................................................... 41

## I.      Introduction

This case demonstrates the need to integrate the theory and practice of ostensibly independent branches of law enforcement—e.g., federal and state judges, federal and state criminal investigation and law enforcement personnel, and parole and probation supervisors—with respect to Fourth Amendment rights.  To the average member of the public, state and federal government anti-crime personnel are part of one cohesive unit that investigates and prosecutes all crimes to protect the community and punish the guilty.

A law enforcement officer, whether employed by a state or the federal government, whatever his or her title, has the same obligation to enforce the same federal Constitution and to act reasonably and with some uniformity in enforcing all law.

The federal judiciary is integrated into our national law enforcement establishment.  It is a part of the system of investigation and law enforcement when asked *ex parte* to approve applications for wiretaps or to pass upon motions to suppress.

Presented with only the government's viewpoint and information in *ex parte* wiretap application proceedings, a federal trial judge has little choice but to grant the application.  *See* Wiretap Report 2015, *available at* http://www.uscourts.gov/statistics-reports/wiretap-report-2015 (in 2015, not a single wiretap application made pursuant to federal or state law was denied; all 4,148 were granted).  Coordinate branches of government must define and enforce appropriate Fourth Amendment conduct to maintain an effective criminal justice system; coordination of state and federal systems raises substantial questions in the instant case.

Defendants Kemal Lambus and Stanley Fuller are charged with violating 21 U.S.C. §§ 841(a)(1), 841 (b)(1)(A)(i), 841(b)(1)(13)(i), 841(b)(1)(C), 846, and 18 U.S.C. § 3551 *et seq*. by participating in an extensive drug conspiracy.  Defendants move to suppress 1) location tracking

data that was allegedly obtained in violation of the Fourth Amendment, 2) evidence that the government gathered as a result of that location tracking data, and 3) wiretapped conversations that were obtained based on an application to this court for a wiretap that contained perjured declarations of a federal law enforcement agent.

The motion of Lambus to suppress location data is denied.

The motion to suppress the conversations recorded pursuant to the wiretap authorization granted on January 9, 2015 in the cases against Lambus and Fuller is granted.


II.     **Facts**

a.  **Charges Against Lambus and Fuller**

A years-long investigation by the Department of Homeland Security, Homeland Security Investigations ("HSI"), the Drug Enforcement Agency ("DEA"), and the New York City Police Department ("NYPD"), resulted in the indictment of alleged members of a drug trafficking organization known as the "Paper Chasing Goons" or "POV City" (the "DTO").  Complaint, ECF No. 1.   Allegedly, for several years, the DTO gang distributed heroin in South Jamaica, Queens.  *Id.*  In August 2015, a grand jury in the Eastern District of New York issued an indictment of Lambus, Fuller, and others.  Indictment, ECF No. 61 at ¶¶ 1-3.

b.  **State Supervision of Lambus and Coordination between State and Federal Law Enforcement Agencies**

Lambus has been the subject of federal and state law enforcement interest for many years.  Prior to his arrest in the instant case, he had been convicted of several crimes under New York law:  attempted criminal possession of a controlled substance in the 3rd degree (New York Penal Law ("NYPL") 220.39) (sentenced to 1 year of imprisonment); attempted criminal possession of a weapon in the 2nd degree (NYPL 265.03) (sentenced to 4 years of imprisonment

and 5 years of post-release supervision); attempted criminal possession of a controlled substance in the 5th degree (NYPL 220.06) (sentenced to 2 years of imprisonment and 2 years of post-release supervision); and criminal possession of a controlled substance in the 5th degree (NYPL 220.06) (sentenced to 2 years of imprisonment and 1 year of post-release supervision). Jan. 9, 2015 [REDACTED] Aff., attached as Exhibit B to the Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287-2 ("Jan. 9, 2015 Aff."), at ¶ 41.

According to the government, New York State Department of Corrections and Community Supervision ("NYSDOCCS") Bureau of Special Services ("BSS") Investigator Scanlon "began coordinating [BSS's investigation into Lambus's drug trafficking activities] with [federal] HSI and other law enforcement agencies" in June 2013. Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287, at 15; Dec. 1, 2016 Hr'g Tr. ("Hr'g Tr.") at 104:9-105:14. This cooperation continued until his arrest on July 8, 2015. Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287, at 15. As described *infra*, the global positioning system ("GPS") monitoring of Lambus was repeatedly cited as evidence of probable cause in HSI's applications for wiretaps that HSI used to further its investigation of the defendants.

### c. The Instant Investigation and the Attachment of the Tracking Device

On March 7, 2012, Lambus was released from the sentence of imprisonment he was serving in connection with his 2010 conviction. Certificate of Release to Parole Supervision, attached as Exhibit L to the Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287-12 ("Certificate of Release"). Two days before release, he signed a "Certificate of Release to Parole Supervision" which acknowledged that he would be subject to post-release supervision by NYSDOCCS for a period of three years, four months, and 25 days. *Id.* Among other

conditions of release, Lambus agreed to: "permit [his] Parole Officer to visit [him] at [his]

residence and/or place of employment and … permit the search and inspection of [his] person,

residence, and property;" "not be in the company of or fraternize with any person I know to have

a criminal record;" "abide by a curfew established by the [Parole Officer];" and "fully comply

with the instructions of [his] Parole Officer and obey such special additional written conditions

as he or she, a Member of the Board of Parole or an authorized representative of the Division of

Parole, may impose." *Id.*

Soon after beginning his parole supervision, Lambus was "flagged" by the NYSDOCCS

Inspector General's ("IG") office.  He had sent a letter and photographs to a state inmate which

raised suspicions that he was selling narcotics.  *See* Apr. 5, 2013 Scanlon Email, attached as

Exhibit N to the Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287-14

("Apr. 5, 2013 Scanlon Email") and Intercepted Lambus Letter, attached as Exhibit O to the

Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287-15 ("Intercepted

Lambus Letter").  Responding to this information, the IG and the federal Drug Enforcement

Administration ("DEA") began a more active investigation of Lambus.  *See* Apr. 5, 2013

Scanlon Email.

On March 17, 2013, NYSDOCCS conducted a curfew visit at Lambus's residence; he

was not home.  Parolee Chrono Report, attached as Exhibit M to the Government's Mem. in

Opp. to Def.'s Motion to Suppress, ECF No. 287-13 ("Parolee Chrono Report"), at 38.

Lambus's girlfriend informed the defendant's parole officer that he was out visiting the mother

of his child in Brooklyn.  *Id.*

On April 5, 2013, an entry into NYSDOCCS's electronic tracking system for parolees

was made by Parole Officer ("P.O.") Candace Benjamin at 10:00 am.  Parolee CMS, attached as

4

Exhibit P to the Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287-16

("Parolee CMS"), at 5-6.  Michael Resnick, the Chief of the NYSDOCCS Queens III Bureau

(which was responsible for supervising Lambus's release at that time), had provided P.O.

Benjamin with "confidential information regarding [Lambus].  Intelligence has been received

from other law enforcement entities that subject is apparently involved in illegal

activities…Night curfew visit requested by BSS and residence to be searched for contraband and

to determine if the residence or record resembles the location where photos posted on Facebook

may have occurred."  *Id.*

    At 5:37 pm that same day, NYSDOCCS Bureau of Special Services ("BSS") Investigator

Thomas Scanlon sent an email to Chief Resnick, P.O. Benjamin, and another P.O. updating them

on the DEA/IG investigation.  *See* Apr. 5, 2013 Scanlon Email.  BSS is the investigative arm of

NYSDOCCS; "supervisory bureaus" (e.g. Queens Bureau III) directly oversee parolees and

probationers.  *See* Hr'g Tr. at 57:11-59:18.

    The DEA had stopped pursuing the investigation of Lambus when it failed to reveal that

he was attempting to distribute drugs in NYSDOCCS facilities.  Apr. 5, 2013 Scanlon Email.

BSS, under Scanlon's initiative, however, decided to continue investigating leads as to "Lambus'

activities" because his "employment and residence are suspect."  *See* Hr'g Tr. at 73:18-74:13;

Apr. 5, 2013 Scanlon Email.  BSS also forwarded to Chief Resnick "Lambus' facebook

photos…of what appear to be large amount of US currency."  Apr. 5, 2013 Scanlon Email.

Investigator Scanlon ended his email by noting that the Facebook photos, the letter that the IG

and DEA investigated, his recent change in residence, his curfew violations, and his criminal

history indicated to BSS that Lambus "may be engaged in behavior contrary to his release

agreement."  *Id.*  BSS, on Scanlon's initiative, promised to "continue to investigate and identify

possible locations, individuals, and vehicles which may be associated to Lambus," and to "assist [the Queens III Bureau] staff" "with a search of Lambus' residence and appropriate follow-up, in a cooperative effort to attempt to determine if Lambus is in compliance with the terms of his release agreement." *Id.*

On April 9, parole officers searched Lambus's residence and found marijuana cigarette butts in an ashtray in his living area. Parolee Chrono Report at 36. Lambus claimed that they did not belong to him. *Id.* On May 2, NYSDOCCS received an anonymous email that reported that Lambus was still engaged in drug dealing. Parolee CMS at 3-4. NYSDOCCS decided to conduct a curfew visit and to continue to conduct periodic searches of Lambus's residence. *Id.* When NYSDOCCS conducted a curfew visit on at Lambus's place of residence on May 5, he was not home in violation of his curfew. Parolee Chrono Report at 33.

On May 6, at 9:15 am, Lambus's P.O., Trudy Kovics, made a redacted entry onto Lambus's Parolee Chrono Report. *Id.* at 33. In the Parolee Chrono Report, there are several entries that have been redacted as "exempt from public disclosure pursuant to Section 87(2)(A), (B), (F), and (G) of the Public Officers Law and 9 NYCRR Section 8000.5(C)(2)." *See id.* at 35, 36. With the exception of this May 6 entry, each entry in the Parolee Chrono Report containing a redaction is explained in the Parolee CMS entries the government submitted. An April 5, 2013 redaction in the Chrono Report corresponds with a CMS entry describing NYSDOCCS receiving intelligence about Lambus from "other law enforcement entities," *See* Parolee CMS at 5-6 (discussed *supra*) and *id.* at 3-4 (an entry on May 2, 2013 which corresponds with a CMS entry describing NYSDOCCS receiving an anonymous email tipping it off to alleged illegal activity by Lambus).

The entry immediately following the redacted entry of May 6 was made only 30 minutes later that same day.  It reads: "Conf w/ SPO Browne, [Lambus] to be placed on electronic monitor when he [reports] on 5/8/13."  Parolee Chrono Report at 33.  According to Scanlon, this decision was made solely in the discretion of the NYSDOCCS supervisory bureau, and not at the behest of BSS or any federal law enforcement agency.  Hr'g Tr. at 98:5-13.

NYSDOCCS decided to place a tracking device on Lambus to learn if he was complying with the conditions of his parole—primarily curfew.  *Id.*  On May 8, 2013, it placed an electronic monitoring bracelet on Lambus's ankle.  Parolee Chrono Report at 33.  Lambus signed a certification acknowledging that GPS monitoring was a special condition of his release that would "remain in effect until the termination of [his] legal period of supervision," which could last until August 2, 2015.  Special Conditions Acknowledgement, attached as Exhibit R to the Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287-18 ("Special Conditions Acknowledgement").

According to Lambus, he was "coerced" into giving his consent because Parole Supervisor Parker told him that "he would violate [Lambus] and send [him] back upstate to prison unless I agree to have a GPS ankle bracelet installed on me."  Apr. 14, 2016 Lambus Aff., attached as Exhibit H to Lambus's Supplemental Mem. in Supp. of Suppression, ECF No. 266-2 ("Apr. 14, 2016 Lambus Aff."), at  ¶¶ 14, 25.  Lambus also said that Supervisor Parker told him he would only have the GPS on him for 3-6 months, but the ankle bracelet remained on until his arrest over two years later on the federal charges he now faces.  *Id.* at ¶¶ 16, 29.  Both Lambus's affidavit and the Parolee Chrono Report confirm that he repeatedly asked to have the GPS tracking device removed.  *Id.* at ¶¶ 18-24; Combined Parolee Chrono Report, attached as Exhibit A to Lambus's Supplemental Mem. in Supp. of Suppression, ECF No. 266-1, at 9-12

7

(documenting seven separate occasions, from October 23, 2013 through June 25, 2014, when Lambus asked his parole officer about removing the GPS tracking device).

### d.  Initial Wiretap Application

On January 9, 2015, Special Agent [REDACTED] of the HSI Narcotics/Violent Gang Unit submitted an affidavit to a judge of this court in support of an application to intercept wire and electronic communications received and sent by a subject telephone number (the "5283 Telephone") for 30 days.  *See* Jan. 9, 2015 Aff.  The 5283 Telephone was being used by Earl "Choice" Davis, a target of the investigation.  *Id.* at ¶¶ 3, 12.  The purpose of the Special Agent's request was to assist in a HSI investigation of a group of individuals in the Bloods gang in Queens that had been ongoing "[s]ince 2013."  *Id.* at ¶¶ 5-9; 25.  The "Targets" section of the affidavit listed a dozen individuals, including Lambus and Fuller.  *Id.* at ¶¶ 11-23.

Crucially, in a section titled "Prior Applications," the Special Agent wrongly stated: "As of December 22, 2014, a check of federal law enforcement databases, including FBI, DEA, ATF, and HSI databases, indicate that *there have been no prior applications seeking Court authorization to intercept the wire, oral, or electronic communications of the Target Subjects* or over the SUBJECT TELEPHONE."  *Id.* at ¶ 24 (emphasis added).

The federal wiretap statute requires an officer applying for a wiretap authorization to include a "full and complete statement of the facts concerning all previous applications" to wiretap any of the persons targeted in the application.  18 U.S.C. § 2518(1)(e).  The provision reads as follows:

> "Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application.  Each application shall include the following information: […] (e) *a full and complete statement of the facts concerning all previous applications* known to the individual authorizing and making the application, made to any judge for

authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or place specified in the application, and the action taken by the judge on each such application."

18 U.S.C. § 2518(1)(e) (emphasis added).

In his affidavit, the Special Agent dedicated 29 paragraphs to explaining why HSI's investigation provided probable cause to believe that the target subjects of the wiretaps were members of a DTO that was distributing narcotics throughout New York. *Id.* at ¶¶ 25-53. HSI's ongoing efforts to investigate the DTO were broken down into several different categories: information learned through a confidential informant ("CI") and through controlled purchases of narcotics by the CI (*id.* at ¶¶ 26-30); analysis of toll records derived from a pen register of the 5283 Telephone, which revealed extensive contacts between the 5283 Telephone and other phones belonging to known narcotics traffickers and other suspected members of the conspiracy (*id.* at ¶¶ 31-39); the criminal history of the Target Interceptees (*id.* at ¶¶ 40-50); and location data, obtained via judicially authorized warrants, for phones and vehicles belonging to suspected members of the DTO (*id.* at ¶¶ 51-53).

The affidavit described in detail other investigative techniques that had been used in the investigation, what those techniques had uncovered, and how and why those techniques had either been tried and failed or appeared likely not to succeed in effectuating the objectives of the investigation. *Id.* at ¶¶ 54-78. The stated objectives of the investigation were to reveal: "(1) the nature, extent and methods of operation of the drug business of the Target Interceptees; (2) the identities and roles of accomplices, aiders and abettors, co-conspirators and participants in their illegal activities; (3) the distribution and transfer of the contraband and money involved in those activities; (4) the existence and location of records; (5) the existence, location and source of resources used to finance their illegal activities; (6) the existence, location and disposition of the

9

proceeds from those activities; (7) the existence and location of firearms used in furtherance of

drug trafficking and (8) the existence and locations of items used in furtherance of those

activities." *Id.* at ¶ 10.

Techniques employed by law enforcement prior to applying for the wiretap included the

use of confidential sources, undercover agents, physical surveillance, mail covers, search/arrest

warrants, grand jury and/or witness interviews, trash searches, location data, pen registers, trap

and trace devices, toll analysis, subscriber information, pole cameras, and criminal database

checks.

In general, while these techniques revealed information about who was participating in

the DTO and certain locations of relevance, the Special Agent averred that their use would not

catch the targets in the act of committing an offense or allow penetration of the inner workings of

the DTO.  *See, e.g.*, *id.* at ¶¶ 56, 61, 67, 75.  Of particular relevance to Defendants' motions, the

affidavit referred to Lambus and the ankle bracelet he was wearing:

> "KAMEL LAMBUS is serving a term of parole in connection with a state narcotics
> conviction.  As a condition of his parole, *LAMBUS is wearing an electronically
> monitored ankle bracelet, which provides location data for his whereabouts on a periodic
> basis.*  This location data has assisted agent in identifying locations where members of
> the conspiracy conduct their narcotics trafficking operations.  Specifically, this location
> data has assisted investigators in identifying the location of suspected stash houses such
> as 119-26 165th Street, 107-53 Watson Place and 177-38 106th Road."

*Id.* at ¶ 71 (emphasis added).

Activity at and near suggested stash house locations—119-26 165th Street, 107-53

Watson Place and 177-38 106th Road—is a common thread that connects several of the subjects

of the investigation.  Between July 17, 2013 and November 21, 2014 law enforcement officers

conducted in-person surveillance of those three residences and identified them as "stash houses

used by members of the conspiracy to store and distribute heroin and cocaine base."  *Id.* at ¶ 60.

10

The affidavit explicitly noted that Daykm Trappier, Shavona Trappier, and Kayseem Spencer appear to meet and socialize at 107-53 Watson Place.  *Id.*

On May 2, 2014, law enforcement officers discovered "cocaine base and drug paraphernalia during a judicially authorized search" at 177-38 106th Road, and "Kareem Mitchell, Scott Williams, and Lambus were present at the residence" when the officers discovered the cocaine.  *Id.* at ¶ 34 n. 15.  *See also id.* at ¶ 18 ("At the time the officers executed the [May 2, 2014] search, Kareem Mitchell, Scott Williams and Lambus were in the immediate vicinity of 177-38 106th Road, Queens, New York together.").  The CI communicated with Earl Davis on the 5283 telephone to arrange buying narcotics from Davis at 177-38 106th Road, and the CI did so on December 17, 2014.  *Id.* at ¶¶ 27-30.  A pen register connected a phone belonging to Lolita Grissom to the 5283 telephone, and Grissom was with the CI at 177-38 106th Road "[i]n or about December 2014."  *Id.* at ¶ 34.

The electronic monitoring bracelet had been placed on Lambus as a special condition of his release on May 8, 2013, months before any other investigative activity documented in this affidavit linked those locations to the DTO.

Another connection between the targets was the presence of glassines of heroin that contained a unique mark.  Glassines marked with a gold foil circle with a black fist and the word "Power" emblazoned on the fist were purchased by the CI from Davis on December 17, 2014, were in Kasheem Spencer's possession when he was arrested on November 19, 2014, and were purchased by another confidential source from Scott Williams on November 10, 2014.  *Id.* at ¶ 32.

11

A judge of this court approved a government wiretap application on January 9, 2015. *See* Jan. 9, 2015 Order, attached as Exhibit A to the Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287-1.

### e. Subsequent Wiretaps

On February 12, 2015, Special Agent [REDACTED] applied for a wiretap authorization for two more telephones believed to be associated with the DTO, a "4421 Telephone" and a "2029 Telephone." *See* Feb. 12, 2015 [REDACTED] Aff., attached as Exhibit C to the Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287-3 ("Feb. 12, 2015 Aff.). The affidavit was largely the same as the previous affidavit, with a few notable additions. Whereas in the prior affidavit, Special Agent [REDACTED] had averred that "[a]s of December 22, 2014 a check of federal law enforcement databases…indicate that *there have been no prior applications* seeking Court authorization to intercept the wire, oral, or electronic communications of the Target Subjects" (Jan. 9, 2015 Aff. at ¶ 24 (emphasis added)), a check of those same databases on January 29, 2015 *revealed four prior authorizations*, from 2003 to 2011, that the government had obtained to intercept the communications of some of the Target Subjects. Feb. 12, 2015 Aff. at ¶¶ 27-31.

When questioned about this discrepancy at the suppression hearing before this court, the Special Agent conceded that Paragraph 24 of the January 9 Affidavit was "absolutely wrong." Hr'g Tr. at 155:21-23. He testified that he checked the databases, "but not for the full set of names…it was a couple names. It was not the entire target list." *Id.* at 156:3-157:7. The Special Agent apparently "misunderstood" what he was saying in the affidavit (*id.* at 157:13-19), and before he submitted an affidavit in connection with the second wiretap application, an AUSA told him that he "did it wrong the first time." *Id.* at 160:23-25.

12

The February affidavit added a few paragraphs describing conversations the government intercepted pursuant to the prior wiretap authorization on the 5283 Telephone.  The wiretap had intercepted conversations between that phone line and a 2029 Telephone and 4421 Telephone when individuals involved in the DTO appeared to be discussing narcotics trafficking.  Feb. 12, 2015 Aff. at ¶¶ 39-44.  The February affidavit also described an analysis of toll records and pen registers for the 2029 and 4421 Telephones.  The 2029 Telephone was being used by a target of the investigation then known as "Trick," (*id.* at ¶¶ 3, 26) and the 4421 Telephone was being used by Shakeem Powell and Shavona Trappier, two other targets of the investigation.  *Id.* at ¶¶ 3, 22, 24.  The affidavit also contained an identical paragraph about how the government is obtaining location data on Kamel Lambus through use of an electronically monitored ankle bracelet.  *See* Jan. 9, 2015 Aff. at ¶ 71; Feb. 12, 2015 Aff. at ¶ 93.  Another judge of this court approved this application on February 12, 2015.  Feb. 12, 2015 Order, attached as Exhibit D to the Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287-4.

On three more occasions, HSI, through affidavits submitted by Special Agent [REDACTED], applied for wiretaps for phones believed to be used by targets in their investigation.  *See* [REDACTED] Affidavits attached as Exhibits E, G, and I to the Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287-5, -7, and -9 ("Mar. 20, 2015 Aff.", "Apr. 28, 2015 Aff.", and "June 11, 2015 Aff.", respectively).  These applications were approved, respectively, by various judges of this court on March 20, 2015, April 28, 2015, and June 11, 2015.  *See* Orders attached as Exhibits F, H, and J to the Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287-6, -8, and -10.  These three applications contained the same paragraph describing Lambus's GPS monitoring as the January 9 and February 15 affidavits, and added a sentence that "[t]his location data, examined in conjunction

13

with intercepted communications" acquired from earlier wiretaps, "suggests" and "demonstrates" that Lambus supplied Trappier and Powell with heroin.  *See* Mar. 20, 2015 Aff. at ¶ 106; Apr. 28, 2015 Aff. at ¶ 122; June 11, 2015 Aff. at ¶ 136.

### III.   Law

#### a.   Standard of Review on Motion to Suppress Location Data

 "On a motion to suppress, a defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure.  Once the defendant has met this burden, the burden…shifts to the government to demonstrate by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment." *United States v. Williams*, 2008 WL 4516234, at *4 (W.D.N.Y. Oct. 2, 2008) (internal citations omitted).

Exclusion of the fruits of an unconstitutional search is not required in every case.  "For exclusion to be appropriate, *the deterrence benefits of suppression must outweigh its heavy costs.*"  *Davis v. United States*, 564 U.S. 229, 237 (2011) (emphasis added).  "[T]he deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue."  *Id.* at 238 (internal quotation marks and alteration omitted).  "[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful…the deterrence rationale loses much of its force."  *Id.* (internal citations and quotation marks omitted).  "[S]earches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."  *Id.* at 232.

#### b.   Standard of Review on Motion to Suppress Evidence Gathered from January 9, 2015 Wiretap

An application for a wiretap pursuant to 18 U.S.C. § 2518 "requires that wiretap applications provide 'a full and complete statement of the facts and circumstance relied upon by the applicant' to establish probable cause, and a 'full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *United States v. Rajaratnam*, 719 F.3d 139, 144 (2d Cir. 2013) (quoting the statute). "Under *Franks* [*v. Delaware*, 438 U.S. 154 (1978)] and its progeny, if a search warrant contains a false statement or omission, and the defendant makes a substantial preliminary showing (1) that the false statement or omission was knowingly and intentionally, or with reckless disregard for the truth, included by the government in a search warrant affidavit, (2) that the information was material, and (3) that *with the affidavit's false or omitted material aside, the affidavit's remaining content is insufficient to establish probable cause*, then the fruits of the search must be suppressed." *United States v. Bianco*, 998 F.2d 1112, 1125 (2d Cir. 1993) (citing *Franks*, 438 U.S. at 155-56) (emphasis added). "[T]o suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause [or necessity] finding." *Id.* at 146 (internal quotation marks omitted).

"Title III contains its own exclusionary rule. It provides that no intercepted communications can 'be received in evidence in any trial * * * if the disclosure of that information would be in violation of this chapter.' 18 U.S.C. § 2515. The specific grounds for exclusion under § 2515 are set forth in § 2518(10)(a). They are that: (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted

is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval. 18 U.S.C. § 2518(10)(a)." *Bianco*, 998 F.2d at 1125. Only violations of statutory requirements that "play[] a substantive role with respect to judicial authorization of intercept orders and consequently impose[] a limitation on the use of intercept procedures" require suppression. *United States v. Donovan*, 429 U.S. 413, 435 (1977) (internal quotation marks omitted). The *Donovan* court's holding was limited to cases where the defective affidavit was only "unlawfully made" inadvertently. It did not address the question: is suppression required, if the violation was committed knowingly or intentionally. *See id.* at 436, n. 23 ("There is no suggestion in this case that the Government agents knowingly [violated the statute] for the purpose of keeping relevant information from the District Court…[i]f such a showing had been made, we would have a different case."); *see id.* at 439, n. 26 ("[T]his case does [not] present an opportunity to comment upon the suggestion…that suppression might be required if the agents knew before the interception that no inventory would be served.") (internal citation omitted).

The specific grounds stated above do not divest the court of its "inherent authority to regulate the administration of criminal justice among the parties before the bar" through its general suppression powers. *United States v. Cortina*, 630 F.2d 1207, 1214 (7th Cir. 1980) (citing *McNabb v. United States*, 318 U.S. 332 (1943)). "Federal courts may use their supervisory power in some circumstances to exclude evidence taken from the defendant by willful disobedience of the law." *United States v. Payner*, 447 U.S. 727, 735 n. 7 (1980) (internal quotation marks and emphasis omitted). "The inherent supervisory power serves to ensure that the courts do not lend a judicial imprimatur to any aspect of a criminal proceeding that smacks of lawlessness or impropriety." *United States v. HSBC Bank USA, N.A.*, 2013 WL 3306161, at *6 (E.D.N.Y. July 1, 2013). "The courts have wielded this authority substantively,

16

that is, to provide a remedy for the violation of a recognized right of a criminal defendant." *Id.* at
*4 (citing cases). Suppression of evidence is but one remedy available to a court exercising its
supervisory authority to maintain the integrity of a judicial proceeding. *See, e.g.*, *Elkins v.
United States*, 364 U.S. 206, 222-24 (1960) (holding that "the imperative of judicial integrity"
requires illegally gathered evidence to be suppressed).

### c.   Fourth Amendment Prohibition of Unreasonable Searches and Seizures

The Fourth Amendment protects the reasonable expectations of privacy of all people,
including (at least to some degree) parolees. It states:

> "The right of the people to be secure in their persons, houses, papers, and effects, against
> unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but
> upon probable cause, supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized."

U.S. Const. amend. IV.

The government's placement of a device upon a person's body to track his or her
movements is a trespass that constitutes a search. *See, e.g.*, *Grady v. North Carolina*, 135 S. Ct.
1368, 1370 (2015); *United States v. Jones*, 132 S. Ct. 945, 949-51 (2012).

"Although the text of the Fourth Amendment does not specify when a search warrant
must be obtained, this Court has inferred that a warrant must generally be secured." *Kentucky v.
King*, 563 U.S. 452, 459 (2011); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)
("It is well settled under the Fourth and Fourteenth Amendments that a search conducted without
a warrant issued upon probable cause is per unreasonable…subject only to a few specifically
established and well-delineated exceptions.") (internal quotation marks omitted). This
"presumption may be overcome in some circumstances because the ultimate touchstone of the
Fourth Amendment is reasonableness." *King*, 563 U.S. at 459 (internal quotation marks and
alteration omitted). Courts determine whether a search is reasonable under the Fourth

Amendment by "examining the totality of the circumstances." *United States. v. Knights*, 534
U.S. 112, 118 (2001) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

"Whether a search is reasonable is determined by assessing, on the one hand, the degree
to which it intrudes upon an individual's privacy and, on the other, the degree to which it is
needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S.
843, 847 (2006) (internal quotation marks omitted).  If a person is under penal supervision and
subject to searches as a condition of his release, that status is a "salient circumstance" that
"informs both sides of that balance." *Knights*, 534 U.S. at 118-19.  Parolees, as compared to
probationers, are closer on the "continuum" of state-imposed punishments to prisoners "because
parole is more akin to imprisonment than probation is to imprisonment." *Samson*, 547 U.S. at
850.  That said, parolees have Fourth Amendment rights. *Id.* at 850, n. 2 ("Contrary to the
dissent's contention, nothing in our recognition that parolees are more akin to prisoners than
probationers is inconsistent with our precedents.  Nor, as the dissent suggests, do we equate
parolees with prisoners for the purpose of concluding that parolees, like prisoners, have no
Fourth Amendment rights.").

### d. Reasonableness of Warrantless Searches of Parolees Conducted Pursuant to "Special Needs"

In *Griffin v. Wisconsin*, the Supreme Court held that warrantless searches of persons
under penal supervision are constitutional because they are justified by the "special needs" of the
probation system which make "the warrant and probable-cause requirement impracticable."  483
U.S. 868, 873-74 (1987) (internal quotation omitted).  In the penal supervision context,
"[s]upervision…is a 'special need' of the State permitting a degree of impingement upon privacy
that would not be constitutional if applied to the public at large." *Id.* at 875; *see also Zielinski v.
DeFreest*, 2013 WL 4838833, at *8 (S.D.N.Y. Sept. 10, 2013) (the special need that allows the

government to search without a warrant "derives from the need for supervision… 'to assure that [court imposed] restrictions are in fact observed.'")  (quoting *United States v. Lifshitz*, 369 F.3d 173, 178 (2d Cir. 2004) (alteration in *Zielinski*).  "[T]he law requires that such greater intrusions occur pursuant to a rule or regulation 'that itself satisfies the Fourth Amendment's reasonableness requirement.'"  *United States v. Newton*, 369 F.3d 659, 665 (2d Cir. 2004) (quoting *Griffin*, 483 U.S. at 873).

The pertinent "rule or regulation" pursuant to which the special need searches of state parolees must be conducted was placed on reasonableness grounds by the New York Court of Appeals in *People v. Huntley*, 371 N.E.2d 794 (N.Y. 1977):

> "Where… the search and seizure is undertaken by the parolee's own parole officer, in our view whether the action was unreasonable and thus prohibited by constitutional proscription must turn on *whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty.*  It would not be enough necessarily that there was some rational connection; the particular conduct must also have been substantially related to the performance of duty in the particular circumstances."  371 N.E.2d at 797 (emphasis added).

The Court explained "that the parole officer's duty has two, sometimes potentially inconsistent aspects: he has an obligation to detect and to prevent parole violations for the protection of the public from the commission of further crimes; he also has a responsibility to the parolee to prevent violations of parole and to assist him to a proper reintegration into his community."  *Id.*  It emphasized that the special continuing relationship between the parolee and the parole officer was central to its holding, noting that "conduct which may be unreasonable with respect to a parolee if undertaken by a police officer may be reasonable if taken by the parolee's own parole officer.  In general the standard by which the reasonableness of a search or seizure with respect to a parolee by a police officer is to be measured would be the familiar requirement of a showing of probable cause."  *Id.* (internal citations omitted).  The lack of

19

evidence "that the searching parole officers were seeking contraband or evidence in aid of prosecution for criminal activity" factored heavily into its analysis that the parole search at issue was properly conducted for parole purposes.  *Id.* at 798.

 *Huntley* based decisions maintain that opinion's distinction between permissible searches conducted for valid supervisory purposes and impermissible searches conducted primarily to enable the police to gather evidence for general law enforcement purposes.  *See People v. Candelaria*, 406 N.Y.S.2d 783, 786 (N.Y. App. Div. 1978) (suppressing evidence seized during a search of parolee's home conducted by parole officers and police because "*a parolee's status ought not to be exploited to allow a search which is designed solely to collect contraband or evidence in aid of the prosecution of an independent criminal investigation*…[w]hen the search is of such a nature, the parole officer becomes the conduit of the police officer in doing what the police officer could not do himself.") (emphasis added) (internal citations omitted); *People v. Mackie*, 430 N.Y.S.2d 733, 734-35 (N.Y. App. Div. 1980) ("We cannot accept the People's argument that the warrantless search was proper as one related to Officer Szczech's duty to detect and prevent parole violations.  On the contrary, we find from the evidence that the search was unmistakably a search by police officers to obtain evidence in furtherance of a criminal investigation and that parole officer Szczech was merely a 'conduit' for doing what the police could not do otherwise.") (internal citations omitted); *People v. Way*, 319 N.Y.S.2d 16, 20 (N.Y. Co. Ct. 1971) (suppressing evidence gathered as a result of an unconstitutional search because if a parolee's "privacy is to be invaded from time to time for the protection of the public, and for his rehabilitation, this may be done only by his parole officer in the course of and for the purpose of effectively supervising him.  This may not be done for the prime purpose of circumventing the ordinary constitutional processes for the convenience of law enforcement officers in the course

of their investigation."); *People, ex rel. Vasquez v. Warden*, 958 N.Y.S.2d 62 (N.Y. Sup. Ct.

2010) (suppressing evidence where a search by police was done in the presence of parole officers

because the "parole officers' presence on September 29, 2009 was not parole related, but was to

supply a color of legality to a warrantless entry by the police into a private dwelling in violation

of the parolee's constitutional protections."); *see also People v. Marcial*, 971 N.Y.S.2d 328, 330

(N.Y. App. Div. 2013) (affirming trial court's decision to suppress evidence where the evidence

was gathered during a search that "*had no parole-related objective*. Instead, the court found that

the parole officer merely facilitated the police's contact with the defendant.") (emphasis added).

The *Huntley* rule is also in accord with Supreme Court precedent holding that "uncover[ing]

evidence of ordinary criminal wrongdoing" and a "general interest in crime control" are not

special needs that justify suspicionless searches. *City of Indianapolis v. Edmond*, 531 U.S. 32,

42, 44 (2000)

The Court of Appeals for the Second Circuit has observed, in the context of federal

probation, that both probation officers and law enforcement personnel have "objectives and

duties" that are "unavoidably parallel and…frequently intertwined" because both are concerned

with crime prevention and detection (*United States v. Reyes*, 283 F.3d 446, 463 (2d Cir. 2002)).

But *Huntley* cases insist that the duties and objectives of these two branches of law enforcement

are not identical.

> **e.  Reasonableness of Warrantless Searches of Parolees under a "Totality of the
> Circumstances" Test**

In *Samson*, the Supreme Court evaluated a warrantless search of a parolee without any

analysis of the special needs doctrine. 547 U.S. at 852 n. 3. Instead, the court examined the

"totality of the circumstances" to determine if a search was reasonable, and therefore

constitutional. *Id.* at 848. This test required weighing the search's intrusion on the individual's

21

privacy against "the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* The parolee's search condition, imposed pursuant to California statute, was a "salient" circumstance affecting his reasonable expectation of privacy, and the state's interest in supervising parolees, previously classified as a "special need," was simply the "legitimate governmental interests" on the other side of the scale. *Id.* at 852-53.

The parolee's unambiguous awareness that California's parole regulations required the parolee to "submit to suspicionless searches by a parole officer or other peace officer at any time" meant "that petitioner did not have an expectation of privacy that society would recognize as legitimate." *Id.* at 852 (internal quotation marks omitted).

"Courts disagree as to whether or not the relevant parole regulation in New York is similar to the California statute at issue in *Samson*...there is no consensus on whether or not *Samson* applies to cases involving New York parolees." *United States v. White*, 622 F. Supp. 2d 34, 41 (S.D.N.Y. 2008) (citing cases).

The Court of Appeals for the Second Circuit has refused to read *Samson* as holding that "parolees in fact have *no* legitimate expectation of privacy and thus [a search of a parolee] could not...violate[] the Fourth Amendment, irrespective of the legitimacy of the State's interests in conducting it." *United States v. Quinones*, 457 F. App'x 68, 69, n. 1 (2d Cir. 2012) (emphasis in original). Instead, it has continued to decide cases under the "the more solicitous [*Huntley*] standard" and has chosen to "save any further analysis for a case where a distinction between *Huntley* and *Samson* would make a difference." *Id.* (citing cases) (internal quotation marks omitted).

In *Grady*, the Supreme Court emphasized its application of the "totality of the circumstances" test. The Court was asked whether satellite-based GPS monitoring of sex

offenders, for life, by the North Carolina agency that oversees parolees and probationers

constitutes a "search" for Fourth Amendment purposes.  The Court concluded "that a

State…conducts a search when it attaches a device to a person's body, without consent, for the

purpose of tracking that individual's movements."  135 S. Ct. at 1370.  The Court withheld

judgment on whether the search was constitutional, noting that the "reasonableness of a search

depends on the totality of the circumstances, including the nature and purpose of the search and

the extent to which the search intrudes upon reasonable privacy expectations."  *Id.* at 1371

(citing *Samson*).  The *per curiam* opinion does not make any explicit reference to the "special

needs" doctrine.


IV.     **Monitoring: Application of Law to Facts**

a.  **Constitutionality of the Electronic Monitoring Search**

The placement of a location-tracking electronic monitoring bracelet on Lambus's ankle

on May 8, 2013 constituted a search.  *Grady*, 135 S. Ct. at 1370.  No warrant supported it; the

government bore the burden of proving the search constitutional.  *United States v. Davis*, 111 F.

Supp. 3d 323, 331 (E.D.N.Y. 2015).  Constitutionality turns on its reasonableness, and "[t]he

reasonableness of a search depends on the totality of the circumstances, including the nature and

purpose of the search and the extent to which the search intrudes upon reasonable privacy

expectations."  *Id.* at 1371.  Following the approach of the Court of Appeals for the Second

Circuit (*see Quinones*, 457 F. App'x at 69, n. 1), the reasonableness of the search will first be

tested under the *Huntley* standard, and then under a "totality of the circumstances" test.

i.  **Nature and Purpose of the Search**

23

According to Investigator Scanlon, the decision to place an electronic monitoring bracelet on Lambus was made by Lambus's parole officer and her supervisors in the NYSDOCCS "supervisory bureau" in order to monitor his compliance with the curfew condition of his parole. Hr'g Tr. at 98:5-13.  Lambus argues that the GPS device was actually placed on him, and kept on him, at the behest of federal law enforcement authorities to aid a federal investigation into narcotics distribution.  He contends that the search was conducted by NYSDOCCS to further general law enforcement objectives, not to pursue a legitimate parole-related objective.  If this were the case, the search would fail under *Huntley* because that decision draws a bright line between parole-related searches by a parole officer and general law enforcement searches by a police officer.  *Huntley*, 371 N.E.2d at 797.  The latter type of search may have a "rational connection" to a parole-related objective, given that both law enforcement and parole officers have the "parallel and…intertwined" "objective[] and dut[y]" to detect "illegal activities" (*Reyes*, 283 F.3d at 463), but a search is not "substantially related" to a parole-related objective if it is primarily conducted "in aid of prosecution for criminal activity."  *Huntley*, 371 N.E.2d at 798.

To substantiate his allegations, Lambus has pointed to "circumstantial evidence" that BSS was coordinating with other law enforcement agencies.  Lambus's Supplemental Mem. in Supp. of Suppression, ECF No. 266, at 6-9.  Entries by Investigator Scanlon in the NYSDOCCS electronic tracking system indicate that he was in contact with outside law enforcement agencies about Lambus in mid-to-late 2012 and the spring of 2013.  *See* Parolee CMS at 3-6.  Investigator Scanlon testified, however, that the decision to place Lambus on electronic monitoring was made by the parole officers in charge of supervising Lambus, and neither BSS nor any federal law enforcement agency was involved in that decision.  Hr'g Tr at 97:3-15.  He swore that the Lambus's violations of his curfew, a condition of his parole, is what motivated the supervisory

24

bureau to impose the GPS monitoring.  *Id.* at 98:5-13.  Lambus's Parolee Chrono Report indicates he had violated his curfew on two occasions prior to the date he was placed on electronic monitoring.  *See* Parolee Chrono Report at 33 and 38.

The court finds Investigator Scanlon's testimony credible.  Mere innuendo and speculation by Defendants that the decision to put an ankle bracelet on Lambus was at the behest of federal law enforcement is not sufficient.  The search, at least initially, was substantially related to the parole objective of ensuring Lambus complied with his parole conditions.  It passes constitutional muster under *Huntley*.

Ending the analysis here, however, would be premature.  At some point in the following two years, the GPS remained on Lambus, not because of the curfew violation, but to assist BSS with its investigation into whether Lambus and others were trafficking narcotics.  Hr'g Tr. at 104:5-15.

BSS contacted the federal authorities in June 2013—one month after Lambus was braceleted—to ask for their assistance in investigating a large narcotics trafficking ring, of which Lambus was a participant.  *Id.* at 104:9-105:14.  A federal law enforcement agency, HSI, thereafter became the "lead agency" in the investigation; it arranged for physical surveillance, undercover infiltration of the DTO, controlled buys, and wiretaps.  *Id.* at 106:11-107:7.  On July 2, 2013—two months after the braceleting—BSS told the supervisory bureau that it was "working closely with [federal] ICE" to investigate Lambus and asked that it "be consulted prior to any consideration of revocation" of Lambus's parole.  July 2, 2013 BSS Memo, attached as Exhibit S to the Government's Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 287-19.

Though Investigator Scanlon testified that the "ultimate decision" to keep the tracking device on Lambus was always made by the NYSDOCCS supervisory bureau (Hr'g Tr. at 110:2-

25

11), he admitted that BSS was "involved in the decision to keep Mr. Lambus on the GPS" about a year after the device was initially attached. *Id.* at 109:9-13.  Scanlon recommended that the supervisory bureau "continue to keep him on the GPS so that … [BSS could] continue its investigation as to his activities, his whereabouts and if he was still noncompliant with his special conditions, specifically conducting criminal activity specifically narcotics distribution." *Id.* at 109:14-22.  While Scanlon testified that the federal government did not ask him to make that recommendation for continued braceleting (*id.* at 109:23-24), by the time he did so, the federal government can be assumed to have been the "lead agency" in the investigation.

Pinpointing exactly when Lambus's electronic monitoring crossed the line from a supervisory search to a general law enforcement search is difficult.  That the line was crossed during the two years seems clear.

Parole officers must serve the community at large and the parolee, a dual responsibility requiring facilitating a parolee's rehabilitation, if possible.  Allowing a parolee to knowingly violate both the conditions of his parole and the law—for months and months on end—betrays both of the constituencies the parole officer is supposed to serve by sacrificing rehabilitation for recidivism in aid of public protection.

A state cannot use a parolee as a sort of fly paper, trailing him around the community for years, trolling for criminals.  If the state wishes to search someone for the primary purpose of furthering a deliberate effort to gather evidence as part of a wide-ranging criminal prosecution, the "warrant and probable-cause requirement is not…'impracticable'" (*Griffin*, 483 U.S. at 873); the search cannot be justified as a "special need," even if the searchee is a parolee.  *See Huntley*, 371 N.E.2d at 797 ("In general the standard by which the reasonableness of a search or seizure

with respect to a parolee by a police officer is to be measured would be the familiar requirement

of a showing of probable cause.").

### ii. Lambus's Reasonable Privacy Expectations

The extent to which Lambus's privacy is deemed invaded by the electronic monitoring

depends on several factors, including his status as a parolee, the clarity of the conditions of his

parole, and the nature of information being gleaned from the search. *See United States v. Lara*,

815 F.3d 605, 610 (9th Cir. 2016). Lambus, as a parolee, had a diminished expectation of

privacy. *Samson*, 547 U.S. at 852. A "diminished expectation" of privacy is different from "no

expectation" of privacy. *See id.* at 850, n. 2. A person on parole or supervised release needs to

be dealt with presumptively as someone trying to rehabilitate with the aid of the government

authorities. He or she remains in possession of many of the central aspects of personal

constitutional rights, including presumed innocence of any further criminal activity, and a limited

right to privacy.

Lambus had agreed to certain conditions as part of his parole, including "permit[ting]

[his] Parole Officer to visit [him] at [his] residence and/or place of employment

and…permit[ting] the search and inspection of [his] person, residence, and property" without a

warrant. *See* Certificate of Release. The conditions of his release are silent on whether

NYSDOCCS had the right to know exactly where he was at each moment—save for a catchall

provision which requires Lambus to "fully comply with the instructions of [his] Parole Officer

and obey such special additional written conditions as he or she, a Member of the Board of

Parole or an authorized representative of the Division of Parole, may impose." *Id.* Unlike the

probation order in *Knights*, where the order "clearly expressed the search condition" of his

residence, a condition about which the probationer was "unambiguously informed," (534 U.S. at

27

119), a search condition granting NYSDOCCS the right to know Lambus's location at all times for over two years was not clearly expressed in his Certificate of Release.

Under New York law, acceptance of such general conditions is not a waiver of all Fourth Amendment rights. *See, e.g.*, *Huntley*, 371 N.E.2d at 798  (the standard authorization in a parolee's certificate of release "is not to be taken as an unrestricted consent to any and all searches or as a blanket waiver of all constitutional rights to be secure from unreasonable searches and seizures.").  The "salience" of his Certificate of Release (*Knights*, 534 U.S. at 118-19) to Lambus's expectation of privacy is limited.

Lambus signed a document on the day he was put on electronic monitoring acknowledging that GPS monitoring was a special condition of his release that would "remain in effect until the termination of [his] legal period of supervision," which could last until August 2, 2015.  Special Conditions Acknowledgement.  He claims he was coerced into signing this paper, and only did so because NYSDOCCS threatened to "violate" his parole and imprison him if he refused to consent. Apr. 14, 2016 Lambus Aff. at ¶¶ 14, 25.

The government has the burden of showing that consent to a search was voluntarily given. *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981) (citing *Schneckloth*, 412 U.S. 218 (1973)).  The court does not rule on this issue of consent, but it notes that the government has presented no evidence of consent other than Lambus's "acknowledgement" that the condition has been "imposed upon [him]."  *See* Special Conditions Acknowledgement.  And, Lambus testified that he was threatened with imprisonment if he did not accede to this special condition.  Apr. 14, 2016 Lambus Aff. at ¶¶ 14-15, 25.  Lambus also testified that Supervisor Parker told him he would only have the GPS on him for 3-6 months.  *Id.* at ¶ 16.

The document relied upon by the government merely shows that the GPS search was "imposed" as a special condition of the Lambus parole.

The nature of an "imposition" undermines the notion of consent.  The existence of a threat of imprisonment if consent is refused also counsels against a finding of voluntariness.  *See, e.g.*, *United States v. Isiofia*, 370 F.3d 226, 232-33 (2d Cir. 2004) (affirming a district court's conclusion that consent to search was not given voluntarily when law enforcement officers said the defendant would be jailed if he did not consent); *see also Samson*, 547 U.S. at 863, n. 4 (Stevens, J., dissenting) (considering a parolee, whose only choice is between compliance and jail, as having given "consent" to a search condition is a "manifest fiction" because the parolee "has little genuine option to refuse.") (internal quotation marks omitted).

Evidence apart from Lambus's affidavit substantiates his testimony that he was told the bracelet would only remain on his person for 3-6 months.  A record from Veritracks, the vendor that provides GPS monitoring services to NYSDOCCS, indicates that the initial GPS monitoring period was set to last only until November 8, 2013, exactly 6 months after the bracelet was attached.  Veritracks Record, attached as Exhibit I to Lambus's Supplemental Mem. in Supp. of Suppression, ECF No. 266-1.  Lambus's Parolee Chrono Report also shows that from October 2013 on, Lambus repeatedly asked his parole officer to remove the device.  *See* Combined Parolee Report at 9-12.  Nearly a year after NYSDOCCS began GPS monitoring of Lambus, when queried by Lambus about when the electronic monitor would be removed, Lambus's parole officer said she "does not know."  *Id.* at 11 (April 16, 2014 entry).  The government failed to meet its burden to establish that Lambus voluntarily consented to the placement of a GPS tracking device on him for over two years.

The information gained by the government through continuous GPS monitoring of an individual helps the government "reveal an intimate picture of [the individual's] life." *United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010), *affirmed on other grounds by Jones*, 132 S. Ct. 945 (2012). "GPS monitoring—by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the Government, in its unfettered discretion, chooses to track—may alter the relationship between citizen and government in a way that is inimical to democratic society." *Jones*, 132 S. Ct. at 956 (Sotomayor, J., concurring) (internal quotation marks omitted). "What the technology yields and records with breathtaking quality and quantity is a highly detailed profile, not simply of where we go, but by easy inference, of our associations—political, religious, amicable and amorous, to name only a few—and of the pattern of our professional and avocational pursuits." *People v. Weaver*, 909 N.E.2d 1195, 1199–200 (N.Y. 2009). The "intimate picture" revealed by GPS surveillance grows more intimate, and, therefore, more problematic, the longer the surveillance continues uninterrupted. *Cf. In re U.S. for an Order Authorizing Release of Historical Cell-Site Info.*, 2011 WL 679925, at *1-2 (E.D.N.Y. Feb. 16, 2011) (reviewing cases involving continuous GPS surveillance and granting a government application for the release of historical cell-site information because the "shorter time period" of 21 days, broken into separate three-, six-, and twelve-day periods, is not "necessarily…as revealing as the sustained month-long monitoring at issue in *Maynard*.").

Lambus, as a parolee, did not have an unfettered right to privacy in some of the information that can be gleaned through continuous GPS surveillance. For example, he was not free to associate with criminals during his parole. *See* Certificate of Release. But, a parolee still has a First Amendment right to exercise his religion, and constant government surveillance

30

which in effect audits his religious practice is highly burdensome.  *See generally U.S. v.*
*Hernandez*, --- F. Supp. 3d ----, 2016 WL   5107017 (E.D.N.Y. Sept. 20, 2016) (holding that a
condition of federal supervised release that prevented a releasee from attending religious services
of his choosing is unconstitutional).

In the instant case, Lambus's location was monitored 24 hours a day, every day from
May 8, 2013 to July 8, 2015—791 days.  In *People v. Weaver*, the New York Court of Appeals
recognized that even if a person has a diminished expectation of privacy in a car traveling on a
public road, continuously tracking the car through use of a GPS monitoring device was a
"massive invasion of privacy" that was "inconsistent with even the slightest reasonable
expectation of privacy."  *Id.* at 1201.  Here, too, the "massive invasion of privacy" by continuous
GPS surveillance vitiated Lambus's reasonable expectation of privacy, even if such an
expectation was "slight."

### iii.  Totality of the Circumstances

It is difficult to precisely balance the competing interests of Lambus and the government
to determine if the search was reasonable when weighing the totality of the circumstances.  The
shifting purpose of the search—from monitoring whether a parolee was violating the conditions
of his parole, to gathering evidence about a narcotics trafficking ring—lessens the legitimacy of
the government's interest in the particular braceleting.  While Lambus's status as a parolee
certainly diminished his reasonable expectation of privacy, it did not eviscerate such
expectations entirely; the search at issue was extraordinarily invasive of the reasonable privacy
expectation he possessed.

### iv.  Lack of Counsel

If Lambus had been represented by counsel during his parole, he might have challenged NYSDOCCS's decision to subject him to this continuing search for such a long duration. Individuals who lack counsel are left in the lurch when attempting to remedy violations of rights to their privacy. It is an unfortunate and common occurrence in our country that rights without counsel are no rights. In a case like the present one, where the invasion of privacy is so substantial and the government's purpose is so questionable, a search is likely unreasonable and therefore unconstitutional at some point. The court does not reach that issue in the instant case. *See infra* Part IV(b).

Judicial notice is taken that a substantial percentage of some groups in some communities are subject to parole and supervised release. Allowing free tracking of those members substantially affects the freedom and equality of the community.

### b.  Good Faith Exception to the Exclusionary Rule

"[W]hen the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful….the deterrence rationale [of the exclusionary rule] loses much of its force." *Davis*, 564 U.S. at 238 (internal quotation marks and citation omitted). This rule is akin to the "qualified immunity" doctrine that protects individual officers from liability in civil lawsuits. *See, e.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982) ("[Q]ualified immunity would be defeated if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury") (internal quotation marks and emphases omitted). "[S]earches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis*, 564 U.S. at 232.

Two Second Circuit Court of Appeals opinions condone the coordination between parole and general law enforcement. *See United States v. Reyes*, 283 F.3d 446 (2d Cir. 2002); *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004). Reliance by the parole officers and federal agents on the broad language in these appellate precedents was objectively reasonable.

In *Reyes*, the Court examined the "stalking horse" theory, which it explained as follows:

> A probation officer acts as a stalking horse if he conducts a probation search on prior request of and in concert with law enforcement officers. However, collaboration between a probation officer and police does not in itself render a probation search unlawful. *The appropriate inquiry is whether the probation officer used the probation search to help police evade the Fourth Amendment's usual warrant and probable cause requirements* or whether the probation officer enlisted the police to assist his own legitimate objectives. A probation officer does not act as a stalking horse if he initiates the search in performance of his duties as a probation officer.

283 F.3d at 463 (emphasis added).

The Court of Appeals for the Second Circuit refused to concede "that this ill-defined theory exists;" it decided "that the doctrine is not a valid defense in this Circuit." *Id.* It noted that "verifying whether the supervisee is dealing in drugs or committing other crimes" is a responsibility of a probation officer, and "[a]ccordingly, the objectives and duties of probation officers and law enforcement personnel are unavoidably parallel and are frequently intertwined…Consequently, the notion of the 'stalking horse' stands in stark contrast to the law governing the long-established practices of probation and parole officers." *Id.* The Court added, in dicta, that while the facts indicated that the search of the probationer involved a "coordinated effort between [the probation office and the DEA], the law permits such cooperation as long as the probation officers are pursuing legitimate probation-related objectives." *Id.* at 464 (internal quotation marks omitted).

Two years after *Reyes*, in *Newton*, a defendant challenged a warrantless search where parole officers were accompanied by the police, "a variation of…a 'stalking horse' theory." 369

F.3d at 667.  The Court of Appeals for the Second Circuit held that the "stalking horse" theory

"is largely foreclosed by our decision in [*Reyes*], which specifically rejected stalking horse

challenges to warrantless searches by probation or parole officers accompanied by the police."

*Id.*  Rejecting the defendant's attempt to distinguish *Reyes* on the ground that the search in *Reyes*

was less intrusive, the court declared: "*Reyes*'s rejection of challenges to coordinated efforts

between probation/parole officers and other law enforcement officials turned not on the

particular level of intrusion in that case, but on the legitimacy of the supervision objectives being

pursued by the probation officers."  *Id.*  The court explained that "[i]n any event, the facts of this

case…do not support a stalking horse challenge [because] a probation officer does not act as a

stalking horse if he initiates the search in the performance of his duties as a probation officer."

*Id.* at n. 3 (internal quotation marks omitted).  The court concluded its analysis by "reiterat[ing]

*Reyes*'s rejection of stalking horse challenges."  *Id.* at 667.

The unequivocal language in these two decisions—*Reyes* and *Newton*—created a binding

appellate precedent that police involvement with a warrantless search of a parolee does not stamp

the search as unconstitutional if it was initiated by a parole officer pursuant to a legitimate

supervisory objective.

In the instant case, the search was initiated by NYSDOCCS to monitor Lambus's

adherence to his parole conditions; specifically, his curfew.  This is a legitimate supervisory

objective.  The decision by NYSDOCCS and the federal agents to coordinate subsequently was

reasonable given the Court of Appeals's *Reyes* and *Newton* decisions.  Neither the NYSDOCCS

officers nor the federal law enforcement officers behaved inappropriately.  There would

therefore be little deterrent value in excluding the evidence.  The court declines to suppress the

location data evidence.  *See, e.g.*, *Davis*, 564 U.S. at 237-38 ("[T]he deterrence benefits of

exclusion vary with the culpability of the law enforcement conduct at issue…when the police act with an objectively reasonable good-faith belief that their conduct is lawful…the deterrence rationale loses much of its force.") (internal citations, quotation marks, and alteration omitted).

The instant case is, however, distinct from *Reyes* and *Newton* in striking ways that may prompt the courts to revisit their jurisprudence in this area in a more generous future case.

The nature of the search in the instant case made it a much greater impingement on Lambus's privacy than the privacy of the defendants in *Reyes* and *Newton*. The searches at issue in *Reyes* and *Newton*, a home visit and a home search, respectively, were of a finite duration and were explicitly delineated as conditions of release. The search of Lambus lasted continuously for over two years and was not specifically covered by Lambus's Certificate of Release. *See supra* Part IV(a)(ii). While "the overriding respect for the sanctity of the home" cannot be doubted (*Payton v. New York*, 445 U.S. 573, 601 (1980)), the degree of impingement on a person's privacy caused by a one-time intrusion into her home pales in comparison to the stripping of privacy caused by generating "a precise, comprehensive record of a person's public movement that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Jones*, 132 S. Ct. at 955 (Sotomayor, J., concurring).

The degree of coordination between the supervising and law enforcement agencies in this case is quite different from *Reyes* and *Newton*. In those cases, coordination was relatively brief, whereas federal law enforcement officers and NYSDOCCS officers cooperated in investigating Lambus for two years prior to his arrest. Government's Mem. in Opp. to Def.'s Motion to Suppress. at 15 (HSI and BSS began coordinating in June 2013).

The purpose of the search in the present case differs markedly from the purpose of the searches in *Reyes* and *Newton*. In *Reyes*, the DEA and U.S. Probation Office coordinated to

search Reyes's house because they believed he might be cultivating marijuana. 283 F.3d at 451-52. About one week after the DEA found marijuana on his property pursuant to a consent search (*id.* at 453-54), Probation charged Reyes with three violations of the conditions of his supervised release and attempted to revoke his release. *Id.* at 454-55.

In *Newton*, the parole officers believed the defendant was in possession of a gun and reasonably brought in the police because of a "not-insubstantial risk that Newton's response to any inquiry might be violent." 369 F.3d at 667. Once the parole officers found a gun during the search, the defendant was placed under parole arrest and turned over to the police officers to process a new state criminal arrest. *Id.* at 664. One month after his arrest and the state criminal charges were dismissed, he was charged in an indictment with being a felon in possession of a firearm. *Id.*

In both cases parole and law enforcement officers suspected the supervisee was committing a specific crime in violation of his parole and coordinated for a limited time to search to determine if he was engaging in a precise criminal activity. And the agencies acted swiftly to charge the defendants as a result of the criminal wrongdoing they uncovered as a result of the search.

Whereas in *Reyes* and *Newton*, the defendants contended that the supervising agency was the stalking horse for the law enforcement agency, in the instant case, coordination by the agencies unwittingly turned Lambus into a stalking horse for the federal agencies. Lambus knowingly had a GPS tracking device placed on his ankle on May 8, 2013, not because he was expected of any criminal wrongdoing, but to monitor whether he was abiding by the curfew condition of his parole. *See* Hr'g Tr. at 98:5-13. This purpose shifted as federal law enforcement began using the location data to build a narcotics trafficking case against a dozen

36

individuals.  His ostensible supervisors, NYSDOCCS, took no actions against him despite,

presumably, possessing evidence of criminal wrongdoing.  *See supra* at Part IV(a)(i).

These three factors—the nature of the search, the degree of coordination, and the purpose

of the search—help guide courts in determining if the "particular circumstances" of a

coordinated investigative effort by parole and law enforcement officers violate the boundaries of

the *Huntley* rule's instruction that a warrantless parole search must be "substantially related to

the performance of duty" of a parole officer and not merely be "rational[ly] connect[ed]" to the

parole officer's duty.  371 N.E.2d at 797.  The more intrusive the search, the deeper the

coordination between the agencies, and the more wide-ranging the web of criminal activity the

search seeks to detect, the less substantial the relation of the search is to the supervision of the

parolee being searched.  The longer the search, the more likely it is to be "seeking contraband or

evidence in aid of prosecution for criminal activity" (*id.* at 798) for the purpose of "uncover[ing]

evidence of ordinary criminal wrongdoing."  *Edmond*, 531 U.S. at 42.  Such a search could not

be justified under the tent of the "special needs" doctrine.  *Nicholson v. Goord*, 430 F.3d 652,

663 (2d Cir. 2007) (reviewing Supreme Court precedent and holding that "normal law-

enforcement objectives…fall outside of the special-needs exception") (internal quotation marks

omitted).

### V.      Motion to Suppress Recordings from Wiretap Authorized on January 9, 2015

In its January 9, 2015 wiretap application, the government violated 18 U.S.C. §

2513(1)(e) by failing to disclose "previous applications" for wiretaps of some of target

interceptees in the January 9th affidavit.  *See supra* at Part II(c)-(d); *Bianco*, 998 F.2d at 1128

("[T]he duty to disclose prior applications under § 2518(1)(e) covers all persons named in the

application and not just those designated as 'principal targets'").  The government argues that the omission of these prior wiretap applications would not have changed the judge's decision to authorize the application because the evidence gathered through those wiretaps was "stale," and therefore would have had no impact on necessity or probable cause.  *See* Hr'g Tr. at 146:16-147:6.  This argument relies upon the "corrected affidavit" doctrine—an outgrowth of the *Franks* decision—which instructs a court to consider whether a judge would have issued the warrant if the omitted information was included in the original affidavt.  *See, e.g.*, *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000).  Suppressing evidence under this precedent requires the defendant to "show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause [or necessity] finding."  *Rajaratnam*, 719 F.3d at 146 (internal quotation marks omitted).

This is not the only route through which a defendant can suppress evidence obtained through a defective Title III wiretap affidavit; the wiretap statute has its own exclusionary rule.  *See generally United States v. Giordano*, 416 U.S. 505, 524 (1974) ("The issue does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights, but upon the provisions of Title III").  In two cases involving motions to suppress due to noncompliance with section (1)(e) of the wiretap statute, the Court of Appeals for the Second Circuit affirmed a district court's decision to deny suppression.  Both those cases are distinguishable on the ground that the omission in this case was not inadvertent.

In *Bianco*, the Court of Appeals held that a violation of section (1)(e) is "subject to the statutory exclusionary provisions of [18 U.S.C.] §§ 2515 and 2518(10); that subsection (1)(e) constitutes a non-central provision of Title III; that the government's failure to comply with the

requirements of subsection (1)(e) was in good faith and inadvertent error, and suppression is

neither permissible or appropriate." 998 F.2d at 1128 (internal citation omitted). The court

rested its decision to affirm the denial on the fact that the "omission of the prior surveillance

applications" was "inadvertent" and the issue of "the requirements of subsection (1)(e) as applied

to a roving intercept application had not been addressed in any reported decisions" prior to the

submission of the wiretap application. *Id.* Similarly, in *United States v. Barnes*, the defendant

argued that "the government's failure to disclose the existence of concurrent state wiretaps

(which, in part, targeted Barnes) requires suppression of the evidence obtained from the federal

wiretaps." 411 F. App'x 365, 368 (2d Cir. 2011). The court noted that "nothing in the record

suggests that the government's affiant was aware of the state wiretaps, which were applied for

after the state and federal investigations were severed." *Id.* The court held that defendant's mere

speculation that the federal government must have been aware of the state wiretaps "is

insufficient to demonstrate a knowing omission on the part of the government. Thus, the

affiant's omission 'was not intentional, but inadvertent' and does not violate § 2518(1)(e)." *Id.*

(quoting *Bianco*, 998 F.2d at 1128).

A natural implication of *Bianco* and *Barnes* is that section 2518(1)(e) of the wiretap

statute is violated by the government's "knowing," non-inadvertent omission. Where the

government knowingly omits information in violation of Title III's statutory requirements,

suppression is appropriate. *See United States v. Bellosi*, 501 F.2d 833 (D.C. Cir. 1974)

(suppressing evidence where government intentionally violated requirement that an application

for a wiretap inform the judge of prior wiretap applications); *United States v. Luong*, CR-96-

0094-MHP, Dkt. No. 586 (N.D. Cal., July 14, 1998) (unpublished) (reviewing circuit court

precedent and holding that "a reckless failure to comply with section 2518(1)(e)" is sufficient

grounds for suppression "without resorting to a *Franks* analysis."); *cf. United States v. Ceballos*, 302 F.3d 679, 684-85 (7th Cir. 2002) (denying a motion to suppress where prior wiretap applications were not disclosed after the affiants ran a database search and the search came up empty); *United States v. Lujan*, 936 F.2d 406, 409 (9th Cir. 1991) ("We are persuaded by those other circuits which have concluded that suppression was not required by the section 2518(1)(e) nondisclosure under similar findings of unintentional noncompliance.").

In the instant case, the omission was not "inadvertent;" it was knowing. The Special Agent testified that despite having been an affiant in previous wiretap applications (Hr'g Tr. at 159:2-6), he did not know that he needed to check for prior wiretap applications related to all the target interceptees. *See id.* at 157:5-7. This mistake alone, despite precedent to the contrary, *may* have constituted mere inadvertence. But this was not the Special Agent's only error. The HSI agent swore that "a check of federal law enforcement databases, including FBI, DEA, ATF, and HSI databases, indicate that there have been no prior application seeking Court authorization to intercept the wire, oral, or electronic communications of the *Target Subjects* or over the SUBJECT TELEPHONE." Jan. 9, 2015 Aff. at ¶ 24 (emphasis added). When he swore to this statement, he knew it was false. This was not a "misunderstanding." *See* Hr'g Tr. at 157:10-19. It was perjury. Suppression is an appropriate remedy for such an omission.

The court need not rely on *Franks* or *Giordano* to rule that any evidence gathered pursuant to the January 9, 2015 wiretap order is suppressed. It is within the court's inherent authority to suppress evidence gathered unlawfully in order to maintain the integrity of its own proceedings and of government affiants appearing before it—particular in an in-chambers appearance without opposing counsel present. *See, e.g.*, *Elkins*, 364 U.S. at 222-24; *see also*

*Payner*, 447 U.S. at 735 n. 7; *McNabb v. United States*, 318 U.S.; *Cortina*, 630 F.2d at 1214; *HSBC Bank USA, N.A.*, 2013 WL 3306161 at *4-6.

Wiretap applications are made *ex parte*.  Judges rely on the absolute fidelity of the government agents and prosecutors who swear to affidavits and answer questions before the court in chambers attesting to the facts necessary to obtain a wiretap.  In reliance on their fidelity, courts almost always grant their requests.  *See* Wiretap Report 2015, *available at* http://www.uscourts.gov/statistics-reports/wiretap-report-2015 (in 2015 all 4,148 wiretap applications made pursuant to federal and state law were granted).  Knowingly false statements cannot be tolerated, especially if those statements are made at proceedings where the courts have little choice but to take the government at its word.  Any evidence of statements made on wiretaps gathered pursuant to the January 9, 2015 wiretap order is suppressed.

No evidence has been presented that what was overheard as a result of this wiretap led to other evidence.  The issue of fruit of the poisoned tree has not yet been posed.  This issue may be raised at the *in limine* hearing on January 3, 2017.

## VI.    Conclusion

The search by way of the ankle bracelet is not suppressed.

Any evidence of statements overheard pursuant to the January 9, 2015 wiretap order is suppressed.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   December 22, 2016
        Brooklyn, New York