UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– against –

KAMEL LAMBUS,

Defendant.

**MEMORANDUM AND ORDER
ON MOTION TO SUPPRESS**

15-CR-382

**JACK B. WEINSTEIN, Senior United States District Judge:**

**APPEARANCES**
United States:

**Bridget M. Rohde**
Acting United States Attorney, E.D.N.Y.
By: **Lauren Howard Elbert**
**Marcia Maria Henry**
**Michael P. Robotti**
271 Cadman Plaza East
Brooklyn, NY 11201

Defendant:

**Angela D. Lipsman**
**Joseph R. Corozzo, Jr.**
**Ronald Rubinstein**
Rubinstein & Corozzo LLP
260 Madison Avenue
22nd Floor
New York, NY 10016

**Table of Contents**

I.     Introduction ......................................................................................................... 1

II.    Facts ...................................................................................................................... 2

       A.   State Parole Supervision of Lambus ................................................... 3

       B.   Installation of the Ankle Bracelet Tracking Device ......................... 5

       C.   Federal Takeover ................................................................................... 8

            1.   BSS Collaboration with Federal Law Enforcement ................. 8

            2.   Circumvention of the DOCCS Supervisory Bureau................. 17

            3.   Use of Tracking Devices Solely to Further the Federal Criminal Investigation.. 20

            4.   Knowledge by Federal Authorities of Need for Judicial Approval...................... 23

III.   Law ....................................................................................................................... 26

       A.   Motion to Suppress .............................................................................. 26

       B.   Requirement of Federal Judicial Approval for Placement or Use of   Tracking Devices for Investigatory Purposes ..................................................... 28

       C.   Supreme Court Requirement of Judicial Approval for Tracking Devices............. 31

       D.   State Searches under Control of Federal Rules if Evidence is to be Used in Federal Prosecutions.......................................................................... 33

IV.    Application of Law to Facts............................................................................... 35

       A.   Installation of Tracking Devices ........................................................ 35

       B.   Use of Tracking Device is a Separate Search ................................... 36

       C.   Rules on Obtaining Judicial Approval Known to Federal Officials ...................... 39

       D.   Consent Not Given ............................................................................... 41

       E.   Privacy Right of Defendant Violated ................................................. 42

V.     "Good-Faith" Exception to the Exclusionary Rule ...................................... 44

VI.    Procedural History ............................................................................................ 47

VII.   Need for Statutory and Supreme Court Clarification ................................... 48

VIII.  Conclusion........................................................................................................... 51

APPENDIX A: Acronyms and Defined Terms ........................................................ 53

APPENDIX B: Personnel, Agencies and Documents .............................................. 55

APPENDIX C: Chronology of Relevant Events on the Use of the Tracking Device Placed on Defendant Kamel Lambus ................................................................. 57

## I.    Introduction

 Absent exigent circumstances, federal investigative or other authorities must obtain a court order before installing or using a location tracking device to monitor the movements of any person or thing.  State parole authorities assume they do not need such an order; they placed a device on a state parolee, Kamel Lambus, and kept it on for over two years under the pretext that it was being used to ensure compliance with a curfew.  In fact, almost from the moment of installation, information from the device was exclusively relied upon by federal authorities working cooperatively with a state official to conduct a complex federal criminal investigation of a major heroin conspiracy that resulted in a federal indictment of defendant.

Upon recognizing that they were relying on this device to help track a large heroin distribution ring, federal officials should have 1) checked to see if court approval had been given, and, if not, 2) obtained approval from a federal district or magistrate judge.  They did not do so. *See infra* Part II.C.4; Part IV.B.

The key to the instant case was stated by Judge Friendly forty-five years ago in *United States v. Birrell*, 470 F.2d 113 (2d Cir. 1972).  Paraphrasing Judge Friendly's opinion in *Birrell*: "The propriety of the first intrusion into [defendant's] privacy [by the state] does not automatically sanction a second [by the federal government]. . . . [A] search by law enforcement officers of another sovereign for a different purpose could not be made without a warrant." *Id.* at 117.

Defendant Kamel Lambus, who wore the tracking device, has not been charged with a parole violation by the state.  He has been indicted by a federal grand jury as a drug conspirator based in part on evidence obtained from that device.  He moves to suppress evidence obtained from the device.  His motion is granted in part.  Information obtained as a direct—but not

indirect—result of use of the device is suppressed. Evidence which may indirectly have been obtained from the device, that is to say, evidence that was obtained with the aid of the device that would have been obtained independently by visual surveillance or otherwise, is not now suppressed.

Suppression is not to be used for punitive purposes; it should be limited to necessary instruction to law enforcement forces and necessary protection of the privacy of those being prosecuted. *See Herring v. United States*, 555 U.S. 135, 144 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.").

## II. Facts

Following this court's original decision granting a motion to reconsider its denial of Lambus's motion to suppress location data, an extensive evidentiary hearing was held. *See infra* Part VI, Procedural History. It provided extensive new information about the placement and use of the device on defendant's ankle and the nature of the relationship between state and federal authorities in obtaining evidence. The court concludes that within one month of placement of the tracking device on defendant's ankle, the federal authorities, working closely with state authorities, directed use of the device to provide evidence for the prospective federal criminal case, and not for any state parole supervision or violation charge. *See infra* Appendix A: Acronyms and Defined Terms ("Appendix A"); Appendix B: Personnel, Agencies and Documents ("Appendix B"); and Appendix C: Chronology of Relevant Events on the Use of the Tracking Device Placed on Defendant Kamel Lambus ("Appendix C").

## A.  State Parole Supervision of Lambus

Kamel Lambus was discharged from prison and became a parolee under the supervision of the New York Department of Corrections and Community Supervision ("DOCCS") on March 7, 2012.  Included in the terms of his parole, which was to last for about three years and five months, was an agreement by Lambus to "permit [his] Parole Officer to visit [him] at [his] residence and/or place of employment" and to "fully comply with the instructions of [his] Parole Officer and obey such special additional written conditions as he or she, a Member of the Board of Parole or an authorized representative of the Division of Parole, may impose."  Gov't Exh. 1.

Suspecting Lambus of attempting to introduce narcotics into a state prison, a member of the DOCCS Bureau of Special Services ("BSS"), Officer Thomas Scanlon, began investigating Lambus shortly after his release from prison.  BSS is a specialized division within DOCCS that investigates parolees who may be committing parole violations; the officers traditionally thought of as "parole officers" are members of DOCCS supervisory bureaus.  *See* Apr. 10, 2017 Hr'g Tr. at 65:24-66:5; Dec. 1, 2016 Hr'g Tr. at 57:11-59:18; *see also infra* Appendix A; Appendix B. This initial investigation quickly led to cooperation between New York State and federal authorities regarding the defendant.  In July 2012, New York's BSS reviewed mail Lambus sent to a prison and pictures gathered from social media sites that appeared to depict Lambus holding large sums of money while other men displayed gang signs.  3500-TS-9; Gov't Exh. 3.

BSS passed along this material to the federal Drug Enforcement Administration ("DEA"), which began its own investigation of Lambus.  3500-CB-8.  Nothing incriminating of Lambus was revealed by this preliminary investigation.  *Id.*  But state BSS Officer Scanlon continued to monitor Lambus for suspicious activities.  *Id.*; *see infra* Appendix C.

On April 5, 2013, state Officer Scanlon wrote to officers of the New York DOCCS Queens III Supervisory Bureau—which was then responsible for supervising Lambus's parole—providing an "interim update regarding the investigation being conducted on Lambus for possible violations of the conditions of his parole." 3500-CB-8. Scanlon noted that "[BSS] was made aware of [the letter Lambus sent to the prison] on 7/3/12 [and] . . . [BSS] determined from the DEA that they were not [pursuing] the matter further since their (DEA & NYSDOCCS [Inspector General]) [investigation] failed to reveal drugs being distributed into targeted DOCCS facilities by Lambus at that time." *Id.* Scanlon expressed concern over the criminal history of Lambus's employer, and stated that "[BSS] continues to investigate/develop leads as to Lambus' activities." *Id.* He believed Lambus "may be engaged in behavior contrary to his release agreement. As per our discussion, this Bureau continues to investigate and identify possible locations, individuals, and vehicles which may be associated to Lambus. *This information will be provided to you once obtained.*" *Id.* (emphasis added). Scanlon said that BSS will "assist your staff with a search of Lambus' residence, and appropriate follow-up, in a cooperative effort to attempt to determine if Lambus is in compliance with the terms of his release agreement." *Id.* The same day he sent the email, BSS Officer Scanlon requested that Lambus's parole officers in the supervisory bureau conduct curfew visits and search his residence for contraband. Gov't Exh. 11 at 4-5.

The supervisory bureau followed up on BSS's requests. Senior Parole Officer Candace Benjamin made a home visit to Lambus on April 9, where she found "marijuana roaches" in two ashtrays in Lambus's living room. Gov't Exh. 10 at 36. Lambus claimed they did not belong to him. *Id.* About a week later, the Lambus parole was transferred from the Queens III Supervisory Bureau to the Queens II Supervisory Bureau. His primary parole officer there was

Trudy Kovics.  *Id.* at 35.  Following an anonymous tip on May 2, Queens II Supervisory Bureau Chief/Area Supervisor Mark Parker instructed his parole officers to conduct a curfew visit. Gov't Exh. 11 at 6-7.  On May 5, as per the instructions of her Area Supervisor, Officer Kovics conducted a curfew visit.  Lambus was not home.  Gov't Exh. 10 at 33.

### B.  Installation of the Ankle Bracelet Tracking Device

The day after the missed curfew, State Parole Officer Kovics and State Senior Parole Officer Hubert Browne, her direct supervisor, met and decided to place Lambus on electronic location monitoring.  *Id.*  The decision to place the tracking device on Lambus was made solely by the members of the supervisory bureau, not at the behest of BSS or the federal government. Mar. 15, 2017 Hr'g Tr. at 20:4-7, 23:7-9; Dec. 1, 2016 Hr'g Tr. at 97:3-15.  On May 8, 2013, Lambus's parole officers placed a tracking device on Lambus's ankle.  Gov't Exh. 10 at 33. According to the State parole officers, it is within their inherent authority to impose this punishment without any oversight from the judiciary.  Mar. 15, 2017 Hr'g Tr. at 12:20-14:15. No judicial approval was obtained.

Before the tracking device was installed, Lambus signed a form acknowledging that the "special condition" of electronic monitoring could last "until the termination of [his] legal period of supervision."  Gov't Exh. 14.  The court finds that this extensive consent was not voluntarily given.  Lambus signed the acknowledgement form only upon threat of incarceration.  Lambus stated that he was "coerced" into giving his consent because Bureau Chief/Area Supervisor Mark Parker, a supervisor at the DOCCS supervisory bureau responsible for his rehabilitation, told Lambus that "he would violate me and send me back upstate to prison unless I agree to have a GPS ankle bracelet installed on me."  Apr. 14, 2016 Lambus Aff., attached as Exh. H to Lambus's Supplemental Mem. in Supp. of Suppression, ECF No. 266-2 ("Apr. 14, 2016 Lambus

Aff."), at ¶¶ 14-15, 25. Lambus also said that Chief Parker told him he would only have the GPS on him for three to six months, but the ankle bracelet in fact remained on his person until his arrest over two years later on the federal charges he now faces. *Id.* at ¶¶ 16, 29. Under oath, Chief Parker did not deny threatening Lambus with incarceration if he did not agree to the special condition, recounting that he discussed with Lambus "the consequences of not adhering to any special conditions . . . and [that] the consequences could lead to a violation and his incarceration." Apr. 10, 2017 Hr'g Tr. at 94:1-10.

To the extent that Lambus's consent was voluntary, it was limited in scope to a search lasting only a few months. The DOCCS handbook describes "Electronic Monitoring" only once, in passing, as a "graduated response" that is part of a "network of alternatives to incarceration" for parolees caught using drugs while on parole. Gov't Exh. 67 at 30; *see also* Mar. 15, 2017 Hr'g Tr. at 26:3-11 (defining "graduated sanction"). The DOCCS "Policy and Procedures Manual" on "Electronic Monitoring," promulgated in December 2006, identified three categories of cases where electronic monitoring may be useful: (1) alternatives to incarceration, (2) community safety, and (3) domestic violence. Gov't Exh. 80; Mar. 17, 2017 Hr'g Tr. at 132:6-24. The manual notes that once someone is enrolled in electronic monitoring, the duration of monitoring will continue generally from four to six months as a maximum:

> [The] releasee's status on electronic monitoring will be reviewed by with the Senior Parole Officer during cases conferences and recorded in case chronos. *The duration of electronic monitoring program participation will generally range from a period of four to six months*. . . . The Area Supervisor will routinely review all electronic monitoring cases with appropriate staff and determine program continuance or termination based on the releasee's progress.

Gov't Exh. 80 (emphasis added). The "reports generated by the contractor [that maintains the information generated by the tracking device] must be routinely reviewed by the Parole Officer/Senior Parole Officer to determine equipment operation and case compliance with the program." *Id.* "If it is recommended that a releasee be removed from electronic monitoring, the Parole Officer will consult with the Senior Parole Officer. The Senior Parolee Officer must seek removal authorization from the Area Supervisor." *Id.*

A document from Veritracks (the program operated by the contractor which maintained the data generated by the tracking device) and statements from both Lambus and Bureau Chief Mark Parker confirm that they had agreed that the electronic monitoring would last only a few months. 3500-HB-10 (listing the "Sched GPS End Date" for Lambus as 11/08/2013); April 10, 2017 Hr'g Tr. at 94:14-20; Apr. 14, 2016 Lambus Aff. at ¶ 16.

Lambus's parole officers testified that Lambus complained "many times" about the continued attachment of the tracking device after it had been on for several months. Apr. 10, 2017 Hr'g Tr. 95:24-96:9 (Chief Parker testifying that beginning in October 2013, Lambus asked "on a number of occasions" when the tracking device could be removed); Apr. 11, 2017 Hr'g Tr. at 159:4-7 (Senior Parole Officer Hubert Browne testifying that Lambus "complained a lot" about the tracking device).

Despite the verbal understanding between Lambus and his parole officers that the tracking device would only remain on his person for a few months, it remained on his person for over two years in order to obtain evidence for the federal criminal investigation until his arrest in the instant case on July 8, 2015 by federal officers for federal crimes. Apr. 11, 2017 Hr'g Tr. at 182:23-183:3.

### C. Federal Takeover

#### 1. BSS Collaboration with Federal Law Enforcement

BSS Officer Scanlon informed federal Homeland Security Investigations ("HSI") Special

Agent Christopher Popolow about the tracking device "almost contemporaneously" with the

installation of the device.

> THE COURT: But realistically, approximately to the best of your
> recollection, it was almost contemporaneous, as I understand it,
> with the placement of the GPS . . . [t]hat somebody in the Fed
> investigation was told or was indicated or knew there was a GPS
> on him.
> BSS OFFICER SCANLON: Yes.
> THE COURT: Almost contemporaneously.
> BSS OFFICER SCANLON: Yes, to the best of my recollection.
> THE COURT: With the placement. Who was that?
> BSS OFFICER SCANLON: That would have been Special Agent
> Christopher Popolow.

Mar. 15, 2017 Hr'g Tr. at 17:24-18:12.[1]  At about the same time, Scanlon asked Special Agent

Popolow for assistance from the federal government in the investigation of Lambus.  Dec. 1,

2016 Hr'g Tr. at 104:23-106:9.  Popolow agreed to help, and the federal law enforcement agency

almost immediately became the "lead agency" in the investigation.

> THE COURT: How did [HSI] assist you?
> BSS OFFICER SCANLON: . . . Initially by conducting
> surveillances --
> THE COURT: On who?
> BSS OFFICER SCANLON: On Mr. Lambus and some of his other
> associates that were identified to be engaged in narcotics transfer,
> transporting of them. And --
> THE COURT: Those other names you gave the feds?
> BSS OFFICER SCANLON: Yes. They became the lead agency.
> They supplied the money for -- they also supplied when it
> eventually -- if you permit me to leap ahead, provided the
> undercovers, the money for transactions to purchase heroin and

---

[1] Throughout, the transcript has been modified to identify those questioning and answering.

also with the help of the prosecutor's office to obtain the Title 3 wiretaps.

*Id.* at 106:19-107:7.  Popolow "was the main federal investigator on the case."  Mar. 17, 2017

Hr'g Tr. at 190:19-25.  Though HSI was designated the "lead agency," BSS also exerted some

control over the investigation.

> AUSA ROBOTTI: Was HSI, Homeland Security Investigations designated the lead agency in this case?
> BSS OFFICER SCANLON: Yes.
> AUSA ROBOTTI: Why?
> BSS OFFICER SCANLON: Because they were pro-- they adopted the case to provide funding for several investigative tools as well as manpower.
> AUSA ROBOTTI: At any point did HSI have sole control of this investigation?
> BSS OFFICER SCANLON: No.

*Id.* at 143:5-13.

The collaboration between BSS and the federal criminal authorities, with the federal

authorities taking the lead, began shortly after the installation of the tracking device.  On June 6,

2013, Scanlon met with DHS/ICE and forwarded to the federal investigators "all photos & id

info to date of p [Lambus] & his gang," and DHS/ICE agreed to "assist[] NYSDOCCS-BSS w/

inv of p."  Gov't Exh. 2 at 20.  On June 13 and 14, Scanlon for the state and Popolow for the

federal forces discussed the investigation on the phone and began to identify Lambus's

"associates."  *Id.*  Later that month, on June 24, Scanlon advised Chief Parker that he was

meeting with the "feds" the next day and asked him to keep that information confidential.  *Id.*

As discussed further *infra* at Part II.C.2, the supervisory bureau was largely sidelined by BSS

and played a limited role in the investigation.  When Scanlon met with the feds on June 25, they

discussed bringing in the DEA, running "penlinks" on phone numbers, and initiating

surveillance.  *Id.*

The data gathered by the tracking device flowed regularly and freely from DOCCS to the federal government through BSS Officer Scanlon.  Mar. 15, 2017 Hr'g Tr. at 22:5-9; *see, e.g.*, 3500-TS-17 through 3500-TS-124 (emails between BSS Officer Scanlon and federal authorities conveying location information generated by tracking device).  Aided by the tracking device, BSS and federal investigators participated in numerous joint surveillance operations.  For example, on July 11, 2013, the tracking device recorded Lambus "leaving his res[idence] approx. 1730 hrs" and indicated "he resumed his usual route."  Gov't Exh. 2 at 20.  Surveillance teams also physically observed him at a certain "high activity" location that day.  *Id.*

Scanlon regularly sent emails to Popolow and other federal agents that included Veritracks links or maps and charts with updates on Lambus's location by the minute.  *See, e.g.*, 3500-TS-81.  From August 7, 2013 until the investigation ended nearly two years later, Scanlon sent such emails many dozens of times.  *See, e.g.*, 3500-TS-17 through 3500-TS-124.  Often, the emails included a brief description of Lambus's activities: "He is spending a lot of time @ 119 & 165th st. Also blows off curfew constantly. @ Perfections strip club in Woodside on Sunday 8/24/14. Looking for patterns will advise if any of significance are determined."  3500-TS-44. At times Scanlon simply wrote "take a look" or "See attached from 2/24/15 activities".  *See, e.g.*, 3500-TS-48; 3500-TS-55.  The federal investigators occasionally asked Scanlon to re-format the GPS data so they could run it through specialized software: "Tom I need date and latitude/longitude. It looks like they took a step further and gave us addresses, but I need the lat/long for the program to be able to read it. Is there anyway you could provide this? . . . I need: date/time, latitude and longitude in an excel spreadsheet. Thanks and sorry for the hassle, Popolow."  3500-TS-22.

On December 11, 2013, Scanlon and Popolow met with federal prosecutors to discuss their investigation. They were informed that the "[Assistant United States Attorney] wants more drugs bought" "to determine level of consp." Gov't Exh. 2 at 15. As Scanlon later recalled, "[b]asically, the [Assistant United States Attorney] stated we didn't meet the threshold for them to prosecute." Mar. 17, 2017 Hr'g Tr. at 209:2-3. After being told that the federal prosecutors would consider prosecution only if the investigation turned up "evidence of more drugs [and] more weight," the investigators did not inquire whether a state prosecution would be possible; instead, Scanlon requested "that the supervising parole Department continue with the GPS so that it would assist in [the] investigation." *Id.* at 209:4-19. The only prosecutors that BSS or the federal authorities ever met with were federal prosecutors (*see id.* at 200:19-25), and from early on in the investigation the decision was made that a federal prosecution would be the investigation's ultimate goal:

> AUSA ROBOTTI: You indicated in your previous testimony that federal prosecution had been determined to be the best resolution for this case; is that correct?
> BSS OFFICER SCANLON: Yes.
> AUSA ROBOTTI: Why is that your view?
> BSS OFFICER SCANLON: In my experience, when I reviewed the evidence that we had gathered, and I recognizes that previous State incarcerations did not deter Mr. Lambus from continuing in his drug distribution ring, I thought federal prosecution along with their penalties would be the best outcome to stop this behavior.

*Id.* at 146:24-147:10.

> COROZZO (ATTORNEY FOR LAMBUS): In fact, you never wanted it to be a state prosecution, you wanted it to be a federal prosecution again; correct?
> BSS OFFICER SCANLON: It fit the guidelines. For our purposes, it appeared to be best suited for a federal prosecution. Whether I determined that or not, it would have been up to the prosecutors, though, sir.
> COROZZO (ATTORNEY FOR LAMBUS): Well, did you contact any state prosecutors?

> BSS OFFICER SCANLON: No.
> COROZZO (ATTORNEY FOR LAMBUS): You only contacted
> federal prosecutors; correct?
> BSS OFFICER SCANLON: Contacted a federal agent and then we
> went to a federal prosecutor subsequent to that.
> COROZZO (ATTORNEY FOR LAMBUS): And after you met
> with [Assistant United States Attorney] Parlovechhio, you also met
> with other federal prosecutors, correct?
> BSS OFFICER SCANLON: Yes. Down the line. Yes.
> COROZZO (ATTORNEY FOR LAMBUS): Did you ever meet
> with state prosecutors?
> BSS OFFICER SCANLON: Not to my knowledge, no, sir.
> COROZZO (ATTORNEY FOR LAMBUS): And you made a
> determination that this could not fit state prosecution as per your
> testimony, correct?
> BSS OFFICER SCANLON: I made a determination that it would
> be suited with federal prosecution, sir.

*Id.* at 157:12-158:6.

Lambus was far from the only target in this wide-ranging investigation. A May 14, 2014 update memorandum written by Scanlon explained that the goal of the "multi-agency" investigation was to dismantle the large gang-affiliated narcotics operation with which Lambus was associated, and recommended that DOCCS honor a federal request to not change the conditions of Lambus's parole to avoid accidentally alerting him of the investigation. Gov't Exh. 7. No other parolees were known targets of the investigation at this time. *See id.* ("Should additional parolees be identified, notification will be made accordingly to the Regions of responsibility."). When the investigators became aware that other targets of the investigation were New York State parolees, they kept the information being uncovered from those parolees' supervising parole officers:

> COROZZO (ATTORNEY FOR LAMBUS): And in that while that
> you developed evidence rising to the level of probable cause that
> Shavona Trappier [a DOCCS parolee] was involved in criminal
> conduct, did you share any of that information with her supervising
> parole officers?

> BSS OFFICER SCANLON: No, sir.
>
> . . .
>
> COROZZO (ATTORNEY FOR LAMBUS): Well, you and Agent Popolow, who you say are the two co-lead agents in the investigation, believe at this time, of January 2015, that Shavona Trappier is trafficking in narcotics, correct?
>
> BSS OFFICER SCANLON: Yes.
>
> COROZZO (ATTORNEY FOR LAMBUS): That would be a violation of parole, correct?
>
> BSS OFFICER SCANLON: Yes.
>
> COROZZO (ATTORNEY FOR LAMBUS): And was her supervising parole officers alerted to that?
>
> BSS OFFICER SCANLON: To that specific issue, no, they were not.

Apr. 10, 2017 Hr'g Tr. at 47:20-48:13.

After being contacted by DOCCS and HSI, the DEA joined the investigation in August or September of 2014. Apr. 11, 2017 Hr'g Tr. at 178:10-25. The DEA was made aware of the tracking device on Lambus as soon as it joined the team. *Id.* at 200:8-10. Scanlon's primary contribution to the investigation was providing the team with the information generated by the tracking device on Lambus's ankle. *Id.* at 222:3-18, 225:24-226:11. Scanlon had the information; Popolow gave the instructions.

> COROZZO (ATTORNEY FOR LAMBUS): Did Tom Scanlon ever tell you a specific time that I want you to surveil a specific location?
>
> DEA SPECIAL AGENT RUSSELL: He listed locations that were relevant to the DTO, to the organization. And told us those locations to go to.
>
> COROZZO (ATTORNEY FOR LAMBUS): He provided the information. Like he provided the GPS information; correct?
>
> DEA SPECIAL AGENT RUSSELL: That's correct.
>
> COROZZO (ATTORNEY FOR LAMBUS): And it was Popolow's call what to do; correct?
>
> DEA SPECIAL AGENT RUSSELL: For the most part.
>
> COROZZO (ATTORNEY FOR LAMBUS): Now, another part of the investigation -- and it was Popolow who would assign different agents, or you or your partner who would assign the different

agents, during the surveillances as to what their roles would be; correct?
DEA SPECIAL AGENT RUSSELL: Yes.

*Id.* at 218:11-219-11.

A June 2014 DEA Report of Investigation describes the details of a joint-agency surveillance operation conducted at Lambus's residence. The report, which primarily recounts physical surveillance efforts, also includes a note from Russell stating: "AGENTS NOTE: A court authorized GPS tracking device attached to Kamel LAMBUS indicating he (LAMBUS) departed the location at approximately this time." 3500-GR-15 at ¶ 3. The note is in error. No court authorized the use of this tracking device.

In addition to the tracking device on Lambus's ankle and physical surveillance, many other methods of investigation were utilized by law enforcement: pole cameras, controlled buys, undercover officers, informants, trash searches, additional tracking devices, and, eventually, wiretaps. *See, e.g.*, 3500-CP-25 (listing investigative techniques employed in furtherance of the investigation). The federal investigation was successful in uncovering vast amounts of evidence of criminal activity.

AUSA ROBOTTI: Now, while Mr. Lambus was on GPS monitoring from May 2013 to June 2015, in general, what did your investigation uncover?
BSS OFFICER SCANLON: Quite a bit. So he was associating with known felons. We know he was tampering with the GPS. There were a couple of occasions with is that. We know he was engaged -- well, we suspected and confirmed that he was engaged with drug trafficking, and that was basically the crux, the overall.
AUSA ROBOTTI: Were there instances of him wearing gang colors?
BSS OFFICER SCANLON: Yes.
AUSA ROBOTTI: Was he found in possession of an unexplained amount of cash?
BSS OFFICER SCANLON: Yes.
AUSA ROBOTTI: Were control buys done from his associates?
BSS OFFICER SCANLON: Yes.

> AUSA ROBOTTI: Was he also frequenting known stash houses?
>
> BSS OFFICER SCANLON: Yes.
>
> AUSA ROBOTTI: And was there an instance in which he attempted to obtain a weapon, specifically an Uzi?
>
> BSS OFFICER SCANLON: Yes.
>
> AUSA ROBOTTI: Now, what, if anything, did this information indicate to you about Mr. Lambus?
>
> BSS OFFICER SCANLON: That he was continuing to engage in criminal activity and not adhering to the conditions of his release.
>
> AUSA ROBOTTI: And what, if anything, did the information that you obtained indicate about his role in his drug trafficking organization?
>
> BSS OFFICER SCANLON: To me, it appeared that Mr. Lambus was a higher-ranking individual in this PCG/POV gang structure.

Mar. 15, 2017 Hr'g Tr. at 42:19-43:21.

Despite BSS possessing substantial evidence that Lambus was violating the conditions of his parole, DOCCS never charged him with a violation or imposed any further "graduated sanctions" to control his conduct. *See* Apr. 10, 2017 Hr'g Tr. at 50:13-18. According to Scanlon, in order to violate a parolee, "the Division of Parole must prove at a final hearing by a preponderance of the evidence that you have violated at least one of the conditions of release in an important respect." Mar. 17, 2017 Hr'g Tr. at 136:3-7. BSS Officer Scanlon tried unsuccessfully to explain why the growing mounds of evidence were never sufficient to violate Lambus.

> AUSA ROBOTTI: Now, based on all of the evidence we just discussed during this GPS monitoring period, did you initiate violation proceedings against Mr. Lambus for engaging in drug trafficking?
>
> BSS OFFICER SCANLON: No.
>
> AUSA ROBOTTI: Why not?
>
> BSS OFFICER SCANLON: As I said before, basically many of these observations did not rise to the level that we would have been able to sustain a charge. In addition to that, as we started to observe him at other locations, we were trying to understand the scope of his involvement, the scope of his heroin distribution ring

and to better understand the totality of the kind of violation that he was engaged in.

AUSA ROBOTTI: Now, at some point you said you started intercepting communications with Mr. Lambus involving drug trafficking; right?

BSS OFFICER SCANLON: Yes.

AUSA ROBOTTI: Was that about February of 2015?

BSS OFFICER SCANLON: Yes.

AUSA ROBOTTI: Now, did you initiate violation proceedings against Mr. Lambus at that time for drug trafficking?

BSS OFFICER SCANLON: No.

AUSA ROBOTTI: Why not?

BSS OFFICER SCANLON: For the same purposes: Basically, at that time we were trying to determine where he was in this organization, where the drugs were going, what other criminal activities they may have been involved with, other associates, other parolees associated with this case. We were trying to identify all the pieces to see how large that this organization that he was involved with was and what rank he played in it.

THE COURT: Excuse me, you say "we." Is that the Feds and you?

BSS OFFICER SCANLON: No. Well, based on the violation, no, that would be my agency. When I say we, sir, Your Honor, my unit, Bureau of Special Services, we were trying to determine where he was.

THE COURT: But you indicated, I thought that you were trying to identify the scope of this entire conspiracy.

BSS OFFICER SCANLON: Yes, sir.

THE COURT: Why would the scope of the conspiracy affect your reaction to the parolee when the scope of the conspiracy was essentially the goal, or determining the scope was the goal of the Feds, not you?

BSS OFFICER SCANLON: No, not -- with due respect, no, not exactly. The scope would have -- the implication of the scope of his organization and what role he played in it would have had an impact on what decisions were made to do -- of how to handle his revocation process going forward.

THE COURT: . . . I don't understand. You now have a huge amount of evidence that he's dealing in narcotics.

BSS OFFICER SCANLON: Uh-hum.

Mar. 15, 2017 Hr'g Tr. at 115:23-117:24.

> AUSA ROBOTTI: Just to be clear, did you view yourself as having sufficient evidence to prove a violation of parole before the wiretap in this case?
> BSS OFFICER SCANLON: No.

*Id.* at 122:19-22

> THE COURT: Wasn't that enough to put him in prison, a parolee negotiating for a Uzi?
> BSS OFFICER SCANLON: Absolutely, positively, not.
> THE COURT: No?
> BSS OFFICER SCANLON: No. He would have had to have possession of that firearm. Talking about it doesn't indicate that he has violated. He would have had to have an overt act. That overt act would have had to have been possession.
> THE COURT: Again, he would have been in prison here.

*Id.* at Hr'g Tr. at 72:1-9.

 The federal takeover of the investigation was so complete, that *even after his arrest on federal drug trafficking charges*, DOCCS still chose not to charge Lambus with a violation of his parole.  His parole expired on August 2, 2015 without any allegation by the state of New York that Lambus ever did anything to violate its terms.  *See id.* at 120:17-19.

## 2.  Circumvention of the DOCCS Supervisory Bureau

A fundamental obligation of a supervising parole officer is to manage a parolee's compliance with his conditions of parole in order to facilitate the parolee's rehabilitation and reintegration.  To complete this objective, parole officers must have information about the parolee's conduct.  Yet the branch of DOCCS most carefully observing Lambus's conduct, BSS, purposely withheld information from Lambus's supervising parole officers.

The only state officers BSS Officer Scanlon spoke to in any detail about the pending investigation were his superiors at BSS.  Mar. 17, 2017 Hr'g Tr. at 148:1-12.  While he did speak on occasion with Parker, the chief of the Queens II Supervisory Bureau, the information he

shared with Parker was "limited."  *Id.* at 148:16-18.  He provided only "limited" information to

Parker out of fear of compromising the investigation.  *Id.* at 148:19-21.  Merely "minimal"

information was given to Lambus's direct supervisors, Parole Officer Kovics and Senior Parole

Officer Browne.  *Id.* at 148:25-149:9.  The "sum and substance" of Scanlon's conversations with

members of the supervisory bureau, which occurred "once every three or so months," was only

that BSS was continuing its investigation.  Apr. 10, 2017 Hr'g Tr. at 54:10-55:6.  Senior Parole

Officer Browne testified that he was kept in the dark about the ongoing investigation:

> AUSA ROBOTTI: Okay. And were you privy to all the details of BSS's investigation into Mr. Lambus?
> SENIOR PAROLE OFFICER BROWNE: No.
> AUSA ROBOTTI: Did you have any meetings with Mr. Scanlon from BSS about that investigation?
> SENIOR PAROLE OFFICER BROWNE: On one occasion I was brought into a meeting with the area supervisor and Mr. Scanlon.
> . . . .
> AUSA ROBOTTI: And do you remember what was discussed during that meeting?
> SENIOR PAROLE OFFICER BROWNE: They were speaking about Mr. Lambus being investigated for illegal activities.
> THE COURT: By whom?
> SENIOR PAROLE OFFICER BROWNE: By other agencies. They didn't tell me who the agencies were.
> THE COURT: Federal or State or both?
> SENIOR PAROLE OFFICER BROWNE: I wasn't told that.
> AUSA ROBOTTI: Were you aware at that time that Mr. Scanlon was involved in the investigation?
> SENIOR PAROLE OFFICER BROWNE: Yes.
> AUSA ROBOTTI: Okay. Did you meet with any Federal investigators about that investigation?
> SENIOR PAROLE OFFICER BROWNE: No.
> AUSA ROBOTTI: Did you meet with any NYPD officers about the investigation?
> SENIOR PAROLE OFFICER BROWNE: No.
> AUSA ROBOTTI: Were you aware of a wire-tap on Mr. Lambus's phone?
> SENIOR PAROLE OFFICER BROWNE: No.

> AUSA ROBOTTI: Were you aware of controlled purchases of narcotics from Mr. Lambus's associates?
>
> SENIOR PAROLE OFFICER BROWNE: No.
>
> AUSA ROBOTTI: Were you aware that Mr. Lambus was associating with multiple known ex-felons?
>
> SENIOR PAROLE OFFICER BROWNE: No.
>
> AUSA ROBOTTI: Were you aware that he was frequenting known stash houses?
>
> SENIOR PAROLE OFFICER BROWNE: No.
>
> AUSA ROBOTTI: And did you conduct any physical surveillance of Mr. Lambus?
>
> SENIOR PAROLE OFFICER BROWNE: No.
>
> AUSA ROBOTTI: Were you aware of a wire-tap call in which Mr. Lambus discussed tampering with his ankle bracelet?
>
> SENIOR PAROLE OFFICER BROWNE: Could you repeat that?
>
> AUSA ROBOTTI: Were you aware of an intercepted call in which Mr. Lambus discussed tampering with his GPS bracelet?
>
> SENIOR PAROLE OFFICER BROWNE: No.
>
> AUSA ROBOTTI: So, in general, you were not aware of evidence of Lambus's drug-trafficking during the time he was on GPS monitoring?
>
> SENIOR PAROLE OFFICER BROWNE: No.

Apr. 11, 2017 Hr'g Tr. at 118:14-120:25.

In order to properly supervise a parolee, in addition to requiring full information on the parolee's conduct, parole officers require the autonomy to loosen or tighten the parolee's restrictions as necessary. Lambus's supervising parole officers were deprived of that ability almost as soon as the federal investigation began. On July 2, 2013, BSS Bureau Chief James Shapiro (*see* Apr. 10, 2017 Hr'g Tr. at 101:16-20) sent a memorandum to Queens II Bureau Chief Parker about Lambus. The memorandum states:

> Please note that the BSS continues to actively investigate the above noted case. To date this investigation has pointed towards his involvement in a significant Narcotics operation, the scope of which has not yet been determined. The BSS is now working closely with ICE and a protracted investigation is expected. This memo is considered strictly confidential and all measures should be taken to prevent our Target from knowledge of this investigation. It is further requested that any change in his

supervision program be communicated to the BSS and that BSS be consulted prior to any consideration of revocation.

Gov't Exh. 6.  Pursuant to this directive, BSS Officer Scanlon instructed the supervisory bureau

*not* to violate Lambus:

> COROZZO (ATTORNEY FOR LAMBUS): And the supervising
> bureau was informed that the BSS is now working closely with
> ICE and a protracted investigation is expected and they were
> informed of this on July 2, 2013, correct?
> BSS OFFICER SCANLON: Yes.
> COROZZO (ATTORNEY FOR LAMBUS): And basically from
> that moment on your relation with the supervising bureau was to
> keep them informed that the investigation was continuing, correct?
> BSS OFFICER SCANLON: Yes.
> COROZZO (ATTORNEY FOR LAMBUS): And you took two
> years - - for the next two year you basically told them we are
> continuing and don't violate him, correct?
> BSS OFFICER SCANLON: Yes.

Mar. 17, 2017 Hr'g Tr. at 186:22-187:9.  The State's supervisory bureau, its officers, and its

objectives were thus rendered a nullity.

### 3.  Use of Tracking Devices Solely to Further the Federal Criminal Investigation

The ankle bracelet tracked Lambus's movements through the use of a satellite-aided

global positioning system (GPS).  Whether on public thoroughfares or in private residences, the

device provided minute-by-minute updates of Lambus's location  For example, one report

generated by Veritracks and forwarded to federal investigators by Scanlon lists Lambus's precise

latitude and longitude at 120 discrete intervals in the span of time between 10:47 a.m. and 12:26

p.m. on April 13, 2015.  3500-TS-81.

The information obtained through the tracking device played a role in the investigation.

*See e.g.* Gov't Opp. to Mot. for Recons. Exhs. W, V, E, X, F (federal ICE Reports of

Investigation documenting multiagency investigation that relies on location information

generated by tracking device); 3500-CP-24 (application for a wiretap that relies on location

information generated by tracking device); 3500-CP-25 (same); 3500-TS-17 through 3500-TS-

124 (emails between BSS Officer Scanlon and federal authorities conveying location information

generated by tracking device).

> AUSA ROBOTTI: Now, did the GPS monitoring assist in your
> investigation during this time period?
> BSS OFFICER SCANLON: Yes.
> AUSA ROBOTTI: How so?
> BSS OFFICER SCANLON: It enabled us to identify places that
> Mr. Lambus was frequenting, the times that he was frequenting,
> establish patterns of where he may have gone on a particular day in
> order for us to -- to assist us with setting up surveillance on those
> areas.

Mar. 15, 2017 Hr'g Tr. at 42:5-13.

While the tracking device was not installed on Lambus at the behest of BSS or federal

law enforcement, they ensured the device remained on him.  Lambus made numerous requests to

have the ankle bracelet removed, beginning with a request in October 2013.  Apr. 10, 2017 Hr'g

Tr. at 95:23-96:9.  Whenever Lambus asked to remove the bracelet, Senior Parole Officer

Browne and Bureau Chief Parker "discussed . . . if [the ankle bracelet] could come off."  *Id.* at

96:2-4.  Browne testified that during the first six months he was subject to electronic monitoring,

Lambus had generally been compliant with the conditions of his parole:

> SENIOR PAROLE OFFICER BROWNE: Mr. Lambus came to
> me and said, I've been on it for more than six months, there's no
> problem, why don't you take it off? I said, I have to speak to my
> boss.
> THE COURT: So, he told you to do that; correct?
> SENIOR PAROLE OFFICER BROWNE: *Yes, the boss said, keep
> it on, don't take it off.*
> THE COURT: But there was nothing that you saw that would have
> caused you, absent that direction from higher up, that would have
> caused you to keep it on, right?

SENIOR PAROLE OFFICER BROWNE: No, but there were some bumps.

Apr. 11, 2017 Hr'g Tr. at 172:8-18 (emphasis added). Both he and Parole Officer Trudy Kovics—the DOCCS parole officer responsible for directly supervising Lambus—did not understand why the device remained attached. *Id*. at 171:24-173:20. Browne testified that he would have removed the device if given the option. *Id.* at 118:7-13.

When Kovics asked Browne why the device was still on Lambus, he told her it was the decision of his "higher-ups." *Id.* at 174:22-175:12. Browne testified that his direct supervisor, Bureau Chief Mark Parker, had the ultimate authority to decide whether to remove the device. *Id*. at 162:12-163:7. Chief Parker testified that it was his decision to leave it on; however, contrary to DOCCS protocol, it was not his decision alone:

> RUBINSTEIN (ATTORNEY FOR LAMBUS): Was it your decision to leave the electronic monitoring on?
> SUPERVISORY BUREAU CHIEF PARKER: Should I answer that?
> THE COURT: That you can answer.
> SUPERVISORY BUREAU CHIEF PARKER: Was it my decision to leave it on?
> RUBINSTEIN (ATTORNEY FOR LAMBUS): Yes.
> SUPERVISORY BUREAU CHIEF PARKER: Yes.
> RUBINSTEIN (ATTORNEY FOR LAMBUS): Alone?
> SUPERVISORY BUREAU CHIEF PARKER: No.
> RUBINSTEIN (ATTORNEY FOR LAMBUS): Who did you consult with about leaving it on?
> SUPERVISORY BUREAU CHIEF PARKER: Recommendations were made to leave it on from Bureau Special Services to the regional director, as well as Thomas Herzog at the time, who was the deputy commissioner.
> RUBINSTEIN (ATTORNEY FOR LAMBUS): But according to the rules, that's supposed to be your decision whether or not to take the electronic monitoring off or not?
> SUPERVISORY BUREAU CHIEF PARKER: The supervision staff, yes, sir.
> RUBINSTEIN (ATTORNEY FOR LAMBUS): The supervision staff?

> SUPERVISORY BUREAU CHIEF PARKER: Yes, sir.
> RUBINSTEIN (ATTORNEY FOR LAMBUS): But here you were
> told by people higher up in the agency to leave it on?
> SUPERVISORY BUREAU CHIEF PARKER: Recommended to
> leave it on, yes, sir.

Apr. 10, 2017 Hr'g Tr. at 97:4-24. Parker testified that while the ultimate decision on the

removal of the device was his, it was "strongly recommended" to him by "his superiors" that

Lambus be kept on location monitoring, and he was "not able" to "overturn their decision to

keep the GPS on Mr. Lambus." Apr. 10, 2017 Hr'g Tr. at 100:16-101:9.

 The evidence generated by the tracking device was used solely in connection with the

extensive federal law enforcement investigation. BSS officers had instantaneous access to the

data being transmitted from the ankle bracelet through the Veritracks website. Mar. 17, 2017

Hr'g Tr. at 192:25-193:10. They used their phones to track Lambus in real-time to assist federal

agents conducting physical surveillance of Lambus and to identify possible places of interest,

such as stash houses. *Id.* at 192:25-193:7, 196:17-198:2. By contrast, the state parole officers

responsible for supervising Lambus—Kovics, Browne, and Parker—rarely, if ever, looked at the

data being generated by the tracking device. *See* Apr. 10, 2017 Hr'g Tr. at 99:10-16; Apr. 11,

2017 Hr'g Tr. at 164:9-166:4. They were being kept in the dark.

### 4. Knowledge by Federal Authorities of Need for Judicial Approval

 In every other instance where a tracking device was to be used, federal agents first sought

prior authorization from a federal judge by applying for and obtaining a tracking device warrant.

3500-CP-25 at ¶¶ 121-127 (describing use of location data and tracking warrants in furthering

the investigation). Federal government agents even applied for and obtained *a warrant to track

Lambus* through the GPS in his cellphone. Apr. 11, 2017 Hr'g Tr. at 213:23-214:11; June 11,

2015 Wiretap Aff., attached as Exh. I to the Gov't Mem. in Opp. to Def.'s Motion to Suppress,

ECF No. 286-3 at ¶¶ 140-41.  On March 15, 2015 federal agents obtained a search warrant "for information about the location of [a] cellular telephone" used by Lambus.  June 11, 2015 Wiretap Aff. at ¶ 140.  Law enforcement learned that this telephone was used by Lambus by "compar[ing] the location data of the [this phone] with the location data obtained from the global positioning monitoring device worn by LAMBUS as a condition of his parole."  *Id.*  On May 6, 2015, federal agents obtained another search warrant for location data associated with a phone—the "6075 TELEPHONE"—they knew to be used by Lambus.  *See id.* at ¶¶ 141; 64-66.  As of June 11, 2015, the investigating agents had "not analyzed the location data obtained pursuant to this –May 6, 2015] warrant."  *Id.* at ¶ 141.  A footnote explains why the investigating agents had not bothered to analyze the location data:

> Around the time investigating agents obtained judicial authorization to obtain location data for the 6075 TELEPHONE, intercepted communications from the 6075 TELEPHONE indicated that LAMBUS was intentionally removing the electronically monitored bracelet he was instructed to wear as a condition of his State term of parole.  However, around the time that investigating agents obtained authorization to obtain location data from the 6075 TELEPHONE, they received notice that LAMBUS's electronically monitored bracelet was operational and that [sic] affixed to his body.

*Id.* at ¶ 141 n. 23.  It can be inferred from this statement that federal agents sought authorization to track Lambus's location through his phone when they believed he was tampering with his ankle bracelet, received judicial authorization to obtain this phone data, and then did not bother to analyze the data when they realized the *same information* could be accurately gleaned from the ankle bracelet.

The need to obtain a tracking device warrant before installing and using a tracking device was obvious to members of the investigative team.  DEA Special Agent Gerald Russell, a federal

agent who had a leading role in the federal investigation, testified that he believed that the tracking device search being conducted vis-à-vis Lambus's ankle bracelet was being conducted pursuant to a court order. Apr. 11, 2017 Hr'g Tr. at 180:25-181:1. Russell testified that no one on the team ever discussed the need to obtain a warrant because of the belief that "it was already mandated by the court system [and] it was legitimately on his ankle mandated by the Court." *Id.* at 183:10-20. Receiving judicial approval prior to installing or using a tracking warrant is part of his police practice—he stated that "every time I've obtained a GPS tracking warrant, it's usually authorized by the Court, so I automatically assumed that it was done so in this case." *Id.* at 181:2-6. His assumption was wrong. Not all federal agents assumed that the State had obtained judicial consent for placement of the tracking device on defendant. The HSI Special Agent who was first informed of the tracking device made it clear in his wiretap applications that Lambus's ankle monitor was being worn "[a]s a condition of his parole," distinguishing it from any other location data obtained pursuant to court orders. *Compare* 3500-CP-25 at ¶ 122 (no judicial authorization was sought or received for use of tracking device placed on Lambus as a condition of his parole) *with id.* at ¶¶ 123-126 (agents applied for and received judicial authorization to track locations through use of cell phone data and a tracking device attached to a vehicle). No law enforcement agent ever sought judicial approval to install or use information from the tracking device on Lambus's ankle.

The court finds, based upon its evaluation of the veracity of the witnesses and the documents, that the leaders of the federal criminal investigation of Lambus were aware from the beginning of the investigation that no judicial officer—State or federal—had approved placement of the tracking device on Lambus's ankle or the use of information obtained from the device.

### III.  Law

#### A.  Motion to Suppress

The government suggests that defendant's concessions have narrowed the issue before the court, requiring denial of defendant's motion to suppress as a matter of law.  *See* Letter, May 1, 2017, ECF No. 436.  The government's argument is misguided.  The present decision is based on the law and facts developed during extensive hearings at this court.  They require a finding of unconstitutionality.  *See infra* at Part IV.  Parties cannot prevent a court from deciding a constitutional issue properly by sending it off on an unpersuasive analysis.  In any event, none of defendant's concessions are inconsistent with this court's present analysis and findings of fact and law.  *See also* Letter from Defense Counsel, May 2, 2017, ECF No. 437, at 1 ("[T]he defendant has not, as the Government insists, conceded any of the argument he or the *amicus curiae* raised before this Court.").

The Fourth Amendment protects "[t]he right of the people to be secure in their persons… against unreasonable searches and seizures."  U.S. Const. amend. IV.  "This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer."  *California v. Carney*, 471 U.S. 386, 390 (1985).  "[A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks omitted).

On a motion to suppress, the burden of proof is initially on the movant to show that a search was unlawful.  If the defendant establishes that the search was executed without a warrant, the burden shifts to the government to prove that the search was lawful.  The standard of proof is a preponderance of the evidence.  *See United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014); *United States v. Rucker*, 32 F. Supp. 2d 545, 551 (E.D.N.Y. 1999).

Violation of the Fourth Amendment is a common ground for suppression. *See, e.g.*, *United States v. Voustianiouk*, 685 F.3d 206 (2d Cir. 2012) (suppressing evidence uncovered through a warrantless search that violated the Fourth Amendment). Evidence from a search may also be excluded if the search is unlawful because of the failure of the investigating authorities to abide by mandatory procedures or rules. *See, e.g.*, *United States v. Giordano*, 416 U.S. 505, 524 (1974) (suppressing evidence not because of "the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights, but [because of failure to follow] the provisions of Title III"); *United States v. Glover*, 736 F.3d 509, 513 (D.C. Cir. 2013) (holding in regards to a violation of Title III that "[s]uppression is the mandatory remedy when evidence is obtained pursuant to a facially insufficient warrant. There is no room for judicial discretion."); *United States v. Burke*, 517 F.2d 377, 386-87 (2d Cir. 1975) (a violation of Federal Rule of Criminal Procedure 41 (Search and Seizure) may, on its own, be sufficient to warrant suppression); *People v. Gavazzi*, 981 N.E.2d 256, 258 (N.Y. 2012) (affirming order of suppression where a warrant failed to comply with a New York statute requiring that it contain the name of the issuing court); *see generally* George E. Dix, *Nonconstitutional Exclusionary Rules in Criminal Procedure*, 27 AM. CRIM. L. REV. 53 (1989).

Not every unlawful search requires exclusion of its fruits; excluding evidence obtained through a search that violated the Fourth Amendment should only be accomplished if exclusion will "appreciab[ly] deter[]" future violations. *See Davis v. United States*, 564 U.S. 229, 237 (2011) (citation omitted). A violation of Federal Rule of Criminal Procedure 41—which concerns search warrants—merits exclusion if "(1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the

Rule." *Burke*, 517 F.2d at 386-87 (Friendly, J.).  Courts may also exclude evidence due to noncompliance with rules when exercising their "supervisory powers over federal law enforcement agencies."  *Rea v. United States*, 350 U.S. 214, 217 (1956).

### B.  Requirement of Federal Judicial Approval for Placement or Use of Tracking Devices for Investigatory Purposes

Detailed rules for obtaining authorizations by federal authorities from a judicial officer suggest the importance attached to judicial control of tracking technology, which can shred privacy.  Federal Rule of Criminal Procedure 41 governs the issuance of search warrants used in federal prosecutions.  *United States v. Turner*, 558 F.2d 46, 49 (2d Cir. 1977).  In 2006, the rule was amended to create special procedures for issuing warrants related to "tracking devices."  A "tracking device" is an "electronic or mechanical device which permits the tracking of the movement of a person or object."  Fed. R. Crim. P. 41(a)(2)(E) (citing 18 U.S.C. § 3117(b)).  The warrant may be issued by a magistrate judge or a district judge to track movements in or out of the district.

> At the request of a federal law enforcement officer or an attorney for the government . . .  a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both[.]

Fed. R. Crim. P. 41(b)(4).

The Advisory Committee Notes to this rule indicate that "only federal judicial officers"— as distinguished from state judges—"should be authorized to issue this type of warrant" "[b]ecause the authorized tracking may involve more than one district or state."  Judicial Conference of the United States, *Report of the Advisory Committee on Criminal Rules*, May 17, 2005 ("Advisory Committee Notes") at 42.  In proposing amendments specific to tracking device

warrants, the view of the Advisory Committee was that "if the officers intend to install or *use the device in a constitutionally protected area, they must obtain judicial approval to do so.* If . . . the officers intend to install and use the device without implicating any Fourth Amendment rights, there is no need to obtain the warrant." *Id.* (emphasis added) (citing *United States v. Knotts*, 460 U.S. 276 (1983) as an example of a case "where the officers' actions in installing and following tracking device did not amount to search under the Fourth Amendment.").

Rule 41(d)(1) makes a showing of probable cause sufficient to install and use a tracking device: "After receiving an affidavit or other information, a magistrate judge . . . must issue the warrant if there is probable cause . . . to install and use a tracking device." The Advisory Committee noted that "the warrant is only needed if the device is installed (for example, in the trunk of the defendant's car) or monitored (for example, while the car is in the defendant's garage) in an area in which the person being monitored has a reasonable expectation of privacy." Advisory Committee Notes at 43.

The 2006 amendments contain a "reasonable length of time" limitation:

> A tracking-device warrant must identify the person or property to be tracked, designate the magistrate judge to whom it must be returned, and specify a reasonable length of time that the device may be used. The time must not exceed 45 days from the date the warrant was issued. The court may, for good cause, grant one or more extensions for a reasonable period not to exceed 45 days each.

Rule 41(e)(2)(C). The purpose of the requirement that the judge "specify in the warrant the length of time for using the device" was "[t]o avoid open-ended monitoring of tracking devices." Advisory Committee Notes at 43.

Rule 41 concerns *both installation and use* of tracking devices by federal law enforcement officers. *See, e.g.*, Fed. R. Crim. P. 41(b)(4) (specifying that a judge has "authority

to issue a warrant *to install* within the district a tracking device; the warrant may authorize *use* of the device to track the movement of a person . . . located within the district, outside the district, or both") (emphasis added); Fed. R. Crim. P. 41(f)(2)(A) ("The officer executing a tracking-device warrant must enter on it the exact date and time the device was *installed* and the period during which it was *used*.") (emphasis added); Fed. R. Crim. P. 41(f)(2)(B) ("Within 10 days after the *use* of the tracking device has ended, the officer executing the warrant must return it to the judge designated in the warrant.") (emphasis added).

Forms produced and made available by the federal judicial branch contemplate that applications for tracking device warrants shall be made when federal officers are able to use a tracking device without first installing one; the forms treat "using" as a separate instance from "installing and using."

Form AO 102 is an "Application for a Tracking Warrant." The form instructs an applicant to "[i]dentify the person to be tracked or describe the object or property to be used for tracking," and contains the language: "I request authority to *install and use* a tracking device *or use* the tracking capabilities of the property or object described above to determine location." Form AO 102 (emphasis added).

Form AO 104 is a "Tracking Warrant," the form a judge may use when granting a warrant application. It distinguishes between "using" and "installing and using." The form reads, in part:

> I find that the affidavit(s), and any recorded testimony, establish probable cause to believe that *(check the appropriate box)*
> ☐ *using* the object   ☐ *installing and using* a tracking device
> to monitor the location of the person, property, or object will satisfy the purposes set out in Fed. R. Crim. P. 41(c) for issuing a warrant.

Form AO 104 (emphasis added). Time limits must be included:

> **YOU ARE COMMANDED** to execute this warrant and begin use
> of the object or complete any installation authorized by the warrant
> by _____ *(no later than 10 days from the date this warrant
> was issued)* and may continue to use the device until _____
> *(no later than 45 days from the date this warrant was issued).*

Form AO 104 (emphasis in original). The basic notion that it may be necessary for law

enforcement to obtain a warrant to use a tracking device that it did not install is clear; it is

specifically provided for in the standard forms pertaining to such warrants. *See* Form AO 102

("I request authority to *install and use* a tracking device *or use* the tracking capabilities of the

property or object described above to determine location.") (emphasis added); Form AO 104 (an

affiant may "establish probable cause to believe that [either] 'using the object' [or] 'installing

and using a tracking device' to monitor the location of the person, property, or object will satisfy

the purposes set out in Fed. R. Crim. P. 41(c) for issuing a warrant.").

### C. Supreme Court Requirement of Judicial Approval for Tracking Devices

Following the addition of the tracking device provisions to the Federal Rules of Criminal

Procedure, the Supreme Court, in the leading case on use of such devices, decided the

constitutionality of GPS tracking device searches. In *United States v. Jones*, 565 U.S. 400

(2012), a tracking device was surreptitiously installed on the defendant's car as part of a joint

investigation by federal and municipal authorities of narcotics trafficking. *Id.* at 402. A federal

agent applied to a United States District Court judge for a warrant to install the device, the judge

issued the warrant, and the car's movements on public streets were monitored for four weeks.

*Id.* at 402-03. Because the way the device was installed contravened the instructions in the

warrant, the installation and use of the device was deemed to be "warrantless." *Id.* at 403-04. At

the Supreme Court, the only issue raised was whether "the attachment of a Global-Positioning-

System (GPS) tracking device to an individual's vehicle, and subsequent use of that device to

monitor the vehicle's movements on public streets, constitutes a search or seizure within the meaning of the Fourth Amendment." *Id.* at 402.

Writing for the Court, Justice Scalia held that the attachment of the tracking device constituted a search within the meaning of the Fourth Amendment because "[t]he Government physically occupied private property for the purpose of obtaining information." *Id.* at 404. Exclusion of the evidence was affirmed because the search—executed without a warrant— violated the Fourth Amendment. *Id.* at 413. The Court was careful to avoid the conclusion that it had reduced the question of whether a Fourth Amendment search occurred to whether a trespass had taken place, holding that "[s]ituations involving merely the transmission of electronic signals without trespass would *remain* subject to [the] *Katz* [reasonable expectation of privacy test]." *Id.* at 411 (emphasis in original). Because the argument had been waived, the Court did not rule on whether the particular search was reasonable notwithstanding its warrantless nature. *Id.* at 413.

The concurrences explained that use of tracking devices without a warrant raised serious Fourth Amendment issues. There were five votes for the proposition that a search requiring a warrant occurs through "the use of longer term GPS monitoring in investigations of most offenses" because such use of a tracking device "impinges on expectations of privacy." *See id.* at 415 (Sotomayor, J., concurring); *id.* at 430 (Alito, J., concurring, joined by Ginsburg, J., Breyer, J., and Kagan, J.) (same). Four of the justices made clear that the specific search at issue violated the defendant's reasonable expectation of privacy:

> In this case, for four weeks, law enforcement agents tracked every movement that respondent made in the vehicle he was driving. We need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely crossed before the 4–week mark. Other cases may present more difficult questions. . . . We also need not consider whether prolonged GPS

monitoring in the context of investigations involving extraordinary offenses would similarly intrude on a constitutionally protected sphere of privacy.

*Id.* at 430-31.

These justices considered four weeks of tracking a suspected drug trafficker on public roads without a warrant to be unconstitutional. In the instant case, a person suspected of the same offense was tracked in both public and private places without a warrant for more than two years. The concurring justices presented a very simple solution to the issue of what law enforcement officers ought to do if they are concerned that their use of a tracking device might run afoul of the Fourth Amendment: *get a warrant. Id.* at 430 ("[W]here uncertainty exists with respect to whether a certain period of GPS surveillance is long enough to constitute a Fourth Amendment search, the police may always seek a warrant.").

### D. State Searches under Control of Federal Rules if Evidence is to be Used in Federal Prosecutions

Searches initiated by state officers are subject to federal rules of criminal procedure when evidence from those searches is to be used in federal court. *United States v. Brown*, 52 F.3d 415, 420 (2d Cir. 1995) ("[F]ederal law is applicable in a federal prosecution even when state police officers were involved."); *see also Preston v. United States*, 376 U.S. 364, 366 (1964) ("The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judge as if the search and seizure had been made by federal officers."). A search may be deemed a "federal search" subject to the strictures of Rule 41 even where the search is executed by state law enforcement personnel for the purpose of detecting violations of state law if "federal officers *'had a hand in it.'" Turner*, 558 F.2d at 49 (quoting *Lustig v. United States*, 338 U.S. 74, 78 (1949)) (emphasis added); *see also In re 381 Search Warrants Directed to Facebook, Inc.*, 2017 WL 1216079 (N.Y. Apr. 4,

2017) (Wilson, J., dissenting) ("State rules of procedure applicable to garden-variety warrants cannot be used as a device to contravene or frustrate federal law.").  For a federal agent to have "had a hand" in a search,

> [i]t is immaterial whether a federal agent originated the idea or joined in it while the search was in progress.  So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it.

*Lustig*, 338 U.S. at 79 (emphasis added).

Prior to the Supreme Court's decision in *Elkins v. United States*, evidence obtained by state authorities in violation of the Fourth Amendment could be used in a federal prosecution so long as federal officers did not participate in the unreasonable search and seizure.  364 U.S. 206, 208-14 (1960).  In *Elkins*, the Court reversed its so-called "silver platter doctrine."  It held federal officials to federal constitutional standards when using evidence obtained by a state.

> [E]vidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial.

*Id.* at 223.  Prohibition on the use of evidence unconstitutionally gathered by a sovereign other than the prosecuting one extends to situations "when the search was by federal officers and the evidence is offered in a state prosecution and when the search was by officers in one state and the evidence is offered in a prosecution in another state."  Wayne R. LaFave, 1 Search & Seizure § 1.5(c) (5th ed. 2012) (citing cases).

It does not follow that evidence lawfully gathered in one jurisdiction may always be used by another prosecuting authority.  In *United States v. Birrell*, 470 F.2d 113 (2d Cir. 1972), the Court of Appeals for the Second Circuit held that evidence lawfully seized by state police in the course of a murder investigation could not be taken and used by the federal authorities absent a

warrant. After papers from a hotel room where the decedent was found were seized by the police, the federal authorities contacted the police and sent an investigator to examine the papers for evidence that Birrell perjured himself when he described his financial situation in a previous matter. Judge Friendly, writing for the court, declared:

> If the papers had remained in [the victim's] hotel room, [there] is clear authority that federal law enforcement officers could not lawfully have searched them for the purpose of obtaining evidence against Birrell without having obtained a warrant. We fail to see how the taking into custody by the city police, proper though we have held this to be, relieves federal authorities from a requirement that would have existed if Birrell's papers had been left where they were.

*Id.* at 117 (citation omitted).

The court in *Birrell* held: "The propriety of the first intrusion into [the defendant's] privacy does not automatically sanction a second." *Id.* Birrell, who asked for his papers back before they were turned over to the federal government, "had sufficiently manifested his claim that a search by law enforcement officers of another sovereign for a different purpose could not be made without a warrant." *Id.*

In dicta, the *Birell* court noted that the outcome may have been different if the city police had "on their own initiative delivered [Birrell's] papers to the Assistant United States Attorney, since then there would have been no federal seizure," but that this case was "determined on the basis of its peculiar facts." *Id.* That dicta does not control the instant case, with a more than two year use of a device without a court order by federal law enforcement officers.

## IV. Application of Law to Facts

### A. Installation of Tracking Devices

No party quarreled with the proposition that the attachment of the tracking device to Lambus's ankle was a search for Fourth Amendment purposes. *Grady v. North Carolina*, 135 S.

Ct. 1368, 1370 (2011) ("[A] State . . . conducts a search when it attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements."); *see also El–Nahal v. Yassky*, 835 F.3d 248, 258-59 (2d Cir. 2016) (Pooler, J., concurring) ("Plainly, the government's physical intrusion on a constitutionally protected area is subject to Fourth Amendment scrutiny even if the intrusion is authorized by municipal regulations."). Nor does either party contest that the search in the instant case was undertaken without a warrant. Warrantless searches are "per se unreasonable under the Fourth Amendment—subject only to a few specially established and well delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971). The government has the burden to show that the search falls within an exception. *Id.* at 455.

Insofar as installation of a tracking device is a complete search in and of itself, that search was executed by state parole officers. The government believes any inquiry into the search's lawfulness should end there. The warrantless installation of a tracking device on a parolee's person by his parole officers—a methodology described by the New York parole handbook as a "graduated sanction"—may be lawful under the "special needs" exception to the warrant requirement. *United States v. Lambus*, 2016 WL 7422299, at *12 (E.D.N.Y. Dec. 22, 2016) ("The search, at least initially, was substantially related to the parole objective of ensuring Lambus complied with his parole conditions. It passes constitutional muster under *Huntley*."). The government's position, however, is not well founded as shown in Part IV.B, below.

### B. Use of Tracking Device is a Separate Search

A tracking device search does not end at the moment of physical trespass by installation. Whether conceptualized as one continuous search, or two discrete searches (*see Jones*, 565 U.S. at 408 n. 5), the use of the tracking device to actually monitor the location of a person or object is

a separate search from installation for Fourth Amendment purposes. As Justice Alito put it, concurring: "[T]he *use* of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." *Jones*, 565 U.S. at 430 (Alito, J., concurring, joined by Ginsburg, J., Breyer, J., and Kagan, J.) (emphasis added). A fifth justice, Justice Sotomayor, agreed. *See id.* at 415 (Sotomayor, J., concurring) ("I agree with Justice Alito that, at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'").

Even if the initial search occasioned by the installation of the device is governed by a limited trespass doctrine, the search occasioned by the use of the device to transmit precise location information is controlled by the broader *Katz* reasonable-expectation-of-privacy test. *See id.* at 411 ("[W]e do not make trespass the exclusive test. Situations involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* analysis.") (emphasis in original).

Were the courts to deem the search finished at the point of installation, they would ignore the reality of the reason for the trespass in the first place: law enforcement's desire for location information. A person is unlikely to object to evidence obtained through use of a defective tracking device or a device with a dead battery for want of any evidence to suppress. The court cannot blind itself to the true nature of the long-continued search in the instant case; it was to permit a full scale federal criminal investigation and attendant federal criminal prosecution that would rely in part on information obtained directly and indirectly from the state installed device.

The search undertaken through use of the ankle bracelet tracking device in the instant case was a search by federal law enforcement officers to "generate evidence for law enforcement purposes." *Ferguson v. City of Charleston*, 532 U.S. 67, 83 (2001). Such a search does not fall

within the ambit of the "special needs" exception to the warrant requirement.  *See Lambus*, 2016

WL 7422299, at *10-13 (the prior opinion of this court examining this issue in detail).

> "One of the principal purposes of a probation/parole officer's
> observation and supervision responsibilities is to ensure that a
> convicted person under supervision *does not again commit a*
> *crime*. . . . The [Supreme] Court noted that the restrictions
> associated with probation are 'meant to assure that the probation
> serves as a *period of genuine rehabilitation and that the community*
> *is not harmed by the probationer's being at large*.'"

*United States v. Reyes*, 283 F.3d 446, 459-61 (2d Cir. 2000) (quoting *Griffin v. Wisconsin*, 483

U.S. 868, 875 (1987)) (emphasis added).  This court cannot reconcile how DOCCS fulfilled its

"special" supervisory mission while allowing— for years without abatement or consequence—

"the leader of a heroin distribution ring [to] fill[] his neighborhood with [a] deadly substance . . .

responsible for a devastating epidemic in New York City and throughout the United States that

kills tens of thousands of people per year."  Gov't Opp. to Mot. for Recons., ECF No. 361 at 37.

The search here was not executed under any of the exigent circumstances identified by

the Court of Appeals for the Second Circuit when it approved the warrantless use of location data

generated by a suspect's cell phone.  *Cf. United States v. Caraballo*, 831 F.3d 95 (2d Cir. 2016)

(use of pinging of defendant's cell phone to locate a fleeing criminal); *United States v. Gilliam*,

842 F.3d 801 (2d Cir. 2016) (use of pinging of defendant's cell phone to locate kidnapping

victim).

The evidentiary record developed since the court issued its prior opinion confirms that

the tracking device was primarily used "to enable [federal] police to gather evidence for law

enforcement purposes," and was not used for "valid supervisory purposes."  *See Lambus*, 2016

WL 7422299, at *10 (citing New York precedent).  The controlling "hand" of the federal

government in this continuing search of defendant Lambus through a tracking device is

unmistakable.  The federal authorities were informed about the device nearly

"contemporaneously" with its installation and almost simultaneously the federal HSI became the

"lead agency" investigating the matter.  At that moment, Lambus's parole officers ceased being

his parole officers for Fourth Amendment purposes and became conduits for the collection of

evidence for use by the federal criminal investigating team.  The state supervisory parole

officers—whose activities generally may fit within the "special needs" warrant exception—were

instructed not to alter his conditions of parole and hardly even glanced at the location data

continuously gathered for years at the request of the BSS.  The BSS never shared any of the

information it compiled with the State supervisory bureau, and despite ample evidence of

criminal activity, Lambus's parole lapsed without any charge of violation of state parole.

### C.  Rules on Obtaining Judicial Approval Known to Federal Officials

Federal agents violated their own acknowledged protocols by failing to apply for a

warrant.  Federal Rule of Criminal Procedure 41 contemplates that federal agents will seek a

warrant when installing o*r using* a tracking device, as do the forms designed to make applying

for and granting such a warrant uniform and convenient.

The court takes judicial notice of the fact that it is the invariable practice in the Eastern

District of New York to require judicial approval for the installation and use of a tracking device,

even if the target of the search is subject to federal supervised release.  Special Agent Russell

testified that this is his practice; when the federal investigators used tracking devices other than

the one fastened to Lambus, they followed Rule 41 and submitted affidavits and applications to a

magistrate judge, and then installed or used the devices only after a warrant was granted.  *See*

Apr. 11, 2017 Hr'g Tr. at 209:10-211:10 (describing process of obtaining a tracking device

warrant); 3500-GR-2 (describing the obtaining of a tracking device warrant and the installation

of the tracking device on a target's vehicle); 3500-CP-25 at ¶¶ 121-127 (describing use of location data information in furthering the investigation).

Federal agents sought, and obtained, judicial authorization to track Lambus's location through the GPS on his phone when they believed that the data from the ankle bracelet may have been compromised:

> AUSA ROBOTTI: There was - - at the time Mr. Lambus was intercepted discussing tampering with his GPS on his phone, agents did request a GPS authorization for his cellular telephone... because they did not believe that the GPS monitor was accurate, in light of Mr. Lambus' admission that he was tampering.
> THE COURT: Did you get that?
> AUSA ROBOTTI: Yes, Your Honor. That, I believe, was in May of 2015 and I believe - - I'd have to check the dates. And I believe that is reflected, in the alter wiretap applications that is mentioned.
> THE COURT: But you had the ankle bracelet on him anyway?
> AUSA ROBOTTI: Right. Yes, Your Honor.

Apr. 11, 2017 Hr'g Tr. at 213:24-214:14. When they realized that the location data from the warrantless ankle search was accurate, they did not bother analyzing the information obtained through the cell phone tracking device warrant. *See* June 11, 2015 Wiretap Aff. at ¶ 141. The actions of the federal agents—proactively seeking and obtaining judicial authorization to use essentially the same data that was being generated by the ankle bracelet—belie the government's argument that no authorization was needed to use this data.

The federal agents disregarded the rules they knew they were bound by when they used the location data generated by the ankle device for years without applying for and obtaining a warrant. This failure to follow Federal Rule of Criminal Procedure 41 "prejudiced" Lambus and warrants exclusion. The tracking device search "would not have been so abrasive if the Rule had been followed;" the search would not have lasted for more than twenty-five months given that

the rule only allows for the gathering of location data in 45-day increments. *Burke*, 517 F.2d at 387.

Alternatively, exclusion is appropriate because the federal authorities used evidence obtained from State authorities for a purpose different than the State's purported purpose, without first obtaining a warrant that they otherwise would have needed. *See Birrell*, 470 F.2d at 117.

### D. Consent Not Given

The government argues that this search may still be constitutional, despite it not falling within the exception for legitimate warrantless parole searches, because Lambus consented to the search or because the search was reasonable under a "totality of the circumstances" test.

The federal prosecutor has the burden of showing that consent to a search was voluntarily given. *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981) (citing *Schneckloth*, 412 U.S. 218 (1973)). It has not met this burden.

Though Lambus signed a form acknowledging the imposition of a special condition of parole which provided that he could be electronically monitored for the duration of his parole, he signed this form only upon threat of incarceration. *See supra* Part II.B.

Dubious is the government's argument that voluntary "consent" can be ascertained from a person whose alternative to consent is prison. *United States v. Isiofia*, 370 F.3d 226, 232-33 (2d Cir. 2004) (affirming a district court's conclusion that consent to search was not given voluntarily when law enforcement officers said the defendant would be jailed if he did not consent); *Samson v. California*, 547 U.S. 843 863 n. 4 (2006) (Stevens, J., dissenting) (considering a parolee, whose only choice is between compliance and jail, as having given

"consent" to a search condition is a "manifest fiction" because the parolee "has little genuine option to refuse.") (internal quotation marks omitted).

The case relied upon by the government to show Lambus's consent was voluntary, *People v. Hale*, is inapposite. In *Hale*, the New York Court of Appeals held that a search was valid when conducted pursuant to "a court-ordered probationary condition, based on a negotiated sentence, and the written, counseled consent of the probationer." 714 N.E.2d 861, 864 (N.Y. 1999). The court held "a consent search provision may be enforceable as a condition of probation . . . insofar as the court-ordered provision and consent were circumscribed to specified types of searches by probation officers acting within the scope of their supervisory duty and in the context of the probationary goal of rehabilitation." *Id.* None of the circumstances looked upon favorably by the New York Court of Appeals in *Hale* are present here: the electronic monitoring condition was not ordered by a court, nor was it subject to negotiation by a defendant represented by counsel, nor was it limited to parole officers acting within the scope of their supervisory duty to further the defendant's rehabilitation.

If Lambus's consent were to be deemed voluntary, the government far exceeded the limited temporal scope to which Lambus consented. *See supra* at Part II.B.

### E.  Privacy Right of Defendant Violated

The government argues that under the totality of the circumstances test (*see Samson*, 547 U.S. at 848-50), the search was reasonable. It argues that Lambus's acknowledgement of the special conditions of his parole, and his general status as a parolee, diminished his expectation of privacy so that his interest in his privacy was outweighed by the government's interest in the search. It is not

> enough, in deciding whether someone's expectation of privacy is
> 'legitimate,' to rely on the existence of the offending condition or

the individual's notice thereof. . . . [T]he loss of a subjective expectation of privacy would play 'no meaningful role' in analyzing the legitimacy of expectations, for example, 'if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry.'

*Samson*, 547 U.S. at 863 (Stevens, J., dissenting) (quoting *Smith v. Maryland*, 442 U.S. 735, 740-41 n. 5 (1979)); *see Hudson v. Palmer*, 468 U.S. 517, 525 n. 7 (1984) ("The Court's refusal to adopt a test of 'subjective expectation' is understandable; constitutional rights are generally not defined by the subjective intent of those asserting the rights. The problems inherent in such a standard are self-evident.") (citing *Smith*, 442 U.S. at 740-41 n. 5); Orin S. Kerr, Katz *Has Only One Step: The Irrelevance of Subjective Expectations*, 82 U. CHI. L. REV. 113, 133 (2015) ("[T]he evolution of Supreme Court doctrine has rendered the subjective test pointless. . . .").

As discussed *supra*, five justices of the Supreme Court in *Jones* recognized that long-term use of a tracking device infringes on an expectation of privacy society recognizes as reasonable. And though parolees have diminished expectations of privacy and Fourth Amendment rights, the totality of the circumstances still weighs in favor of Lambus's privacy interest. *See Lambus*, 2016 WL 7422299, at *12-15 (balancing Lambus's privacy interest against the government's interest in conducting the warrantless search and finding that "[w]hile Lambus's status as a parolee certainly diminished his reasonable expectation of privacy, it did not eviscerate such expectations entirely; the search at issue was extraordinarily invasive of the reasonable privacy expectation he possessed.").

Because the government has not met its burden of showing that the search of Lambus occasioned by the use of location data by federal agents was reasonable, the search was unconstitutional and violated Lambus's limited Fourth Amendment rights. Balancing the deterrence value of excluding the location data against the "heavy costs" of ignoring evidence of

guilt (*see Davis*, 564 U.S. at 236-37), the court finds exclusion to be appropriate. Conducting an invasive search for years for the sole purpose of furthering a general criminal investigation without any form of judicial approval is a Fourth Amendment violation worth deterring. The costs of exclusion are unlikely to be particularly heavy. The government has amassed a tremendous amount of evidence against this defendant not directly connected to the ankle device. Exclusion of the location data is unlikely to "set the criminal loose in the community without punishment." *Id.* at 237.

## V.     "Good-Faith" Exception to the Exclusionary Rule

Relying on this court's earlier opinion in this case, the government contends that the good-faith exception applies because of "binding appellate precedent that police involvement with a warrantless search of a parolee does not stamp the search as unconstitutional if it was initiated by a parole officer pursuant to a legitimate supervisory objective." *Lambus*, 2016 WL 7422299, at *17. The "binding appellate precedent" application of the good-faith exception to the exclusionary rule was articulated by the Supreme Court in *Davis v. United States*. In *Davis*, the Court reviewed its exclusionary-rule precedents, and held that the exclusionary rule should not apply when "the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way. . . . [W]hen binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities." 564 U.S. at 239-41 (emphasis in original).

The "binding appellate precedent" application of the good-faith exception to the exclusionary rule is not limited to scenarios where the facts are identical to the facts in the opinions cited as "binding appellate precedent." In *United States v. Aguiar*, the Court of Appeals for the Second Circuit's primary application of the *Davis* "binding appellate precedent" rule, the court applied the rule and held that evidence from a vehicular GPS search need not be suppressed

even though "[p]rior to *Jones*, our Circuit lacked occasion to opine on the constitutionality of using electronic tracking devices attached to vehicles, either of the beeper or GPS variety." 737 F.3d 251, 261 (2d Cir. 2013). The court held that the Supreme Court cases of *Knotts* and *Karo*, which respectively stood for the propositions "that the warrantless use of a tracking device to monitor the movements of a vehicle on public roads did not violate the Fourth Amendment" and that trespass was not relevant to the question of whether the Fourth Amendment had been violated, could have been reasonably relied on by law enforcement to "reasonably conclude placing a GPS device on the exterior of Aguiar's vehicles did not violate the Fourth Amendment." *Id.* The reliance of the Court of Appeals for the Second Circuit on precedent that arguably was not directly on point has led to the conclusion that "at least some extrapolation from current precedent" is appropriate when applying the *Davis* rule. *United States v. Parrilla*, 2014 WL 2111680, at *10 (S.D.N.Y. May 13, 2014).

This court extrapolated too far in its previous opinion when it held that that the location data evidence should not be suppressed because of good-faith reliance on binding appellate precedent by the federal officers.

The hearings conducted after remand by the Court of Appeals for the Second Circuit to reconsider this court's earlier decision demonstrate that federal investigators knew they should have obtained a warrant. Though there is appellate precedent stating that the "stalking horse" theory is not viable, this conclusion does not mandate that a search, once initiated validly pursuant to the special needs doctrine, is immune from all scrutiny regardless of how it evolves. Exempting the entire search from the warrant requirement under the special needs exception because it may have initially fallen under that exception, while ignoring clear evidence that the vast bulk of the search had no special supervisory objective, would be inappropriate. As noted in

this court's previous opinion, the search in the instant case is distinguishable from the precedent previously relied upon in important ways that should have given this court pause when it originally held the good-faith exception applied. *See Lambus*, 2016 WL 7422299, at *17-18.

The issue had not then been fully briefed or argued. Unlike the cases cited as the foundation for the court's original rule, the instant case involved a much longer and more invasive search, requiring a much greater degree of coordination between the parole and general law enforcement authorities, to serve the broad purpose of investigating a heroin conspiracy involving mostly participants who were not under parole supervision. *See id.* at *17-18. Such distinctions make it inappropriate to extrapolate broadly from appellate precedent to hold that the federal agents were acting in accordance with precedent when conducting this search without a warrant.

Upon reconsideration of the law and development of the factual record, this court now finds that the federal agents acted unlawfully—not in accordance with binding appellate precedent—and that such conduct should be deterred. While the court's original conclusion that the search was validly initiated without a warrant pursuant to the special needs doctrine may remain intact, the record now shows that the location data was ignored by New York's DOCCS supervisory bureau. Instead, the location information was used exclusively by the federal law enforcement authorities in determining if federal criminal laws were being violated, not for searching out state parole violations the investigation was uncovering. This conduct occurred entirely in a post-*Jones* environment where law enforcement agencies were on notice that judicial authorization was likely to be necessary before installing and using tracking devices.

In analyzing the applicability of the exclusionary rule and the good-faith exception, "the actions of all the police officers involved" must be considered. *Herring*, 555 U.S. at 140.

Federal agents began using the device simultaneously with its installation, and controlling federal agents knew the device was attached without a warrant.  Crucially, the decision to seek a warrant to track Lambus's location through his cell phone indicates that federal agents were aware that a tracking device warrant was necessary to conduct this kind of search—a constant and continuing monitoring of someone's location—notwithstanding that person's status as a parolee.  This is not a new rule of law.  It has been the practice in the Eastern District for many years and was integrated into the Federal Rules of Criminal Procedure in the 2006 amendments to Rule 41.  The good-faith exception to the exclusionary rule does not apply.

## VI.    Procedural History

On December 22, 2016, this court issued a memorandum and order granting the motion of defendant Kamel Lambus and Stanley Fuller to suppress evidence gathered from a wiretap authorization granted on January 9, 2015, and denying Lambus's motion to suppress evidence gathered from the ankle monitoring device.  *See Lambus*, 2016 WL 7422299, at *20.  All portions of that decision not inconsistent with the present decision are deemed incorporated in this decision.

On December 27, 2016, Lambus filed a letter-motion asking the court to reconsider its decision to not suppress the ankle bracelet evidence.  Motion for Reconsideration, Dec. 27, 2016, ECF No. 321 ("Motion for Reconsideration").  On December 28, 2016, the government notified the court that it was pursuing an interlocutory appeal of the order suppressing the wiretap evidence.  Notice of Interlocutory Appeal, Dec. 28, 2016, ECF No. 323.

On December 29, 2016, the court held a conference with the parties regarding the pending motion for reconsideration and the interlocutory appeal.  In an order issued following the conference, this court certified, pursuant to Federal Rule of Criminal Procedure 37(a)(3)

clause 2, that the motion for reconsideration "raises a substantial issue."  Order, Dec. 29, 2016, ECF No. 326 at ¶ 1.  This court believed that a remand prior to the appellate court's decision on the interlocutory appeal would promote the efficient administration of this case.  *See id.* at ¶ 8.

On January 4, 2017, pursuant to Federal Rule of Appellate Procedure 12.1(b), Lambus moved in the Court of Appeals for a remand of the case to this court to decide the issue raised by the motion for reconsideration.  Letter, Jan. 18, 2017, ECF No. 334.  The government opposed the motion on January 17, 2016.  Letter, Jan. 18, 2016, ECF No. 336.  On January 23, 2017, the Court of Appeals granted defendant's motion to remand pursuant to Federal Rule of Appellate Procedure 12.1(b).  Remand Order, Jan. 23, 2017, ECF No. 337.

On March 15, 2017, this court held an evidentiary hearing on defendant's motion for reconsideration.  *See* Mar. 15, 2017 Hr'g Tr.  Testimony was given by BSS Investigator Thomas Scanlon.  *Id.*  Further testimony was given by this witness at a hearing on March 17, 2017.  *See* Mar. 17, 2017 Hr'g Tr.  The court heard from other witnesses from DOCCS and federal law enforcement at hearings on April 10, 2017 and April 11, 2017.  *See* Apr. 10, 2017 Hr'g Tr.; Apr. 11, 2017 Hr'g Tr.  The matter was fully briefed.  As indicated *supra* Parts I-V, the facts now require withdrawing the court's order of December 22, 2016 insofar as it denied suppression of the location data.  The present memorandum and order granting in part the motion to suppress is substituted.

## VII.    Need for Statutory and Supreme Court Clarification

It will be difficult for the law enforcement community—state or federal—to obtain clarity on when a warrant must be obtained to install or use a tracking device if it is forced to rely on iterative case law.  Federal legislation that specifies when a tracking device warrant is necessary, the showing law enforcement must make before a judge may grant a tracking device warrant, and penalties for failure to follow proper procedures is a better solution.  *See Jones*, 565 U.S. at 429-

30 (Alito, J., concurring) ("In circumstances involving dramatic technological change, the best solution to privacy concerns may be legislative. A legislative body is well situated to gauge changing public attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive way.") (citation omitted).

One model for such legislation is the Title III wiretap statute, which applies to both state and federal authorities. *See* 18 U.S.C. § 2518, *et al.* A bill with bipartisan sponsorship which is modeled on Title III—the "Geolocational Privacy and Surveillance Act" or "GPS Act"—has been introduced in both chambers of Congress, but it has not advanced far through the legislative process. *See* Geolocational Privacy and Surveillance Act. S. 395, H.R. 1062, 115th Cong. (2017).

New technology puts under stress traditional notions of Fourth Amendment protections. *See, e.g.*, Ethan Thomas, *The Privacy Case for Body Cameras: The Need for a Privacy-Centric Approach to Body Camera Policymaking*, 50 COLUM. J.L. & SOC. PROBS. 191, 197 (2017) ("[C]oncerns for the general public include the use of [police body camera] footage to conduct dragnet surveillance, whereby evidence is collected and reviewed without judicial supervision or any basis of suspicion."); Mark Gorenflo, *Defense Innovation Unit-Experimental (DIUx)*, THE SUBMARINE REVIEW, March 2017, at 156 (the military has "contracted with a company to get an autonomous indoor tactical drone which could be used by special forces to go and map the insides of buildings before they go and try and get inside them."); Monte Reel, *Secret Cameras Record Baltimore's Every Move from Above*, BLOOMBERG BUSINESSWEEK, Aug. 23, 2016, *available at* https://www.bloomberg.com/features/2016-baltimore-secret-surveillance/ (detailing how a spy plane with the capability of tracking the movements of individuals and vehicles across

a 30 square mile area in real-time flew over Baltimore for months in secret without legislative or judicial oversight and was used to apprehend suspected criminals).

By focusing on the type of information that persons are entitled to keep private—as well as the method for obtaining that information—legislation can protect against warrantless searches even if technology is deployed that enables information to be gathered imperceptibly. And, if federal legislation is not forthcoming, states can act to protect the privacy of their citizens. *See United States v. Maynard*, 615 F.3d 544, 564 (D.C. Cir. 2010) (listing states that have "enacted legislation imposing civil and criminal penalties for the use of electronic tracking devices and expressly requiring exclusion of evidence produced by such a device unless obtained by the police acting pursuant to a warrant."); *see, e.g.*, Conor Dougherty, *States Seek To Step In On Privacy For Web*, N.Y. TIMES, Mar. 27, 2017, at B2 ("In the case of online privacy, consumers groups and civil liberties advocates . . . [n]ow . . . face a White House and a Congress that are looking to roll back regulations, not create them. But federal blockage can create local opportunities.").

The line between supervisory parole searches and general law enforcement searches needs clarification. Though it is possible to distinguish between the two, *see Lambus*, 2016 WL 7422299, at *10-13, decisions by the Court of Appeals for the Second Circuit have raised the danger that a difference will be interpreted as a distinction without a difference. *See, e.g.*, *Reyes*, 283 F.3d at 463 (observing that probation officers and law enforcement personnel have "objectives and duties" that are "unavoidably parallel and…frequently intertwined" because both are concerned with crime prevention and detection). In the instant case, the line was apparent; it was drawn almost simultaneously with installation of a tracking device, which was used not to

supervise a state parolee but to gather sufficient evidence to prosecute him federally for narcotics trafficking.

The scope of parolee Fourth Amendment rights also needs to be made clear. The Court of Appeals for the Second Circuit has avoided the issue of how the decision by the Supreme Court in *Samson* impacts searches of parolees. *See, e.g.*, *United States v. Quinones*, 457 F. App'x 68, 69 n. 1 (2d Cir. 2012) (the appellate court has been "sav[ing] any further analysis" of *Samson*'s impact "for a case where a distinction between *Huntley* and *Samson* would make a difference.") (citing cases). The government in the instant case made the same argument it made in *Quinones*:

> [F]ollowing the Supreme Court's decision in *Samson*, parolees in fact have *no* legitimate expectation of privacy and thus the search of [the parolee] could not have violated the Fourth Amendment, irrespective of the legitimacy of the State's interests in conducting it.

*Id.* (emphasis in original). This court rejects this argument, finding that Lambus—though a parolee—possessed some Fourth Amendment rights, and those rights, even if limited, were violated. *See supra* Part IV.E. But, in any event, whether the State of New York did or did not violate his rights, the federal authorities certainly did.

## VIII.   Conclusion

The location data generated by the tracking device attached to Lambus's ankle is suppressed. Any fruit derived indirectly from this poisonous tree is not suppressed, but the issue may be raised anew with respect to particular items of evidence at the in limine hearing and trial.

SO ORDERED.

*Jack B. Weinstein*

Jack B. Weinstein
Senior United States District Judge

Date: May 1, 2017
Brooklyn, New York

## ACRONYMS AND DEFINED TERMS

### I. FEDERAL

**ATF:** Bureau of Alcohol, Tobacco, Firearms and Explosives. ATF is a law enforcement agency that protects communities from violent criminals, criminal organizations, the illegal use and trafficking of firearms, the illegal use and storage of explosives, acts of arson and bombings, acts of terrorism, and the illegal diversion of alcohol and tobacco products.

**AUSA:** Assistant United States Attorney. The United States Attorney is the chief federal prosecutor in their district.

**DEA:** Drug Enforcement Administration. DEA is a law enforcement agency focused on enforcement of federal drug laws.

**DEA Report of Investigation:** A report written by DEA agents to chronicle an investigation.

**DEA Strike Force:** A specialized unit of DEA agents and prosecutors.

**DHS:** Department of Homeland Security. DHS is a cabinet department of the federal government intended to protect the public safety of the United States from the many risks the nation faces. DHS is composed of multiple law enforcement agencies.

**DHS-ICE:** United States Immigrations and Customs Enforcement. ICE is an agency within the Department of Homeland Security which aims to protect public safety by enforcing federal laws governing border control, customs, trade and immigration.

**HSI:** Homeland Security Investigation. HSI is the investigative arm of the Department of Homeland Security (DHS).

**HSI NY:** Homeland Security Investigation New York. HSI NY is the New York regional office of the investigative arm of the Department of Homeland Security (DHS).

**ICE:** United States Immigrations and Customs Enforcement. *See* DHS-ICE, *supra.*

**ICE/DHS:** United States Immigrations and Customs Enforcement. *See* DHS-ICE, *supra.*

**ICE Report of Investigation:** A report written by ICE agents to chronicle an investigation.

**IRS:** Internal Revenue Service. IRS is the federal agency responsible for tax collection and tax law enforcement.

**ROI:** Drug Enforcement Administration Report of Investigation. *See* DEA Report of Investigation, *supra*.

### II. STATE

**BSS:** New York State Department of Corrections and Community Supervision Bureau of Special Services. BSS is a specialized agency within the New York State Department of Corrections and Community Supervision that provides supportive services to the Community Supervision by conducting investigations, collecting and conveying information, and developing intelligence that is relevant to public safety.

**Chronos:** New York State Department of Corrections and Community Supervision reporting system where parole officers in the Community Supervision offices document events related to the supervision of parolees.

**DOCCS:** New York State Department of Corrections and Community Supervision. DOCCS consists of 7 Regions and 36 Field Bureaus (Community Supervision offices) geographically identified and established in accordance with the Department's jurisdictions and core mission. DOCCS's "Community Supervision" mission is to supervise

individuals released on parole supervision.

**DOCCS BSS:** New York State Department of Corrections and Community Supervision Bureau of Special Services. *See* BSS, *supra.*

**DOCCS Queens II Bureau:** DOCCS Community Supervision Bureau responsible for Kamel Lambus's parole supervision. Lambus was under the supervision of this Bureau from March 7, 2012, to February 7, 2013, and from late April 2013 until his parole expired. In the interim, he was supervised by the Queens III Bureau.

**DOCCS Queens III Bureau:** DOCCS Community Supervision Bureau responsible for Kamel Lambus's parole supervision from February 7, 2013 to late April 2013. At all other times, Lambus was supervised by the Queens II Bureau.

**Inv. Case Rec.:** New York State Department of Corrections and Community Supervision reporting system where parole officers in the Bureau of Special Services document events related to the investigation of parolees.

**NCPD:** Nassau County Police Department.

**NY BSS:** New York State Department of Corrections and Community Supervision Bureau of Special Services. *See* BSS, *supra.*

**NY DOCCS:** New York State Department of Corrections and Community Supervision. *See* DOCCS, *supra.*

**NYSDOCCS:** New York State Department of Corrections and Community Supervision. *See* DOCCS, *supra.*

**NYCDOC:** New York State Department of Corrections and Community Supervision. *See* DOCCS, *supra.*

**NYDOC:** New York State Department of Corrections and Community Supervision. *See* DOCCS, *supra.*

**NYPD Queens Gang:** New York Police Department Queens Gang Unit.

**NYS CMS:** NYS Parole Partner / CMS Contact Inquiry. DOCCS reporting system where parole officers in the Community Supervision offices document events related to the supervision of parolees.

**Supervisory Bureau:** A DOCCS Field Office primarily concerned with supervision of parolees, as compared to the specialized BSS. *See*, *e.g.*, DOCCS Queens II Bureau, DOCCS Queens III Bureau, *supra.*

### III. MISCELLANEOUS

**E.M.:** Electronic Monitor. In this case, the term refers to the "tracking device" placed on Lambus's ankle by New York State Department of Corrections and Community Supervision Queens II Bureau. *See also* Tracking Device, *infra.*

**GPS/GPS Tracker:** Global Positioning System. In this case, the term refers to the "tracking device" placed on Lambus's ankle by New York State Department of Corrections and Community Supervision Queens II Bureau. *See also* Tracking Device, *infra.*

**Tracking Device:** "An electronic or mechanical device which permits the tracking of the movement of a person or object." 18 U.S.C. § 3117(b). In this case, the term refers to the "tracking device" placed on Lambus's ankle by New York State Department of Corrections and Community Supervision Queens II Bureau.

**Veritracks:** The electronic monitoring program managed by Satellite Tracking of People ("STOP") LLC, a DOCCS vendor. The program managed the GPS data generated by the tracking device placed on Lambus's ankle.

**PERSONNEL, AGENCIES AND DOCUMENTS**
(in some instances, individuals are referred to in testimony as members of a number of agencies)

## I.  FEDERAL
Department of Homeland Security ("DHS")
Immigration and Customs Enforcement ("ICE"/ "DHS-ICE" / "DHS-ICE")
Homeland Security Investigation ("HSI" / "HSI NY")
- Personnel:
  - HSI Special Agent Chris Popolow
  - ICE Special Agent Stephen/Stefan Lee
- Documents:
  - Department of Homeland Security ICE Report of Investigation ("ICE Report of Investigation")

Drug Enforcement Agency ("DEA")
- Personnel:
  - DEA Supervisor Brian Jasey
  - DEA Special Agent Gerald Russell
  - DEA Special Agent Anthony Ferentini
- Documents:
  - U.S. Department of Justice Drug Enforcement Administration Report of Investigation ("DEA Report of Investigation"/"ROI")

Federal Bureau of Investigation ("FBI")
- Personnel:
  - FBI Special Agent Peter Strauss

Internal Revenue Agency ("IRS")

Alcohol Tobacco and Firearm ("ATF")

United States Attorney's Office
- Personnel:
  - AUSA Kenji Price
  - AUSA Gina Parlovecchio

## II.  STATE
Department of Corrections and Community Supervision
("DOCCS"/"NYSDOCCS"/"NYCDOC"/"NYDOC" / "NY DOCCS")
- Personnel:
  - DOCCS Deputy Commissioner Thomas Herzog
  - DOCCS Regional Director Mike Burdi
- Documents:

- New York State – DOCCS – Community Supervision Parolee Chrono Report ("Chrono")

<u>DOCCS Bureau of Special Services ("BSS")</u>
- Personnel:
  - BSS Chief James Shapiro
  - BSS Assistant Chief Anna DeJesus
  - BSS Senior Investigator Thomas Scanlon
- Documents:
  - Investigation Case Record ("Inv. Case Rec.")

<u>DOCCS Queens II Bureau</u>
- Personnel:
  - DOCCS Bureau Chief Mark Parker
  - DOCCS Senior Parole Officer Hubert Browne
  - DOCCS Parole Officer Trudy Kovics
- Documents:
  - NYS Parole Partner / CMS Contact Inquiry ("NYS CMS")
  - New York State – DOCCS – Community Supervision Parolee Chrono Report ("Chrono")

<u>DOCCS Queens III Bureau</u>
- Personnel:
  - DOCCS Bureau Chief Mike Resnick
  - DOCCS Senior Parole Officer Candace Benjamin
- Documents:
  - NYS Parole Partner / CMS Contact Inquiry ("NYS CMS")
  - New York State – DOCCS – Community Supervision Parolee Chrono Report ("Chrono")

<u>NYPD Queens Gang</u>
- Personnel:
  - NYPD Detective Edward Rourke
  - NYPD Detective Steven Lalchan

<u>Nassau County Police Department</u>

## III. CO-DEFENDANTS
- Michael Scott
- Stanley Fuller
- Shavona Trappier
- Shakeem Powell
- Sean Brabram
- Scott Williams
- Tyrone Thomas
- Andre Mitchell
- Earl Davis
- Tyran Trotter

# APPENDIX C

## CHRONOLOGY OF RELEVANT EVENTS ON THE USE OF THE TRACKING DEVICE PLACED ON DEFENDANT KAMEL LAMBUS

| Dates | Event Description | Reference |
|---|---|---|
| 3/5/2012 | Lambus signed the "Certificate of Release to Parole Supervision" for a term of parole lasting from 3/7/12 to 8/2/15. | Gov't Exh. 1 |
| 8/16/2012 | Inv. Case Rec. (state): Spoke to IG investigator who referred the case to DEA strike force (federal). | Gov't Exh. 2 at 22 |
| 10/4/2012 | NYS CMS (state): Original charge of Lambus sending drugs to Otisville is still being investigated by BSS (state). Searching Facebook. | 3500-CB-2 at 3; Gov't Exh. 11 at 2 |
| 10/_/2012 | DEA (federal) stopped pursuing the investigation into Lambus, which did not reveal any drugs being distributed at that time. | Mar. 15, 2017 Hr'g Tr. 21:7-22; Gov't Exh. 7 |
| 2/_/2013 | Mark Parker (NY DOCCS) is informed about Lambus investigation. | Apr. 10, 2017 Hr'g Tr. 65:15-18 |
| 4/5/2013 | Email from Scanlon (NY BSS) to Michael Resnick (NY DOCCS), Anna DeJesus (NY BSS), and Candace Benjamin (NY DOCCS): interim update regarding Lambus. Email gives an account of the previous "interagency" investigation into Lambus regarding the suspicious photos published on social media and letter to Otisville. "This bureau [NY BSS] continues to investigate/develop leads as to Lambus' activities." | 3500-CB-8 |
| 4/10/2013 | NYS CMS (state): A/S Resnick (NY DOCCS) Writer of the confidential investigation of Lambus. Intel received from other "law enforcement entities" that Lambus is likely involved in illegal activities. | 3500-HB-4 at 11-12; Gov't Exh. 11 at 4; 3500-MP-2 at 4-5 |
| 4/18/2013 | Lambus is transferred to Queens II Bureau (NY DOCCS). | Gov't Exh. 10 at 35 |
| 5/2/2013 | NY DOCCS receives an anonymous email that Lambus is currently still selling drugs. | Gov't Exh. 11 at 7 |
| 5/3/2013 | Inv. Case Rec. (state): Numerous surveillance efforts were conducted. Parker (NY DOCCS) states he received notice that Lambus was selling drugs, in addition to violating curfew and is not reporting to work. Parker (NY DOCCS) decides curfew check should be scheduled. Discussed case actions with Scanlon (NY BSS). | Gov't Exh. 2 at 22; *see also* Gov't Exh. 13; Apr. 10, 2017 Hr'g Tr. at 74:16-22 |
| 5/5/2013 | Parole Officer Kovics (NY DOCCS) conducts curfew visit, Lambus is not home. | Gov't Exh. 10 at 33 |

| Date | Event | Citation |
|---|---|---|
| 5/5-6/2013 | NYS CMS (state): DOCCS decides to place GPS tracker on Lambus. Mark Parker (NY DOCCS) authorized the placement of the GPS. | 3500-HB-8; 3500-MP-6; *see also* Gov't Exh. 10 at 33; Apr. 11, 2017 Hr'g Tr. at 115:17-24 |
| 5/8/2013 | NYS CMS (state): GPS tracker is placed on Lambus. | 3500-HB-9; 3500-MP-7; 3500-MP-12; *see* Gov't Exh. 10 at 33; *see also* Gov't Exh. 2 at 22 |
| 5/21/2013 | Satellite Tracking of People LLC Letter: validates and authorizes GPS placement. Verifies Veritracks data is accurate w/ GPS data. | 3500-HB-11 at 2 |
| 6/6/2013 | Inv. Case Rec. (state): communicated with ICE/DHS. Agreed to send all photos and information on his gang. Agent Lee (federal ICE) "will attempt to determine if 172-32 143 Ave. (address may be inaccurate) a cargo jfk location is known to them as well as assisting NYSDOCCS w/ inv of p.". | Gov't Exh. 2 at 20 |
| 6/13/2013 | Inv. Case Rec. (state): First recorded communication between Scanlon (NY BSS) and Popolow (federal HSI) regarding Lambus. | Gov't Exh. 2 at 20; Mar. 15, 2017 Hr'g Tr. 20:25-21:6 |
| 6/_/13 | ICE Report of Investigation (federal): NY DOCCS requested assistance from HSI NY (federal) with investigation of parolee Lambus. | 3500-CP-5; *see also* 3500-CP-7; 3500-CP-9; 3500-CP-13 |
| 6/25/2013 | Inv. Case Rec. (state): Parker (NY DOCCS) informed Scanlon (NY BSS) about meeting with the feds 6/25/13. Request that meeting remain confidential between ICE/DHS (federal). Popolow (federal HSI) conference with DEA Agent Isais Colon (federal) - who requested Popolow (federal HSI) speak with him away from Scanlon (NY BSS). Conference with parole officer and James Shapiro (NY BSS). Conference with Burdi (NY DOCCS). Phones & surveillance to be initiated. | Gov't Exh. 2 at 20 |
| 7/2/2013 | NY DOCCS Memo from James Shapiro (NY BSS) to Mark Parker (NY DOCCS): BSS (state) is actively working to investigate Lambus. BSS is now working closely with ICE (federal). A protracted investigation is expected. "It is further requested that any changes in his supervision program be communicated to the BSS and that BSS be consulted prior to any consideration of revocation." | 3500-MP-15; 3500-TS-2; Gov't Exh. 6 |
| 7/11/2013 | Inv. Case Rec. (state): surveillance with ICE/DHS/BSS (federal and state) of parolee's residence. Lambus did not leave house in AM but GPS picked up his movement around 5:30PM. | Gov't Exh. 2 at 20 |

| | | |
|---|---|---|
| 8/7/2013 | Email from Scanlon (NY BSS) to Popolow (federal HSI): discussing logistics and planning for upcoming ATL trip. Scanlon (NY BSS) asks if HSI (federal) will need any documentation in order to permit Lambus to board the plane with the GPS. | 3500-TS-17 |
| 8/14/13-8/19/13 | Lambus takes first of multiple trips to ATL to visit his mother. | Gov't Exh. 10 at 25-26 |
| 8/14/2013 | ICE Report of Investigation (federal): Popolow (federal HSI) officially opens a case to investigating Lambus's drug trafficking activity. | 3500-CP-5; 3500-CP-10; *see also* 3500-CP-7 |
| 8/23/2013 | Inv. Case Rec. (state): Popolow (federal HSI) requests that Scanlon (NY BSS) send him a list of locations from the ATL trip. | Gov't Exh. 2 at 18 |
| 8/26/2013 | Email from Scanlon (NY BSS) to Popolow (federal HSI): email includes attachment of locations frequented while in ATL | 3500-TS-18 |
| 9/23/2013 | Conference with Evans (NY DOCCS) and Burdi (NY DOCCS) regarding the placement of the GPS. GPS remains installed on subject since 6/28/13, | Gov't Exh. 10 at 24 |
| 9/27/2013 | Email from Scanlon (NY BSS) to Popolow (federal HSI), Rourke (NYPD Queens Gang), DeJesus (NY BSS): Discussing Lambus's request to travel to "Great Adventure" (NJ) on 10/25/13. Scanlon (NY BSS) urges recipients to remember Lambus remains on GPS. | 3500-TS-21 |
| 10/2/2013 | Inv. Case Rec. (state): Use of GPS data for surveillance purposes. According to GPS Lambus returned home at 1700hrs and remained home for 20 minutes before leaving. | Gov't Exh. 2 at 17 |
| 11/_/2013 | Six months after the placement of the GPS Lambus made a request for its removal. The request was denied by Mark Parker (NY DOCCS). Lambus's parole officer, Hubert Browne (NY DOCCS), does not understand why the request was refused despite Lambus's overall compliance with parole conditions. | Apr. 11, 2017 Hr'g Tr. at 172:8-174:21. |
| 12/2/2013 | NYS CMS (state): "Discussed GPS justification due to ongoing sensitive investigation BSS (state) GPS provided to subject device can be switched to passive." ("Passive [means] there is no immediate notification of any violations of the parameters. The notifications are made nightly and e-mailed every morning.") | 3500-HB-4 at 2; Gov't Exh. 11 at 8; Apr. 10, 2017 Hr'g Tr. at 98:10-20 |
| 12/11/2013 | Scanlon (NY BSS) and Popolow (federal HSI) meet with a federal prosecutor for the first time. | Mar. 17, 2017 Hr'g Tr. at 143:19-144:14; Gov't Exh. 2 at 15 |
| 12/17/2013 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks report. Reports took a while to produce, assume the request for the reports was made much earlier. | 3500-TS-22; Apr. 10, 2017 Hr'g Tr. at 98:13-15. |
| 12/18/2013 | Email from Popolow (federal HSI) to Scanlon (NY BSS): responding to prior email. Popolow (federal HSI) requests the date and latitude/longitude for the "program to be able to read it" | 3500-TS-22 |

| | | |
|---|---|---|
| 1/23/2014 | Email from Scanlon (NY BSS) to Edward Roark, Chris Popolow (federal HSI), Sean Kilpatrick, Anna DeJesus (NY BSS): GPS and Surveillance shows that Lambus is frequenting an address in "Valley Stream." Investigation is continuing to narrow down the address and to ID his associates. Email includes possible addresses and associates. | 3500-TS-6 |
| 2/19/2014 | Inv. Case Rec. (state): conversation with Popolow (federal HSI) about pole cameras and reviewing GPS. | Gov't Exh. 2 at 13 |
| 2/24/2014 | Inv. Case Rec. (state): surveillance with DHS/ICE (federal) of Valley Stream. (planned extended surveillance to determine activity of res/location). Surveillance of GPS locations of Lambus @ cargo road and freedom circle JFK airport. | Gov't Exh. 2 at 13 |
| 2/25/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): Satellite Tracking of People LLC report attached with GPS locations and times regarding Lambus's location at areas of interest | 3500-TS-23 |
| 2/26/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): performed a GPS status check, Lambus was in residence. | 3500-TS-26 |
| 3/12/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes links to Veritracks Reports | 3500-TS-27 |
| 3/26/2014 | Email from Popolow (federal HSI) to Scanlon (NY BSS): requesting GPS data from previous surveillance (believes surveillance occurred on March 18, 2014) in order to narrow down investigation of a house where Lambus was seen. | 3500-TS-30; Apr. 10, 2017 Hr'g Tr. at 24:19-25:9 |
| 3/31/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): places Lambus within a particular location based on GPS acquired data. | Gov't Opp. to Mot. for Recons. ("GOMR") Exh. Z |
| 3/31/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-31 |
| 3/31/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): shares address located by GPS and surveillance efforts. | 3500-TS-32 |
| 4/2/2014 | ICE Report of Investigation (federal): NYPD Gang Unit (state) execute search/arrest warrant. Found small bag of crack-cocaine and drug paraphernalia. Scott Williams arrested. Lambus found with $2300 and released without incident. | GOMR Exh. G |
| 4/11/2014 | ICE Report of Investigation (federal): GPS location data was used to locate Lambus to further the investigation. | Gov't Exh. 58; Mar. 15, 2017 Hr'g Tr., at 82:1-33:25 |
| 4/12/2014 | ICE Report of Investigation (federal): GPS location data was used to locate Lambus to further the investigation. | GOMR Exh. EE |
| 4/16/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes links to Veritracks reports | 3500-TS-33 |
| 4/16/2014 | Email from Popolow (federal HSI) to Scanlon (NY BSS): Requesting GPS link for 4/12/14 | 3500-TS-34 |

| 4/18/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): Responding with Veritracks links for 4/7-4/18/14. | 3500-TS-35 |
|---|---|---|
| 4/28/2014 | ICE Report of Investigation (federal): surveillance of residence conducted by Scanlon (NY BSS) on 10/18/13. | GOMR Exh. D |
| 4/30/2014 | Inv. Case Rec. (state): First meeting with Kenji Price (federal AUSA) discussing Lambus. | Gov't Exh. 2 at 11; *see also* Apr. 10, 2017 Hr'g Tr. at 25:7-22 |
| 5/_/2014 | Mark Parker (NY DOCCS) decides to extend the use of the GPS, a recommendation made by supervisory members of BSS (state) and DOCCS (state) who were participating in the Lambus investigation. | Apr. 10, 2017 Hr'g Tr. 97:4-24; Mar. 15, 2017 Hr'g Tr., at 44:23-45:1 |
| 5/6/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. Mentions murder of two people in Hempstead, contacting FBI agent Shaw to determine whether it was related to PCG/POV crew. | 3500-TS-36; Apr. 10, 2017 Hr'g Tr. at 26:12-27:14 |
| 5/12/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): Veritracks links from 5/9-5/12 | 3500-TS-38 |
| 5/14/2014 | NYS Corrections and Community Supervision Exec. Memo.: After notice that DEA strike force (federal) investigation closed, Oct. 2012, surveillance conducted by the bureau showed that Lambus was engaging in activities resembling/relating to drug trafficking. From the investigation, an associate of Lambus, known as "KB" has been identified as Kareem Frazier, a Bloods gang member who has agreed cooperate with this agency and DHS (federal) in an effort to charge all parties in a federal conspiracy matter. | 3500-MP-11; 3500-TS-13; Gov't Exh. 7 |
| 6/_/2014 | Lambus wrote letter requesting GPS ankle monitor to be removed. He states the GPS was only supposed to be placed for a 60-90 day period. | 3500-MP-13; Apr. 10, 2017 Hr'g Tr. at 94:4-10 |
| 6/16/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): message says that Lambus is in Valley Stream address. Veritracks links included. | 3500-TS-39 |
| 7/4/2014 | Lambus is arrested for promoting gambling, possession of gambling devices, disorderly conduct, unspecified violation. | 3500-MP-9; 3500-CP-5 |
| 7/8/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): forwarding an arrest report of Lambus | 3500-TS-40 |
| 7/9/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): states that "on 7/8/17 [sic] @1436hrs lambus @Fuller/McGriff valley stream." Email attaches Veritracks links. | 3500-TS-41 |
| 8/_/2014 | DHS (federal) and NY DOCCS request DEA's (federal) participation in the investigation. DEA joined the investigation in August/September. | Apr. 11, 2017 Hr'g Tr. at 178:14, 199:8-10 |

| | | |
|---|---|---|
| 8/15/2014 | ICE Report of Investigation (federal): Multiagency surveillance being conducted. Noted that Lambus is wearing a GPS giving a location every 10-15 minutes. GPS location data was used to locate Lambus. | GOMR Exh. C at 1, 4 |
| 8/19/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): telling Popolow (federal HSI) what time Lambus returned home. Includes Veritracks. | 3500-TS-42 |
| 8/19/2014 | First recorded DEA Report of Investigation (federal): Operational plan outlines the basis of investigation and targets. | 3500-GR-1; *see also* Apr. 11. 2017 Hr'g Tr. at 195:17, 199:8-10 |
| 8/20/2014 | Inv. Case Rec. (state): surveillance with DHS/DEA/IRS (federal) - use GPS location data to locate numerous areas for an investigation into Lambus and pov city (bricktown). | Gov't Exh. 2 at 7-8 |
| 8/26/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-43 |
| 8/26/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): Lambus continues to blow off curfew and is frequenting specific locations. | 3500-TS-44 |
| 8/29/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): Discussing information about a vehicle that Lambus has been seen driving. Information includes his GPS coordinates. | 3500-TS-45 |
| 9/3/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-46 |
| 9/8/2014 | ICE Report of Investigation (federal): GPS location data was used to locate Lambus to further the investigation. | GOMR Exh. T |
| 9/15/2014 | Inv. Case Rec. (state): DHS-HSI (federal) & BSS (state) surveillance beginning with GPS location data. | Gov't Exh. 2 at 7 |
| 9/18/2014 | ICE Report of Investigation (federal): GPS location data was used to locate Lambus to further the investigation. | GOMR Exh. U |
| 9/18/2014 | DEA Report of Investigation (federal): mentions that NYDOC (state) has fitted Lambus with GPS tracker. GPS location data used in report details. | 3500-GR-3 at ¶¶ 3, 4, 9-10, 26, 33, 35 |
| 9/29/2014 | Inv. Case Rec. (state): FBI/DHS/DEA/NCPD (state and federal) make a purchase of heroin from Lambus. GPS location data contradicted info. about the seller, showing that Lambus was not at buy location. Awaiting ID pictures for confirmation. | Gov't Exh. 2 at 5 |
| 9/29/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-48 |
| 10/16/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI): GPS shows many hits on Watson (location), also Lambus is frequenting areas in Great Neck, Long Island in New York. Includes Veritracks links. | 3500-TS-50 |
| 11/19/2014 | Email from Scanlon (NY BSS) to Sgt. Kevin Matthews, Detective Steve Lalchan (NYPD Queens Gang) and Popolow (federal HSI): commending participants on joint surveillance. Reviewing addresses where Lambus and his crew are. | 3500-TS-51 |

| | | |
|---|---|---|
| 12/15/2014 | Email from Scanlon (NY BSS) to Popolow (federal HSI), Lalchan (NYPD Queens Gang): includes GPS info for 12/5-12/15. Includes Veritracks links. Highlights important locations in the "Bronx, NYC, HEMPSTEAD and Watson Pl." | 3500-TS-52; Apr. 10, 2017 Hr'g Tr. at 35:4-15 |
| 12/17/2014 | Email from Popolow (federal HSI) to Kenji Price (federal AUSA): "DEA CS has been a cooperating defendant for approximately 1-2 years. The information provided has been reliable and has enabled the DEA (federal) to perform several seizures and to initiate several TIII's" The subject of the email is "buy/walk." | 3500-CP-15 |
| 12/20/2014 | Email from Popolow (federal HSI) to Kenji Price (federal AUSA): discusses warrants and location data for various surveillance instruments, none of which are the ankle bracelet worn by Lambus. | 3500-CP-17 |
| 1/9/2015 | Wiretap Affidavit (federal HSI): Includes location data acquired via GPS ankle tracker. Data was used to identify stash houses. | 3500-CP-20 at 29; Gov't Exh. 36 |
| 1/12/2015 | ICE Report of Investigation (federal): investigation into Lambus is ongoing. Investigation initiated upon request of parole services. On 1/9/15 Kenji Price (federal AUSA) and Popolow (federal HSI) appeared before U.S. District Court and applied for wiretap. | 3500-CP-21 |
| 1/13/2015 | NY DOCCS BSS Memo from Anna DeJesus (NY BSS) to James Shapiro (NY BSS): PO Scanlon (NY BSS) has met with various other agencies to discuss Lambus. Through these meetings it was determined that Lambus and his associates are a more organized structured group and there is reasonable cause to seek conspiracy charges. An AUSA (federal) has been assigned to the case. There is sufficient evidence to begin a Title III investigation. "The objective of the joint investigation is to dismantle the drug operation." This Agency (NY BSS) has been asked to participate in the Title III investigation. | 3500-TS-8 |
| 2/4/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): discusses change in Lambus's activity patterns. Now frequenting "Rosedale" location. Includes Veritracks links. | 3500-TS-53 |
| 2/12/2015 | Wiretap Affidavit (federal HSI): includes location data acquired via GPS ankle tracker. Data was used to identify stash houses. | 3500-CP-23 at 42 |
| 2/16/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): discusses a particular pattern travelled by Lambus. Includes related Veritracks links. | 3500-TS-54 |
| 2/25/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links from 2/24/15. | 3500-TS-55 |
| 2/27/2015 | Multiple emails from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-56-59 |
| 3/4/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-60 |
| 3/11/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. Lambus appeared to be at "Watson Pl." | 3500-TS-61 |
| 3/17/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): explaining that "Liverpool" is a known "Bloods" location. Lambus is in Valley Stream multiple times a day. Includes Veritracks links. | 3500-TS-62 |

| 3/19/2015 | Wiretap Affidavit (federal HSI): Includes location data acquired via GPS ankle tracker. Data was used to identify stash houses. | 3500-CP-24 at 49 |
|---|---|---|
| 3/20/2015 | Multiple emails from Scanlon (NY BSS) to Popolow (federal HSI) and other federal agents: Andre Mitchell is original PCG/POG member. Includes Veritracks links. | 3500-TS-63-65 |
| 3/22/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-66 |
| 3/23/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. Lambus was at "Fuller's again." | 3500-TS-67 |
| 3/25/2015 | Multiple emails from Scanlon (NY BSS) to Popolow (federal HSI), Ferentini (federal DEA), Strauss (federal FBI), Russell (federal DEA): includes GPS information from 3/25/15 which was previously requested. A map, a chart containing latitude/longitude and Veritracks links are attached. Other emails include Veritracks links from 3/20-3/25. Strauss (federal FBI) and Scanlon (NY BSS) corresponded by email throughout the day. | 3500-TS-68-72 |
| 3/27/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): Scanlon (NY BSS) responding to Popolow (federal HSI)'s request of Veritracks information for specific times. Includes Veritracks links. | 3500-TS-73 |
| 3/29/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks information from 9:00AM-12:30PM. | 3500-TS-74 |
| 3/29/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-75 |
| 4/4/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI), Strauss (federal FBI), Russell (federal DEA) , Ferentini (federal DEA): includes Veritracks links for the week. | 3500-TS-76 |
| 4/7/2015 | Email from Strauss (federal FBI) to Scanlon (NY BSS): requesting Veritracks for the past week. Scanlon (NY BSS) responds expecting to send the information tomorrow in the specified format. | 3500-TS-77-78 |
| 4/9/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-79 |
| 4/10/2015 | ICE Report of Investigation (federal): GPS location data was used to locate Lambus to further the investigation. States that Lambus had a "court ordered GPS on his ankle." | GOMR Exh. W |
| 4/12/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-80 |
| 4/13/2015 | ICE Report of Investigation (federal): GPS location data was used to locate Lambus to further the investigation. States that "LAMBUS was wearing a court ordered GPS on his ankle." | GOMR Exh. V |
| 4/13/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI), Strauss (federal FBI), Russell (federal DEA) : discusses Lambus's route from Fuller's to "106Rd and 106Ave." then to his residence. Includes Veritracks links in a way formatted to Strauss' (federal FBI) requests. Email includes data in a chart with latitude/longitude locations by the minute. | 3500-TS-81 |
| 4/14/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links | 3500-TS-82 |
| 4/23/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links | 3500-TS-83 |

| | | |
|---|---|---|
| 4/24/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links | 3500-TS-84 |
| 4/28/2015 | Wiretap Affidavit (federal HSI): Includes location data acquired via GPS ankle tracker. Data was used to identify stash houses. Information from cellular telephone number: 347-870-8153, was compared to location data obtained from GPS fitted to Lambus's ankle. Law enforcement agents determined the data from the cellular phone and Lambus's GPS matched. | 3500-CP-25 at 64-68; Apr. 11, 2017 Hr'g Tr. at 213:23-214:11 |
| 4/29/2015 | Lambus's GPS was malfunctioning. Multiple emails sent. Email from Scanlon (NY BSS) to Popolow (federal HSI): GPS malfunctioned briefly but is now working. Includes Veritracks links. Sends similar email to Lalchan (NYPD Queens Gang), Russell (federal DEA). Popolow (federal HSI) requested the Veritracks from April 4. | 3500-TS-85-88 |
| 5/1/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-90 |
| 5/1/2015 | Email from Popolow (federal HSI) to Scanlon (NY BSS) : requesting Veritracks from yesterday and today. | 3500-TS-91-92 |
| 5/3/2015 | Email from Popolow (federal HSI) to Scanlon (NY BSS): requesting Veritracks from April 14, 2015. Scanlon (NY BSS) responds with Veritracks links. | 3500-TS-93-94 |
| 5/4/2015 | Two emails from Scanlon (NY BSS) to Popolow (federal HSI): both include Veritracks links. | 3500-TS-95-96 |
| 5/9/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI), Ferentini (federal DEA), Strauss (federal FBI): based on information from cellular call from "k," compared with GPS data, Lambus is in Valley Stream. Information from wiretap also showed that Lambus tried to purchase a weapon ("a 44 or an Uzi") but did not trust the seller, "so @ this point he is considering it." | 3500-TS-97 |
| 5/12/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links from 5/10/15. | 3500-TS-98-99 |
| 5/13/2015 | ICE Report of Investigation (federal):  GPS location data was used and cross-referenced with cell site data, each pinging in separate locations. | GOMR Exh. E |
| 5/13/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-100-101 |
| 5/15/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links from 5/14-5/15/15 | 3500-TS-102 |
| 5/17/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links from "5/2" | 3500-TS-103 |
| 5/17/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links of the current day's activities. | 3500-TS-104 |
| 5/18/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links from 5/1/15 | 3500-TS-105 |
| 5/19/2015 | ICE Report of Investigation (federal):  GPS location data was used to locate Lambus to further the investigation. | GOMR Exh. X |
| 6/3/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-106 |

| | | |
|---|---|---|
| 6/3/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): discussing when Lambus removed and tampered with his GPS on 5/3/15. | 3500-TS-109 |
| 6/8/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-110 |
| 6/8/2015 | Email from Popolow (federal HSI) to Scanlon (NY BSS): requesting Veritracks for 5/8-5/9/15. | 3500-TS-111 |
| 6/9/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links for 5/12-5/16/15 as requested by Popolow (federal HSI). | 3500-TS-112-116 |
| 6/11/2015 | Wiretap Affidavit (federal HSI): Includes location data acquired via GPS ankle tracker. Data was used to identify stash houses. Discloses that law enforcement obtained judicial authorization to obtain and use location data generated by Lambus's cell phone, but then chose not to analyze this data because they already had access to the location data generated by the tracking device attached to Lambus's ankle | June 11, 2015 Wiretap Aff., attached as Exh. I to the Gov't Mem. in Opp. to Def.'s Motion to Suppress, ECF No. 286-3; Apr. 11, 2017 Hr'g Tr. at 213:24-214:14 |
| 6/12/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI), Cabrera, Lewis, Hayward, Strauss (federal FBI): GPS location updates (i.e. Lambus is at his residence as of 1127hrs). | 3500-TS-117-118 |
| 6/12/2015 | Email from Scanlon (NY BSS) to Ferentini (federal DEA): assisting surveillance effort of Fuller's residence by sending Veritracks information to determine if Lambus was present. | 3500-TS-119 |
| 6/13/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-120 |
| 6/15/2015 | ICE Report of Investigation (federal): Mentions GPS placement, but no data used in report. Report only includes information pertaining to physical surveillance. | GOMR Exh. F |
| 6/23/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-121 |
| 6/29/2015 | Inv. Case Rec. (state): recalls different investigative efforts since 2/14/15-6/28/15. GPS surveillance conducted on 5/4/15. Multiagency surveillance conducted repeatedly throughout timeframe. | Gov't Exh. 2 at 4 |
| 6/29/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links. | 3500-TS-122 |
| 6/29/2015 | DEA Report of Investigation (federal): "AGENTS NOTE: A court authorized GPS tracking device attached to Kamel LAMBUS indicating he (LAMBUS) departed the location at approximately this time." | 3500-GR-15 at ¶ 3; *see also* Apr. 11, 2017 Hr'g Tr. at 181:3-6 |
| 6/30/2015 | Email from Scanlon (NY BSS) to Popolow (federal HSI): includes Veritracks links from "6/29" and "6/13". | 3500-TS-123-124 |

| Date | Description | Reference |
|------|-------------|-----------|
| 7/1/2015 | NYS Corrections and Community Supervision Exec. Memo. from James Shapiro (NY BSS) to Thomas Herzog (NY DOCCS): Memo contains the following sections: Presenting Issue, Findings, Recommendations, Plan. FBI/DEA/ATF/IRS/Nassau County Police (state and federal) have been involved in the investigation of Lambus. Actions have been taken by law enforcement agencies to develop evidence against defendants. Requested that U.S. attorney's office keep matter confidential until the anticipated arrest date (7/8/15). | Gov't Exh. 8; 3500-TS-9 |
| 7/2/2015 | Location data from GPS used in Strauss (federal DEA) Affidavit in Support of Application For Search Warrant. Mentions that investigating agents have examined location data on numerous occasions. | GOMR Exh. Y at ¶ 18 |
| 7/8/2015 | Lambus is arrested by federal authorities. | Gov't Exh. 10 at 1; Mar. 17, 2017 Hr'g Tr. at 154 |
| 7/9/2015 | NYS Corrections and Community Supervision Exec. Memo. from James Shapiro (NY BSS) to Steven Claudio (Assistant Commissioner): on 7/1/15 the Bureau was notified by federal authorities of Lambus's anticipated arrest. Department of Homeland Security was the lead agency in the investigation with NYPD, FBI, DEA, ATF, & IRS (state and federal) of 14 defendants. Feds authorized arrest and search warrants 7/8/15. Lambus and Trappier have been remanded. | 3500-MP-10; 3500-TS-10 |
| 3/18/2016 | Email from Scanlon (NY BSS) to US Attorney's Office (federal): attaching the chronos. Scanlon (NY BSS) states date of GPS placement and that GPS was used strictly for parole purposes. | 3500-TS-11-12 |
| 10/21/2016 | Handwritten notes titled "GPS Tech Issues." For example, "12/_/13 - active to passive." No mention of federal involvement. | 3500-MP-14 |
| | Hubert Browne (NY DOCCS) Handwritten note: GPS is written/mentioned, but unable to determine the content of the note. | 3500-HB-25 |